**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITIBANK, N.A.,<br><br>      Plaintiff,<br><br>            v.<br><br>ARALPA HOLDINGS LIMITED PARTNERSHIP AND RODRIGO LEBOIS MATEOS<br><br>      Defendants. | Case No.: _____<br><br>**COMPLAINT** |

Citibank, N.A. ("Citibank" or "Lender") by and through its attorneys, Goodwin Procter LLP, brings this action against Aralpa Holdings Limited Partnership ("Aralpa" or "Borrower") and Rodrigo Lebois Mateos ("Lebois" or "Guarantor") (collectively, the "Defendants") and alleges as follows:

### THE NATURE OF THIS CASE

1.      This action is brought by Citibank, as Lender, against Defendant Aralpa, as Borrower for Aralpa's default on a loan in the amount of $35 million under a Fourth Amended and Restated Multi-Draw Term Note, which was originally signed on June 16, 2017 and amended and restated on September 30, 2019, April 12, 2021 and November 30, 2021 (the "Note").[1]

2.      Citibank also seeks judgment against Defendant Lebois under an unconditional Guaranty Agreement, which was originally signed on June 16, 2017, amended and restated on September 30, 2019, and amended and reaffirmed on April 12, 2021 and November 30, 2021 (the "Guaranty"), by which Lebois absolutely and unconditionally guaranteed payment of all of Aralpa's obligations under the Note.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Note.

3.      Both Defendants are in default—Aralpa under the Note and Lebois under the Guaranty, as further detailed below.  As a result of the numerous defaults ("Events of Default")—which continue to this day—Citibank accelerated the Note and declared all Obligations under the Note and Guaranty to be due and payable on August 10, 2022.  Since that time, several additional Events of Default occurred and, despite Citibank's identification of additional Events of Default to Aralpa and Lebois and further demand for payment on August 29, 2022, Aralpa and Lebois have defaulted on their obligations under the Note and Guaranty.

4.      Accordingly, Citibank seeks a judgment against each Defendant for $35 million plus all interest, costs, expenses and attorneys' fees owing under the Note and Guaranty which as of the date of this filing are $35,474,723.74 (exclusive of costs, expenses and attorneys' fees) and accruing interest daily.

## THE PARTIES

5.      Citibank is a national banking association with its main office, as listed in its federal charter, in Sioux Falls, South Dakota.

6.      Aralpa is a Canadian (New Brunswick) limited partnership, with its principal place of business at 1 Germain St., Suite 1500, Saint John, New Brunswick E2L4V1.  The sole limited partner of Aralpa is Lebois, an individual domiciled in Mexico.  The general partner of Aralpa is Yucon Mining LLC, which is a Delaware limited liability company whose only member is Lebois.  Aralpa was formed to borrow funds for Lebois' personal business ventures.

7.      Lebois is a Mexican citizen who resides and is domiciled in Mexico City, Mexico.

## JURISDICTION AND VENUE

8.      The Court's subject matter jurisdiction over all claims asserted herein is proper under 28 U.S.C. §§ 1332(a) and 1348 because this is a civil action in which the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states or citizens and/or subjects of a foreign state.

9.      The Court's subject matter jurisdiction over all claims asserted herein also is proper under 28 U.S.C. § 1331 and 12 U.S.C. § 632, as the case is civil in nature, Citibank is a national bank chartered under federal law, and the claims involve international banking transactions.

10.      The Court has personal jurisdiction over Defendants because each has consented to jurisdiction in the United States District Court for the Southern District of New York, pursuant to the governing Note and Guaranty.

11.      The Court has personal jurisdiction over the Defendants pursuant to C.P.L.R. § 301(a)(1)-(3) because Defendants have transacted business within New York.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because the parties consented to venue in this District in the governing Note and Guaranty.

## THE UNDERLYING FACTS

**A.      The Establishment of Borrower's $35 Million Credit Facility**

13.      On November 30, 2021, Aralpa and Citibank executed the Note, pursuant to which Aralpa promised to pay Citibank the principal sum of $35,000,000 maturing on September 30, 2023 and to pay all other amounts due and owing under the Note.  A true and correct copy of the Note is attached hereto as Exhibit 1.[2]

---

[2]  The original note between Citibank and Aralpa was dated June 16, 2017 in the amount of $20,000,000 maturing on June 16, 2018.  That note was amended and restated on July 27, 2018 to increase the credit limit to $50,000,000 and extend maturity to July 26, 2019.  A second amendment and restatement of the note on September 30, 2019 maintained the $50,000,000 credit limit and extended maturity to September 30, 2021.  A third amendment and restatement of the Note on April 12, 2021 reduced the credit limit to $40,000,000 and maintained maturity at September 30, 2021.  The final November 30, 2021 fourth and operative iteration of the Note described above, reduced the credit limit to $35,000,000 and extended maturity to September 30, 2023.

14. Aralpa is wholly-owned by Lebois.  Lebois is a high-net-worth individual who is the chairman, founder, president, and majority shareholder of Unifin Financiera, SAB de CV SOFOM ENR ("Unifin").  Unifin is the largest independent operating and leasing company in Latin America and trades publicly on the Bolsa Mexicana de Valores.

15. The collateral pledged as security for the Note (the "Collateral) was comprised of Lebois's personal holdings of his majority stake (approximately 53%) in Unifin.  Lebois pledged the Unifin shares through Promexcap Spain, S.L. ("Promexcap"), a Spanish holding company wholly-owned by Lebois.

16. As described in more detail below, the Note required Aralpa (as Borrower) and Lebois (as Guarantor) to comply with a number of covenants to ensure the debt was at all times secure and adequately collateralized.

17. Based on a number of defaults (described in more detail below), on August 10, 2022 (the "Notice of Default and Acceleration") and August 29, 2022 (the "Subsequent Demand for Payment") Citibank declared multiple Events of Default under the Note and Guaranty and accelerated Borrower's and Guarantor's obligations to pay the outstanding balance plus interest.

18. Despite Citibank's due demand for payment, the Borrower and Guarantor have defaulted and Citibank seeks recovery of all Obligations due under the Note and Guaranty (including accrued interest and its attorney's fees) as set forth herein.

**B.     Aralpa's Defaults Under the Note**

      **a.     Aralpa's Covenant Breaches Constitute Events of Default Pursuant to Section 12(a)(ii) of the Note**

19. Pursuant to Section 12(a)(ii) of the Note, an Event of Default occurs if "[a]ny Obligor fails to . . . (ii) observe or comply with any of the covenants, terms or conditions of this Note or any other Credit Document."  Aralpa breached multiple covenants under the Note, each

of which is an Event of Default, as described in further detail below.[3]

### i. The Obligors' Collateral Coverage Deficiency Constitutes an Event of Default Pursuant to Section 12(a)(ii) of the Note

20.     Pursuant to the Note and the parties' agreement, Aralpa shall "[n]ot, and shall cause each other Obligor to not, permit the Collateral Value at any time to be less than the Coverage Level" (a "Coverage Deficiency").  Note § 11(i).

21.     As defined in the Note, the "Coverage Level" means a Collateral Value of "at least 1.40."  Note § 2 at 3.  "Collateral Value" is calculated by dividing the Unifin shares market value by the aggregate exposure less the individual loanable value of the securities assets other than Unifin shares.  In the event that the Obligors fail to maintain the 1.40 Coverage Level, the Note stipulates that the Obligors "[w]ithin five (5) Business Days of the occurrence of a Coverage Deficiency, (i) shall, and shall cause each other Obligor to, provide Lender sufficient additional Securities Assets and/or (ii) in its capacity as Borrower, make a partial prepayment . . . in order for the Collateral Value to be equal to or greater than the Coverage Level."  Note § 11 (j).

22.     On May 11, 2022, Aralpa acknowledged that an "Event of Default has occurred" under the Coverage Deficiency provisions (as well as the Unencumbered Liquid Assets provisions), and Citibank and Aralpa executed a limited waiver of that default until July 31, 2022 ("May 11 Limited Waiver") to enable Aralpa time to remedy the Coverage Deficiency as well as other Unencumbered Liquid Assets defaults described further below.  In order to induce Citibank to agree to the May 11 Limited Waiver, Borrower represented that Unifin was performing well and that positive news related to Unifin was anticipated in the near future.  Upon information and belief, none of these representations were true.

23.     Similarly, on August 2, 2022, Aralpa again acknowledged that an "Event of Default

---

[3] The Note defines "Obligor" to include Aralpa, Lebois and Promexcap.  *See* Note § 2, pages 1, 4-6.

has occurred" under the Coverage Deficiency provisions, and Citibank and Aralpa executed a second limited waiver of the Coverage Deficiency default until October 15, 2022 ("August 2 Limited Waiver") to enable Aralpa time to remedy the Coverage Deficiency default.  In order to induce Citibank to agree to the August 2 Limited Waiver, Borrower represented that upcoming projects for Unifin were expected to have a positive impact on the company.  Upon information and belief, none of these representations were true.

24.     The August 2 Limited Waiver expired on October 15, 2022.

25.     As of this date, the Coverage Deficiency default continues and the August 2 Limited Waiver period has expired.   Citibank calculates that the market value of the 48,530,000 shares of Unifin stock held as collateral for the loan to be $4,125,050 (based on the Unifin stock closing price of MXN 1.71 per share on October 14, 2022).  Citibank thus calculates the Coverage Level as of this date to be 0.12, which is well below the 1.40 threshold required by the Note.

26.     Aralpa is thus in default of the Coverage Deficiency Covenant and an Event of Default has occurred pursuant to Sections 12(a)(ii) and Sections 11(i) and (j) of the Note, and is continuing under the Note.

### ii.   The Substantial Decline in Aralpa's and Lebois' Aggregated Unencumbered Liquid Assets Constituted an Event of Default Under Section 12(a)(ii) of the Note

27.     Aralpa is required to comply with the Unencumbered Liquid Assets covenant under the Note.  *See* Note § 11(p).  Specifically, the Note provides that Aralpa must:

> [m]aintain at all times, together with Guarantor, on an aggregate basis, Unencumbered Liquid Assets having an aggregate market value of not less than 40% of all indebtedness of Borrower and Guarantor under this Note and the other Credit Documents, less the Individual Loanable Value of the Securities Assets (other than Unifin Shares) constituting Collateral plus all indebtedness under loans not collateralized by (i) marketable securities or (ii) residential mortgages[.]

Note § 11(p) (the "Unencumbered Liquidity Covenant").

28.     The Note defines "Unencumbered Liquid Assets" as follows:

"Unencumbered Liquid Assets" means with respect to any Person, the following assets: (i) cash; and (ii) marketable securities, which (a) are held solely in the name of the Person (with no other Person having ownership rights therein), (b) can be converted to cash within five Business Days, (c) are otherwise acceptable to Lender in its sole and absolute discretion, and (d) do not constitute collateral and are not to be counted or included to satisfy any other liquidity requirement under any other obligation, whether with Lender or any other lender, including, without limitation, for margin loans, guarantees or any other contingent liabilities, unless otherwise agreed by Lender in its sole and absolute discretion.

Note § 2, page 7.

29.     On or about July 28, 2022, Aralpa delivered its account statements and Lebois' unsigned Personal Financial Statement as of June 30, 2022.  On or about August 8, 2022, Aralpa delivered its compliance certificate as of June 30, 2022.  In both the compliance certificate and the unsigned Personal Financial Statement, Aralpa represented that the combined cash held by Aralpa and Lebois was $14,835,000, and thus, the Unencumbered Liquid Assets of Aralpa and Lebois had an aggregate market value of 42%.

30.     Citibank's May 11, 2022 Limited Waiver of the Unencumbered Liquid Assets provisions expired on July 31, 2022 and was not extended.

31.     Upon information and belief, Aralpa and Lebois misstated the cash value in both the compliance certificate and the unsigned Personal Financial Statement because the summary of bank accounts provided by Aralpa identified Aralpa Inversiones SL as the holder of over $14 million, not Aralpa Holdings or Lebois.  Aralpa Inversiones SL is not an eligible entity under the Note for assessing unencumbered liquidity for Aralpa or Lebois.

32.     Additionally, upon information and belief, based on Citibank's discussions with Lebois, approximately 66% of the $14 million identified in the bank accounts is being held in connection with a Spanish bank loan.  Thus, contrary to their attestations in Aralpa's compliance

7

certificate and Lebois' unsigned Personal Financial Statement, Aralpa and Lebois do not have $14 million in available cash for purposes of assessing their Unencumbered Liquid Assets.

33.     On July 20, 2022 and August 5, 2022, Citibank requested that Lebois provide a signed Personal Financial Statement to confirm his available cash for purposes of evaluating his compliance with the Unencumbered Liquidity Covenant.  To date, Lebois has failed to provide a signed Personal Financial Statement in violation of Sections 11(p), (t), and (u) of the Note.

34.     Upon information and belief, Aralpa and Lebois possess significantly less than $14 million in available cash, and thus, their aggregate Unencumbered Liquid Assets is below the 40% threshold required under Section 11(p) of the Note.

35.     Aralpa is thus in default of the Unencumbered Liquidity Covenant and an Event of Default has occurred pursuant to Sections 12(a)(ii) and 11(p) of the Note, and is continuing under the Note.

### iii.   The Decline in Lebois's Personal Net Worth Constitutes an Event of Default by Aralpa Pursuant to Section 12(a)(ii) of the Note

36.     Under the Note, Aralpa agreed to "[c]ause Guarantor to maintain at all times a Net Worth of not less than $400,000,000" (the "Net Worth Covenant").  Note § 11(o).

37.     As stated above, on or around July 20, 2022, Citibank requested that Lebois provide his signed Personal Financial Statement to verify that he was in compliance with the Net Worth Covenant, among other covenants, pursuant to covenant sections 11(o) and (u) of the Note.

38.     On or about July 28, 2022, Lebois delivered the unsigned Personal Financial Statement, which is out of compliance with the covenants in the Note (which require delivery of a Personal Financial Statement that is signed in accordance with the form set forth in Exhibit A to the Guaranty).  *See* Note §§ 11(r), (u), pg. 5 (defining "Personal Financial Statement").

39.     Based on Lebois' representation in his unsigned Personal Financial Statement,

Lebois' net worth was approximately $589 million, approximately $223 million of which was attributable to Lebois' personal holdings in Unifin shares.  As of June 30, 2022, the Unifin shares were worth MXN 17.40 per share.  On August 5, 2022, Citibank again requested that Lebois provide a compliant Personal Financial Statement.  Lebois has failed to comply with Citibank's further request for a compliant Personal Financial Statement certifying that he is compliant with the Net Worth Covenant.

40.     At the time that Citibank sent Defendants the Notice of Default and Acceleration on August 10, 2022, the value of the Unifin shares had declined to MXN 1.00 per share (an approximate 94% decline in value).  Upon information and belief, the value of the Unifin shares that Lebois owned as of August 10, 2022 declined significantly from approximately $223 million to approximately $13 million (a decline of approximately $210 million) which renders Lebois's personal net worth out of compliance with the Net Worth Covenant.

41.     Upon information and belief, and without receipt of Lebois' signed Personal Financial Statement (due to Lebois' further reporting defaults as set forth above), the decline in the value of Unifin caused Lebois' personal net worth to decline, by millions of dollars, below the $400 million threshold required under the Note.  Due to Lebois' decline in net worth, Aralpa is in default of the Net Worth Covenant in the Note.  Accordingly, an Event of Default has occurred under Sections 12(a)(ii) and 11(o) and (u) of the Note.

### iv.   Aralpa's Failure to Furnish Bank and Brokerage Statements Constitutes an Event of Default Pursuant to Section 12(a)(ii) of the Note

42.     Aralpa is required to furnish bank and brokerage statements upon request under the Note.  The Note provides that Aralpa must:

> Furnish to Lender 60 days after the end of each calendar period ending on each June 30 and December 31, commencing with the calendar period ending December 31, 2021, upon the request of Lender, bank and/or brokerage statements of

Borrower and/or Guarantor, in respect of assets not held at Lender, in each case in form and substance satisfactory to Lender in its sole and absolute discretion.

Note § 11(t).

43.    On or about July 20, 2022, consistent with its right to request bank and brokerage statements under Note § 11(t), Citibank requested that Aralpa and Lebois furnish a statement of bank accounts.  To date, Aralpa has failed to furnish a statement of bank and/or brokerage accounts in the name of Aralpa or Lebois (as opposed to Aralpa Inversiones SL), and thus has failed to furnish bank or brokerage statements in form or substance that are satisfactory to Citibank.  More than 60 days have elapsed since Citibank made its request.  Accordingly, an Event of Default has occurred, and is continuing, under Sections 11(t) and 12(a)(ii) of the Note.

**b.    Promexcap's Pre-Insolvency Notification in Spain Constitutes an Event of Default Pursuant to Section 12(d) of the Note**

44.    Pursuant to Section 12(d) of the Note, an Event of Default occurs upon "[t]he filing of any petition by or against an Obligor or Material Person, or the commencement of any proceedings instituted by or against such Obligor or Material Person seeking to adjudicate it bankrupt or insolvent (or files a notice of intention to do so), or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any federal, state or foreign law now or hereinafter in effect, including without limitation, . . . the Spanish Insolvency Act . . ." or its current equivalent.  Note § 12(d), clause (A).

45.    The Note defines Obligor to include Promexcap.  *See* Note § 2, pages 1, 4-6.

46.    On or about September 8, 2022, Promexcap filed a notification of opening of negotiations with creditors before a Spanish court ("September 8 Pre-Insolvency Notification"), which states that Promexcap is "in a situation of insolvency and that [it has] started negotiations to reach an agreement to obtain adhesions for an early proposal of agreement and refinancing."

47.     The September 8 Pre-Insolvency Notification is a petition or proceeding initiated by an Obligor seeking to adjudicate it insolvent or a notice of intention to do so.

48.     Accordingly, an Event of Default has occurred and is continuing under the Note. *See* Note § 12(d).

### c.   The S&P Downgrade Reports Concerning Unifin Constitute Events of Default Pursuant to Section 12(l) of the Note

49.     Pursuant to Section 12(l) of the Note, an Event of Default occurs if "[t]he long term foreign issuer (or equivalent) rating of the Unifin Shares shall be less than Ba3/BB-, as published by Moody's Investor Services, Inc. and Standard & Poors Ratings Group, respectively." *See* Note § 12(l), clause (A).

50.     In March 2022, S&P Global Ratings issued a downgrade report (the "March 2022 Downgrade Report") of Unifin, pursuant to which S&P Global Ratings downgraded Unifin to B+ from BB-.  Because the credit rating for Unifin set forth in the March 2022 Downgrade Report is less than BB-, an Event of Default has occurred, and is continuing, under the Note.

51.     On April 13, 2022, Citibank sent Aralpa, Lebois and Promexcap a Notice of Event of Default and Reservation of Rights (the "April 13, 2022 Default Notice") (appended hereto as Exhibit 3) notifying the Obligors that "an event of default has occurred and is continuing" under Section 12(l) of the Note as a result of the March 2022 Downgrade Report.

52.     In the April 13, 2022 Default Notice, Citibank notified the Obligors that it was expressly reserving its rights to declare an Event of Default under the Note and to exercise remedies pursuant to Section 13 of the Note, including to declare all amounts due under the Note to become immediately due and payable.  *See* Default Notice, page 2.

53.     On August 9, 2022, S&P Global Ratings issued another downgrade report (the "August 2022 Downgrade Report") of Unifin, pursuant to which S&P Global Ratings downgraded

its issuer credit rating for Unifin to D from B+.  Because the credit rating for Unifin set forth in

the August 2022 Downgrade Report is less than BB-, an Event of Default has occurred, and is

continuing, under the Note.[4]

### d.  The More Than 90% Decline in Unifin Share Price Constitutes an Event of Default Pursuant to Section 12(f) of the Note

54.     Pursuant to Section 12(f) of the Note, an Event of Default occurs if Citibank

"considers any Obligations insecure or any guaranty, Collateral or security for Obligations unsafe,

insecure, inadequate, impaired or insufficient."  Note § 12(f), clause (v).

55.     On August 25, 2022, Unifin filed with the Mexican Stock Exchange a press release

(the "August 25 Announcement") pursuant to which Unifin announced that its Board of Directors

had approved the creation of a Strategic Restructuring Committee to carry out Unifin's

restructuring efforts.

56.     Citibank considers the guaranty, Collateral and/or security for the Obligations to be

insecure, inadequate, impaired and/or insufficient because the Unifin share price has declined in

market value by more than 90%.  Citibank's doubt in the Obligors' ability to pay is further

supported by Aralpa's and Lebois' failure to pay the Obligations under the Note and Guaranty

after Citibank's acceleration of the loan and due demand for payment.

57.     Given the foregoing, an Event of Default has occurred under Section 12(f) of the

Note.

### e.  The Substantial Decline in Unifin Shares is a Material Adverse Effect Event of Default Pursuant to Section 12(j) of the Note

58.     Pursuant to Section 12(j) of the Note, it is an Event of Default if "[a]n event shall

---

[4]  Although Section 12(l)(A) states the ratings as published by Moody's and S&P, respectively, Moody's does not cover Unifin, and thus is not relevant for purposes of determining an event of Default.  It is noteworthy that, on August 18, 2022, Fitch Ratings also announced a downgrade of its ratings for Unifin to a "Restricted Default" rating.

have occurred which, in [Citibank's] reasonable opinion, would have a Material Adverse Effect."

Note § 12(j).  The Note defines "Material Adverse Effect" as follows:

> "Material Adverse Effect" means **a material adverse effect on**: (a) the operations, business, assets, nature of assets, properties, condition (financial or otherwise), liabilities or prospects of Borrower or any other Obligor (as applicable), **(b) the ability of Borrower or any of the other Obligors to perform any of their respective obligations under this Note or any of the other Credit Documents,** (c) the legality, validity or enforceability of this Note or any of the other Credit Documents, (d) the rights and remedies of Lender under this Note or any of the other Credit Documents, (e) the creation, perfection or priority of Lender's lien on or security interest in the Collateral, if any, securing the payment of any of the Obligations or **(f) the value of the Collateral**.

Note § 2, page 4 (emphasis added).

59.     The value of the Collateral is exclusively derived from the Unifin shares market value, as the only Collateral securing the Note and the other Credit Documents is the pledged Unifin shares.

60.     Public announcement of Unifin's downgrade by the ratings agencies and restructuring of its debts, as well as the more than 90% decline in the value of its shares, have and will continue to have, a material adverse effect on the Obligors' ability to perform their Obligations under the Note, on the value of the Collateral and Citibank's rights and remedies under the Note and the Guaranty.

61.     Accordingly, an Event of Default has occurred, and is continuing, under the Note.

**f.     Promexcap's Pre-Insolvency Notification in Spain Constitutes an Event of Default Pursuant to Section 12(h) of the Note**

62.     Pursuant to Section 12(h) of the Note, an Event of Default occurs if, among other things, an Obligor, "voluntarily or involuntarily, participate[s] or take[s] any action to participate in any facility or exercise involving the rescheduling of such Obligor's or Material Person's debts, as the case may be . . . ."  *See* Note § 12(h), clause (ii).

63.     The Note defines Obligor to include Promexcap.  *See* Note § 2, pages 1, 4-6.

64.     The September 8 Pre-Insolvency Notification states that Promexcap is "in a situation of insolvency and that [it has] started negotiations to reach an agreement to obtain adhesions for an early proposal of agreement and refinancing."

65.     The September 8 Pre-Insolvency Notification is an action or exercise by Promexcap, an Obligor under the Note, to refinance and reschedule its debts.

66.     Accordingly, an Event of Default has occurred, and is continuing, under Section 12(h) of the Note.

### g.   Unifin's Rescheduling of Debts Constitutes an Event of Default Pursuant to Section 12(h) of the Note

67.     Pursuant to Section 12(h) of the Note, an Event of Default occurs if, among other things, a Material Person, "voluntarily or involuntarily, participate[s] or take[s] any action to participate in any facility or exercise involving the rescheduling of such Obligor's or Material Person's debts, as the case may be . . . ."  *See* Note § 12(h), clause (ii).

68.     The Note defines "Material Person" as follows:

"Material Person" means, collectively, ***any Obligor or each Obligor's*** beneficial owners, settlors, trustees, members, managers, partners, participants or other ***Affiliates*** (as applicable).

Note § 2, page 4 (emphasis added).

69. The Note defines "Affiliate" as follows:

"Affiliate" means, as to any Person, ***any other Person that directly, or indirectly*** through one or more intermediaries, controls, ***is controlled by, or is under common control with, such Person.*** If such first Person is an individual, "Affiliate" shall include any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is or limited partnership whose general partner is such individual or one or more members of such immediate family and any Person who is controlled by any such member or trust.

Note § 2, page 1 (emphasis added); *see also* Note § 2, page 5 (definition of "Person").

70.     Unifin is an "Affiliate" of Lebois because it is, directly or indirectly, controlled by Lebois.  Indeed, in filings with the Mexican regulator, Unifin stated that Lebois "controls Unifin." Unifin is also an "Affiliate" of Aralpa, an entity under Lebois' common control.[5]

71.     In light of the Unifin Announcements regarding its financial restructuring and the steep decline in the price of the Unifin shares as set forth in Paragraphs 55, 56, 77 and 78, Unifin is voluntarily participating in, taking an action to participate in a facility, and/or taking an action to participate in an exercise involving the rescheduling of Unifin's debts.  Accordingly, an Event of Default has occurred, and is continuing, under Section 12(h) of the Note.

### h.   The Unifin Announcements Constitute an Event of Default Pursuant to Section 12(d) of the Note

72.     Section 12(d) of the Note provides that an Event of Default occurs upon either of the following: "[t]he general nonpayment by an Obligor or Material Person of its respective debts as such debts become due," or "the admission in writing by [an] Obligor or Material Person of its inability to pay its respective debts generally."  *See* Note § 12(d).

### i.   *General Non-Payment by Material Person (Unifin) of Debts That Become Due:*

73.     On August 12, 2022, Unifin missed an interest payment on the 00122 CEBURES bonds of Unifin that are traded on the Mexican Stock Exchange.  On August 25, 2022, Unifin missed an interest payment on the 00422 CEBURES bonds of Unifin that are traded on the Mexican Stock Exchange.

74.     Moreover, On August 18, 2022, Fitch Ratings announced a downgrade of its ratings for Unifin to a "Restricted Default" rating, which rating indicated that Unifin had experienced an

---

[5] For the avoidance of doubt, Unifin is not an Obligor under the Note or other Credit Documents.  *See* Note § 2 at 1, 4-6.

uncured payment default (the "Fitch August 18 Downgrade Report").

75.     Unifin announced that, starting on August 8, 2022, it will not be honoring its debts as they come due and does not expect to repay its debts until it reaches a debt restructuring agreement (the "August 8, 2022 Announcement", and collectively with Unifin's August 25 Announcement, the "Unifin Announcements").

76.     Because Unifin is generally not paying its debts as they become due, an Event of Default has occurred under Section 12(d) of the Note.

### ii.     *Admission in Writing by Material Person (Unifin) of Inability to Pay Debts Generally*

77.     In the August 8, 2022 Announcement, Unifin stated that it has begun a voluntary restructuring of its debts and that it is ceasing to make principal and interest payments on its outstanding debts.  The August 8 Announcement resulted in an approximate 92% decline in Unifin's share price and, accordingly, an approximate 92% decline in the value of the Unifin shares Borrower pledged as Collateral for the Note.

78.     In the August 8 Announcement, Unifin unequivocally stated that it will cease making interest and principal payments on its debts.  The August 8 Announcement further stated that Unifin had limited access to funding sources, which affected its capital structure and liquidity. Because the August 8 Announcement constitutes an admission in writing by Unifin (a Material Person as defined under the Note) of its inability to pay its debts as they become due, an Event of Default under Section 12(d) of the Note has occurred.

### i.     **Aralpa's Failure to Provide Notices of Default Breaches Section 12(a)(i) of The Note**

79.     Aralpa's failure to provide Citibank with a statement of Event of Default within five days after the occurrence of each Default, as set forth above in Paragraphs 19 through 78, is a

further default under Sections 11(f) and 12(a)(ii) of the Note.

80.     Section 11(f) of the Note states that Borrower shall "[d]eliver to Lender a statement, as soon as possible and in any event within five days after the occurrence of each Default continuing on the date of such statement, setting forth the details of such Default and the action that Borrower has taken and proposes to take with respect thereto."

81.     Aralpa failed to provide any statement of default compliant with Section 11(f) of the Note, which is in and of itself an Event of Default.  *See* Note §§ 11(f), 12(a)(ii).

**j.   The Acceleration of The Note and Subsequent Breaches**

82.     As described in further detail above, Aralpa has numerous defaults under the Note.

83.     On August 10, 2022, Citibank sent the Obligors the Default and Acceleration Notice (appended hereto as Exhibit 4), pursuant to which Citibank notified the Obligors of Events of Default under Sections 12(c) (failure to pay debts), 12(d) (non-payments generally), 12(f) (insecure Obligations, guaranty or Collateral), 12(h) (rescheduling of debts), 12(j) (Material Adverse Effect) and/or 12(l)(A) (Unifin shares ratings downgrade) and (D) (Unifin reorganization) of the Note, and thus declared all Obligations to be immediately due and payable.  As of August 10, 2022, the outstanding balance of the Obligations was $35,165,465.80.[6]

84.     On August 29, 2022, Citibank sent the Obligors an additional Subsequent Payment Demand (appended hereto as Exhibit 5), pursuant to which Citibank notified the Obligors of additional Events of Default under Sections 12(a)(i) (failure to pay Obligations under the Note) and 12(a)(ii) (covenant breaches relating to non-compliance with Unencumbered Liquidity Covenant and furnishing Personal Financial Statements and compliance certificates under sections 11(p), (t) and (u)) of the Note—necessary to confirm and assess Aralpa's and Lebois's compliance

---

[6]  The "Obligors" are Aralpa, Lebois and Promexcap.  *See* Note 1, 4-6.

with myriad other covenants—and again declared all Obligations to be immediately due and payable.

85.     As of the filing of this Complaint, Aralpa has not paid the Obligations due under the Note.  Accordingly, an Event of Default for non-payment has occurred, and is continuing, under Section 12(a)(i) of the Note.

## C.     Lebois's Defaults Under the Guaranty

86.     Under the Guaranty, Lebois personally guaranteed the Obligations due under the Note.  True and correct copies of the Amended and Restated Guaranty Agreement and the first and second amendments thereto are attached hereto as Exhibit 2.

87.     Pursuant to the Guaranty, Lebois "absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, to Lender and its respective successors and assigns the Guaranteed Obligations."  Guaranty § 2.  Lebois also agreed "that if Borrower shall fail to pay in full when due (whether upon demand, at stated maturity, by required prepayment, by acceleration or otherwise) any of the Guaranteed Obligations, Guarantor will promptly pay the same, without any demand or notice whatsoever."  *Id.*

### a.     Lebois Has Defaulted On His Unconditional and Absolute Payment Obligations Under the Guaranty

88.     Lebois agreed to "pay to Lender on demand and in immediately available funds, all Guaranteed Obligations then due and outstanding."  Guaranty § 3.  Lebois further agreed that his "obligations under [the Guaranty] shall be irrevocable, absolute and unconditional, irrespective of, and Guarantor hereby irrevocably waives any defenses Guarantor may now have or hereafter acquire in any way relating to" an enumerated list of waivers.  Guaranty § 4.

89.     On April 13, 2022, Citibank sent Aralpa, Lebois and Promexcap the April 13, 2022 Default Notice indicating that an Event of Default had occurred under Section 12(l) of the Note as

a result of the March 2022 Downgrade Report.

90.     As set forth in Paragraphs 83 through 84, Citibank sent Aralpa, Lebois and Promexcap the Default and Acceleration Notice on August 10, 2022 and the Subsequent Payment Demand on August 29, 2022, demanding that the Obligors immediately pay in full all Obligations under the Note.

91.     Pursuant to Section 5 of the Guaranty, Lebois agreed that "[u]pon any other Obligor's failure to make payment of any of the Guaranteed Obligations when due whether upon demand, maturity, by required prepayment, acceleration or otherwise, Lender may proceed directly and at once, without further notice, against Guarantor to obtain performance of and to collect and recover the full amount, or any portion, of the Guaranteed Obligations without Lender first proceeding against any other Obligor, any other Person or any security or Collateral for all or any part thereof."  Guaranty § 5.

92.     As set forth in Paragraphs 17 through 91 above, Borrower has defaulted under the Note, and all obligations under the Note and Guaranty were accelerated.  Despite due demand for payment, Lebois has failed to make the payments owing under the Guaranty.

   **b.  Lebois' Additional Defaults Under the Guaranty**

        **i.   The Obligors' Collateral Coverage Deficiencies Constituted a
             Guarantor Default Under Sections 9(m)-(n) of the Guaranty**

93.     Pursuant to the Guaranty and the parties' agreement, Lebois shall "[n]ot, and shall cause each other Obligor to not, permit the Collateral Value to be less than the Coverage Level." Guaranty § 9(m).

94.     The Guaranty also states that "[w]ithin five (5) Business Days of the occurrence of a Coverage Deficiency," Lebois "(i) shall and shall cause each other Obligor to, provide Lender sufficient additional Securities Assets and/or (ii) cause Borrower, to make a partial prepayment

. . . in order for the Collateral Value to be to be equal to or greater than the Coverage Level."
Guaranty § 9(n).

95.     The Note defines "Coverage Level" as "the Collateral Value is at least 1.40."  Note
at 3.  As set forth in Paragraphs 20 through 26, the Coverage Level is well below the 1.40 threshold
required by the Note, and no Obligor has provided sufficient additional Securities Assets or partial
prepayment in order to remedy such Coverage Deficiency.

96.     Accordingly, an Event of Default has occurred and is continuing under the
Guaranty.  *See* Guaranty §§ 9(m)-(n).

### ii. Lebois' Failure to Provide Notice of Promexcap's Pre-Insolvency Notification in Spain Constituted a Guarantor Default Under Section 9(h) of the Guaranty

97.     Pursuant to the Guaranty, Lebois shall "[p]rovide notice to Lender promptly after
the commencement of all actions and proceedings before any court, Governmental Authority or
arbitrator affecting Guarantor, or any other Obligor or the Collateral, and of any event or omission
that has resulted, or could reasonably be expected to result, in a Material Adverse Effect."
Guaranty § 9(h).

98.     The Note defines Obligor to include Promexcap.  *See* Note § 2, pages 1, 4-6.

99.     Promexcap's September 8 Pre-Insolvency Notification (as set forth in Paragraphs
44 through 48 above) is a proceeding before a Spanish court that affects Promexcap, which is an
Obligor under the Note.

100.    Accordingly, an Event of Default has occurred and is continuing under the
Guaranty.  *See* Guaranty § 9(h).

### iii. Lebois's Failure to Furnish A Compliant Personal Financial Statement Constituted a Default Under Section 9(c) of the Guaranty

101.    Lebois is required to comply with the covenant requiring the furnishing of a

compliant semi-annual personal financial statement upon request under the Guaranty.   The Guaranty provides that Lebois must:

> Furnish to Lender from time to time, such other information, including semi-annual personal financial statements (including an income statement, a cash flow statement and a balance sheet which either contains or has a separate statement of liabilities as well as details of all contingent debt), tax returns, investment statements and other information, as Lender may reasonably request.

Guaranty § 9(c).

102.    On or about July 20, 2022, Citibank requested that Lebois furnish a Personal Financial Statement, cash flow projections and account statements as of June 30, 2022 to verify liquidity.   On August 5, 2022, Citibank again requested a signed Personal Financial Statement from Lebois.   Lebois failed to furnish a signed Personal Financial Statement and bank account statements in the name of Aralpa or Lebois that were satisfactory to Citibank.   Accordingly, Lebois breached Section 9(c) of the Guaranty.

### c.    Lebois' Failure to Provide Notices of Default Breaches Section 9(g) of the Guaranty

103.    Lebois' failure to provide Citibank with a statement of Event of Default within five days after the occurrence of each Default, as set forth above in Paragraphs 88 through 102, is a further default under Section 9(g) of the Guaranty.

104.    Section 9(g) of the Guaranty states that Borrower shall "[d]eliver to Lender a statement of, or on behalf of, Guarantor, as soon as possible and in any event within five days after the occurrence of each Default (relating to Guarantor) continuing on the date of such statement, setting forth details of such Event of Default and the action that Guarantor has taken and proposes to take with respect thereto."

105.    Lebois failed to provide any statement of default as required by Section 9(g) of the Guaranty, which is in and of itself an Event of Default.   *See* Guaranty § 9(g).

21

### FIRST CLAIM FOR RELIEF ON THE NOTE AGAINST ARALPA

106.     Citibank realleges and incorporates herein the allegations in each of the paragraphs above as if fully set forth herein.

107.     Pursuant to the Note, Borrower agreed that Citibank had the right to exercise all remedies included in Section 13 of the Note when an Event of Default is continuing, including an acceleration of all Obligations by declaring them to be immediately due and payable.

108.     Citibank noticed an event of default on April 13, 2022, Aralpa acknowledged events of default on May 11, 2022 and August 2, 2022, and Citibank issued the Default and Acceleration Notice on August 10, 2022 and the Subsequent Payment Demand on August 29, 2022.

109.     Borrower has defaulted and continues to be in default under the Note as fully set forth in paragraphs 19 through 92.

110.     Borrower is liable to Citibank under the Note for full principal in the amount of $35 million plus interest.

111.     Despite due demand for payment, Borrower has failed to make the payments due and owing under the Note.

112.     Under Section 15(a) of the Note, Citibank is entitled to all costs and expenses, including attorneys' fees, charges and disbursements.

### SECOND CLAIM FOR RELIEF ON THE GUARANTY AGAINST LEBOIS

113.     Citibank realleges and incorporates herein the allegations in each of the paragraphs above as if fully set forth herein.

114.     Pursuant to the Guaranty, Guarantor unconditionally guaranteed all Guaranteed

Obligations due under the Guaranty.

115.    Citibank noticed an event of default on April 13, 2022, Aralpa acknowledged events of default on May 11, 2022 and August 2, 2022, and Citibank issued the Default and Acceleration Notice on August 10, 2022 and the Subsequent Payment Demand on August 29, 2022.

116.    Guarantor has defaulted and continues to be in default under the Guaranty as fully set forth in paragraphs 88 through 105.

117.    Guarantor is liable for full payment on the Guaranteed Obligations in the amount of $35 million plus interest.

118.    Despite due demand for payment, Lebois has failed to make the payments due and owing under the Guaranty.

119.    Pursuant to Section 13 of the Guaranty, Citibank is entitled to all costs and expenses, including attorneys' fees, charges and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, Citibank demands judgment against the Defendants as follows:

(a)    Against Defendant Aralpa in the amount of $35 million plus interest, costs and expenses, including attorneys' fees, charges and disbursements;

(b)    Against Defendant Lebois in the amount of $35 million plus interest, costs and expenses, including attorneys' fees, charges and disbursements; and

(c)    Awarding Citibank such other relief as this Court may deem just and proper.

Dated: New York, New York
       October 17, 2022

Respectfully submitted,

**GOODWIN PROCTER LLP**

/s/  Marshall H. Fishman

Marshall H. Fishman
Samuel J. Rubin
Lindsay E. Hoyle
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
MFishman@goodwinlaw.com
SRubin@goodwinlaw.com
LHoyle@goodwinlaw.com

*Attorneys for Plaintiff Citibank, N.A.*