UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIBANK, N.A.,

                              Plaintiff,

                -against-

ARALPA HOLDINGS LTD. PARTNERSHIP
and RODRIGO LEBOIS MATEOS,

                              Defendants.

Case No. 1:22-cv-08842 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Citibank N.A. ("Plaintiff" or "Citibank") brings this action for breach of a
promissory note against Defendant Aralpa Holdings Limited Partnership ("Aralpa"), and for
breach of a personal guaranty against Defendant Rodrigo Lebois Mateos ("Lebois" and, together
with Aralpa, "Defendants").  *See* ECF No. 1 ("Compl."); *see also* ECF No. 21 ("Ans.").  Now
before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Federal
Rule of Civil Procedure ("Rule") 12(c), filed on December 27, 2022 (ECF Nos. 23 ("Br."), 28
("Reply")), which Defendants oppose (ECF Nos. 27 ("Opp."), 33 ("Sur-Reply")); and (2)
Plaintiff's proposed order to show cause without emergency relief, filed on July 17, 2023, which
seeks a prejudgment attachment of Defendants' assets, and which Defendants oppose (ECF
Nos. 36, 41, 44).  Oral argument was held on September 11, 2023.  *See* Oral Arg.  For the
reasons set forth below, Plaintiff's motion for judgment on the pleadings is GRANTED, and
Plaintiff's request for a prejudgment attachment is DENIED as moot because judgment will be
entered forthwith.

## BACKGROUND[1]

### I.      The Note and Guaranty

This dispute arises out of a loan agreement (the "Note") between Citibank and Aralpa, which was executed on November 30, 2021,[2] and pursuant to which Aralpa promised to pay Citibank the principal sum of $35,000,000, and any other amounts owed pursuant to the Note, on September 30, 2023 (the "Maturity Date").  Compl. ¶ 13; Ans. at 4; ECF No. 1-1 ("Note") § 1. Defendant Aralpa is wholly owned by Defendant Lebois, an admitted "high-net-worth individual who is the chairman, founder, president, and majority shareholder of Unifin Financiera, SAB de CV SOFOM ENR ('Unifin')."  Compl. ¶ 14; Ans. at 5.  Pursuant to the Note, Aralpa pledged as collateral Lebois's "personal holdings of his majority stake (approximately 53%) in Unifin." Compl. ¶ 15; Ans. at 5.  Those shares were pledged as collateral through Promexcap Spain, S.L. ("Promexcap"), a Spanish holding company also wholly owned by Defendant Lebois.  Compl. ¶ 15; Ans. at 5.

The Note provides a lengthy recitation of the parties' rights and obligations pursuant to the agreement.  As relevant here, however, several provisions are of import.  First, the Note provides that an "Event of Default" is "any of the events set forth in Section 12."  Note § 2. Those Events of Default include, but are not limited to, where:

- "Any Obligor fails to . . . observe or comply with any of the covenants, terms or conditions of this Note or any other Credit Document."  *Id.* § 12(a)(ii) ("**General Default Provision**").

---

[1] The following facts are taken from the pleadings, which form the basis for Plaintiff's motion for judgment on the pleadings, and are undisputed unless otherwise noted.  *See* Compl.; Ans.

[2] The Note at issue here is the Fourth Amended and Restated Multi-Draw Term Note, which was originally signed by the parties in June 2017, and subsequently amended several times.  *See* Compl. ¶¶ 1, 13 & n.2; *see* Ans. at 4.

- "The general nonpayment by an Obligor or Material Person of its respective debts as such debts become due, the admission in writing by such Obligor or Material Person of its inability to pay its respective debts generally, . . . or the commencement of any proceedings instituted by or against such Obligor or Material Person seeking to adjudicate it bankrupt or insolvent (or files a notice of its intention to do so), or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any federal, state or foreign law now or hereinafter in effect . . . ." *Id.* § 12(d) ("**Insolvency Default Provision**").

- "[A]ny Obligor or Material Person shall, voluntarily or involuntarily, participate or take any action to participate in any facility or exercise involving the rescheduling of such Obligor's or Material Person's debts, as the case may be, . . . ." *Id.* § 12(h) ("**Rescheduling Default Provision**").

- "The long term foreign issuer (or equivalent) rating of the Unifin Shares shall be less than Ba3/BB-, as published by Moody's Investor Services, Inc. and Standard & Poors Ratings Group, respectively." *Id.* § 12(l)(A) ("**Credit Rating Default Provision**").

Additionally, until the loan is repaid, the Note requires Aralpa to adhere to certain covenants (per the aforementioned General Default Provision) that include but are not limited to:

- Aralpa shall "[n]ot, and shall cause each other Obligor to not, permit the Collateral Value at any time to be less than the Coverage Level (in such case, a 'Coverage Deficiency')." *Id.* § 11(i).

  - If there is a Coverage Deficiency, which is also defined in the Note, "[w]ithin five (5) Business Days of the occurrence," Aralpa shall provide sufficient additional assets, or make a partial payment, in accordance with the terms of the Note. *See id.* § 11(j) (with § 11(i) collectively, "**Coverage Deficiency Provisions**").

- Aralpa shall "[f]urnish to Lender" at times set forth in the Note, or "upon the request of Lender, bank and/or brokerage statements of Borrower and/or Guarantor, in respect of assets not held at Lender, in each case in form and substance satisfactory to Lender in its sole and absolute discretion." *Id.* § 11(t) ("**Financial Statements Provision**").

The Note goes on to outline Citibank's rights "[i]f an Event of Default is continuing." *Id.* § 13 ("**Lender's Rights Provision**"). The Note provides that "Lender may declare the principal amount outstanding under this note, all interest thereon and all other amounts payable under this Note to be immediately due and payable, at which time all such principal, interest and other amounts will become immediately due and payable." *Id.* Under that provision, Citibank may

also "terminate any obligation it may have to make any Advance . . . in each case, without . . .
demand or further notice of any kind, all of which are hereby expressly waived by" Aralpa.  *Id.*
Additionally, "[a]t Lender's option, Borrower's Obligations owed to Lender will also become
due and payable, also without notice or demand."  *Id.*  Finally, Citibank as Lender has "all the
rights and remedies available to Lender under law."  *Id*.

At the time Citibank and Aralpa executed the Note, Lebois also executed an amended and
restated personal guaranty of the Note (the "Guaranty").  Compl. ¶ 2; Ans. at 2; ECF No. 1-2.
The Guaranty provides that Lebois, as Guarantor, "hereby absolutely, unconditionally and
irrevocably guarantees, as primary obligor and not merely as surety, to Lender [Citibank] and its
respective successors and assigns the Guaranteed Obligations," which include Aralpa's payment
obligations under the Note.  Guaranty § 2(a); *see id.* § 1 (defining "Guaranteed Obligations").
The Guaranty further provides that Lebois "agrees that if [Aralpa] shall fail to pay in full when
due (whether upon demand, as stated maturity, by required prepayment, by acceleration or
otherwise) any of the Guaranteed Obligations, Guarantor will promptly pay the same, without
any demand or notice whatsoever."  *Id.* § 2(a).  Lebois also agreed that his "obligations under
this Agreement shall be irrevocable, absolute and unconditional, irrespective of, and Guarantor
hereby irrevocably waives any defense Guarantor may now have or hereafter acquire . . . relating
to" a myriad of possible defenses, but, specifically, "the waiver, consent, extension, forbearance
or granting of any indulgence by, or on behalf of, Lender or any of its Affiliates with respect to
any provision of the Credit Documents" and "any defense, set-off or counterclaim (other than a
defense of payment or performance) that may at any time be available to, or be asserted by, any
other Obligor against Lender."  *Id.* § 4.

## II.      The Alleged Defaults

On March 16, 2022, Standard & Poor's Global Ratings ("S&P") issued a report

downgrading Unifin's credit rating from BB- to B+.  Compl. ¶ 50; ECF No. 24-1 ("March 2022

Downgrade Report"); Ans. at 13 (admitting to issuance of "March 2022 Downgrade Report" but

declaring that document speaks for itself).  On April 13, 2022, Citibank sent Aralpa, Lebois, and

Promexcap a "Notice of Event of Default and Reservation of Rights" that identified the Event of

Default pursuant to § 12(l) of the Note (the Credit Rating Default Provision), and stated that

Citibank was reserving its rights under § 13 of the Note, the Lender's Rights Provision, to

declare an Event of Default and to declare all amounts owed to become immediately due and

payable.  Compl. ¶¶ 51-52, 89; ECF No. 1-3 ("April 13, 2022 Default Notice"); Ans. at 13-14.

About a month later, on May 11, 2022, Aralpa acknowledged, as part of the parties' first

limited waiver agreement, that an Event of Default had occurred.  Compl. ¶¶ 22; ECF No. 24-4

("May 11, 2022 Limited Waiver" or "May Limited Waiver"); Ans. at 6-7 (admitting to execution

of "May 11, 2022 Limited Waiver" but declaring that document speaks for itself).  Specifically,

Aralpa agreed to the following in the May Limited Waiver: "[a]n Event of Default has occurred

under Sections 11(i), (j) [the Coverage Deficiency Provisions], and (p) of the Note, . . . and

Sections 9(m), (n) and (s) of the Guaranty.  The Lender has agreed to waive Such Events of

Default on the terms and conditions set forth herein[,] . . . until the earlier of (x) the date the

Collateral Value equals or exceeds the Coverage Level . . . and (y) to and including July 31,

2022."  May 11, 2022 Limited Waiver § 1; *see also id.* § 2 (admitting Event of Default under

§ 11(p) and providing for shorter term of waiver).  The May Limited Waiver acknowledges an

Event of Default under the Coverage Deficiency and General Default Provisions, but does not

mention § 12(l) (the Credit Rating Default Provision).  *Id.* at 1.  It further provides that "[e]xcept

as expressly modified by this Limited Waiver, the Note and the other Credit Documents shall continue in full force and effect." *Id.* The May Limited Waiver finally provides that:

> [N]othing in this Limited Waiver shall be deemed to constitute a consent to non-compliance by Borrower or any other Obligor with respect to any other term, provision or condition of the Note or any other Credit Document or any other instrument or agreement referred to therein or prejudice any right or remedy that Lender may now have or may have in the future under or in connection with any Credit Document or any other instrument or agreement referred to therein.

*Id*. § 3. Citibank alleges, and Defendants deny, that the May Limited Waiver was agreed to after Aralpa "represented that Unifin was performing well and that positive news related to Unifin was anticipated in the future." Compl. ¶ 22; Ans. at 6-7.

On July 20, 2022, Citibank requested that Defendants "furnish a statement of bank accounts" pursuant to § 11(t) of the Note, or the Financial Statements Provision. *Id*. ¶ 43; Ans. at 11-12. Aralpa admits that it "has not furnished the statement of bank and/or brokerage accounts requested by Citibank on or about July 20, 2022." Ans. at 11.

The prior May Limited Waiver expired as of July 31, 2022, and on August 2, 2022, Aralpa again acknowledged Events of Default in the parties' second limited waiver. Compl. ¶ 23; ECF No. 24-5 ("August 2, 2022 Limited Waiver" or "August Limited Waiver"); Ans. at 23 (admitting to execution of "August 2, 2022 Limited Waiver" but declaring that document speaks for itself). Citibank again alleges, and Defendants deny, that Citibank agreed to this second limited waiver because Aralpa "represented that the upcoming projects for Unifin were expected to have a positive impact on the company." Compl. ¶ 23; Ans. at 6-7. The August Limited Waiver acknowledges that "[a]n Event of Default has occurred under Sections 11(i) and (j) of the Note [the Coverage Deficiency Provisions], . . . and Sections 9(m) and (n) of the Guaranty. The Lender has agreed to waive such Events of Default on the terms and conditions set forth herein . .

. until the earlier of (x) the date the Collateral Value equals or exceeds the Coverage Level . . . and (y) to and including October 15, 2022." August 2, 2022 Limited Waiver § 1. The August Limited Waiver contained the same language as the May Limited Waiver, stating that:

> [N]othing in this Limited Waiver shall be deemed to constitute a consent to non-compliance by Borrower or any other Obligor with respect to any other term, provision or condition of the Note or any other Credit Document or any other instrument or agreement referred to therein or prejudice any right or remedy that Lender may now have or may have in the future under or in connection with any Credit Document or any other instrument or agreement referred to therein.

*Id.* § 2. It also provided that the Note otherwise remains in full force and effect. *Id.*[3]

Days later, on August 8, 2022, Unifin issued a press release where it announced that "it will not be honoring its debts as they come due and does not expect to repay its debts until it reaches a debt restructuring agreement." Compl. ¶ 75; *see* Ans. at 19 (stating that document speaks for itself); *see also* ECF No. 24-6. After this announcement, Defendants admit that "there was an approximate 92% decline in Unifin's share price." Ans. at 19; *see also* Compl. ¶ 77. The following day, on August 9, 2022, S&P issued another report, which downgraded the credit rating of Unifin from a B+ to a D. Compl. ¶ 53; ECF No. 24-7 ("August 2022 Downgrade Report"); Ans. at 14 (admitting to issuance of "August 2022 Downgrade Report" but declaring that document speaks for itself).

---

[3] The Court rejects Defendants' counsel's attempt to distance Defendants from the May Limited Waiver and August Limited Waiver by stating for the first time at oral argument that Defendants did not sign these waivers. Oral Arg. at 33:11-13; *see In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) (concluding that "argument . . . raised for the first time at oral argument . . . was waived"). In any event, regardless of whether there was a signature by Defendants or not, Defendants admit in their Answer that "Citibank and Aralpa executed a limited waiver" on May 11, 2022 and August 2, 2022. Ans. at 6.

On August 10, 2022, Citibank sent Aralpa, Lebois, and Promexcap a "Notice of Event of Default and Acceleration" that identified the following sections of the Note, pursuant to which the purported defaults had occurred: "Sections 12(c) (failure to pay debts), 12(d) (non-payments generally) [the Insolvency Default Provision], 12(f) (insecure Obligations, guaranty or Collateral), 12(h) (rescheduling of debts) [the Rescheduling Default Provision], 12(j) (Material Adverse Effect) and/or 12(l)(A) (Unifin shares ratings downgrade) [the Credit Rating Default Provision], and (D) (Unifin reorganization)."  Compl. ¶ 83; ECF No. 1-4 ("August 10, 2022 Default Notice") at 1; Ans. at 20.  Citibank also declared Defendants' "[o]bligations [under the Note] to be immediately due and payable" pursuant to the Lender's Rights Provision and advised that the outstanding balance was $35,165,465.80.  Compl. ¶ 83.

Citibank issued another notice of default on August 29, 2022 that identified additional purported Events of Default under the following sections of the Note: Sections 12(a)(i) and 12(a)(ii) (the General Default Provision), which related specifically to the covenant obligations in Sections 11(p), 11(t) (the Financial Statements Provision), and 11(u) of the Note.  *See* Compl. ¶ 84; ECF No. 1-5 ("August 29, 2022 Default Notice") at 1-2; Ans. at 21.  The letter again "demand[ed] immediate payment in full by the Obligors," which include Defendants.  August 29, 2022 Default Notice at 2.[4]  The August Default Notice closes by stating, among other things, that the letter shall not be construed as to waive "any Specified Event of Default or any other Default or Event of Default (whether or not such other Default or Event of Default is described in this letter)" or to "waive, limit, prejudice or otherwise adversely affect any rights, remedies or powers of Lender under the Note . . . or applicable law or at equity, all of which are hereby

---

[4] Promexcap is also an Obligor on the Note, *see* Compl. ¶ 45; Note at 5-6, but has not been sued in this litigation, *see generally* Compl.

expressly reserved." *Id.*  Finally, it states that any failure by Citibank to exercise, or delay by Citibank to exercise, any right or remedy under the Note or applicable law or at equity "whether at this time or in the future, shall not constitute a waiver of such right or remedy or of any default." *Id.*  On September 8, 2022, Promexcap filed a pre-insolvency notification before a Spanish court.  Ans. at 12; *see also* Compl. ¶ 46.  The August Limited Waiver expired on October 15, 2022.  Compl. ¶ 24; Ans. at 7.

Two days later, Citibank filed the instant action on October 17, 2022.  *See* Compl.  In its Complaint, Citibank alleges that the market value of Unifin stock, as of October 17, 2022, was $4,125,050, which it contends is below the threshold for a Coverage Deficiency as defined in the Note.  *Id.* ¶ 25.  Defendants filed their Answer on December 9, 2022.  *See* Ans.  Defendants do not admit to Citibank's interpretation of the stock's market value of Unifin in their Answer.  *See id.* at 7.

Following Defendants' Answer, Citibank moved for judgment on the pleadings on December 27, 2022.  ECF No. 22.  Citibank also moved for a prejudgment attachment on July 17, 2023.  ECF Nos. 34-35.

## LEGAL STANDARD

Under Rule 12(c), after the pleadings have closed, "but early enough not to delay trial," a party may move for judgment on the pleadings.  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).  "A motion for judgment on the pleadings is governed by 'the same standard' as a motion to dismiss under Rule 12(b)(6)." *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)).  That is, the Court must accept the non-movant's factual allegations as true, and draw all inferences in favor of the non-movant.  *Id.*  When a plaintiff moves for judgment on the pleadings, "the question for

determination is whether on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C.*, 537 F. Supp. 3d 533, 545 (S.D.N.Y. 2021) (internal quotation marks and citation omitted); *see also Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) ("When a plaintiff is the movant [in the context of a motion for judgment on the pleadings], courts must accept all factual allegations in the answer and draw all reasonable inferences in favor of the defendants, who are the non-movants in that scenario.").  Put another way, "if a defendant's answer admits, alleges, or fails to deny facts which, taken as true, would entitle a plaintiff to relief on one or more claims supported by the complaint, then the plaintiff's Rule 12(c) motion should be granted." *Allstate Ins. Co.*, 537 F. Supp. 3d at 545 (quoting *Mitsui Rail Cap., LLC v. Detroit Connecting R.R. Co.*, No. 13-cv-13502, 2014 WL 3529214, at *2 (E.D. Mich. July 16, 2014)).

On a Rule 12(c) motion, "courts may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice." *Lively*, 6 F.4th at 306; *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).  However, if a pleading is contradicted by a document either attached to that pleading or otherwise "made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." *Wrights Mill Holdings*, 127 F. Supp. 3d at 167 (alteration in original) (quoting *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994)).  Indeed, because of this, "a motion for judgment on the pleadings 'can be particularly appropriate in breach of contract cases involving legal

interpretations of the obligations of the parties.'" *Id.* (*quoting VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013)).

## DISCUSSION

### I.     Judicial Notice

As an initial matter, the parties do not agree on the materials that may be properly considered at this stage in the litigation.  Defendants do not dispute that the Court may consider the documents attached to the Complaint (which include the Note, the Guaranty, the April 13, 2022 Default Notice, the August 10, 2022 Default Notice, and the August 29, 2022 Default Notice), and many of the documents attached to Citibank's motion, including the March 2022 Downgrade Report, the May 11, 2022 Limited Waiver, the August 2, 2022 Limited Waiver, and the August 2022 Downgrade Report.  *See* Opp. at 13.  They also do not dispute that the Court can consider two Unifin press releases, dated August 8, 2022 and August 25, 2022, respectively, which are referenced in the Complaint.  *See id.*

However, Defendants argue that the following documents, all of which were attached to a declaration filed in support of Citibank's motion, may not properly be considered by the Court: a March 16, 2022 Unifin Press Release (ECF No. 24-2); a chart purportedly listing Unifin's share prices from Yahoo! Finance (ECF No. 24-3); an August 9, 2022 Unifin Press Release (ECF No. 24-8); an August 10, 2022 Unifin Press Release (ECF No. 24-9); a September 8, 2022 Notice from Promexcap filed in Spanish court (ECF No. 24-11); a November 8, 2022 Unifin Press Release (ECF No. 24-12); a November 28, 2022 Unifin Press Release (ECF No. 24-13); a November 28, 2022 Notice of Suspension from the Mexican Stock Exchange (ECF No. 24-14); a November 28, 2022 Bloomberg news article (ECF No. 24-15); a December 6, 2022 Unifin Press Release (ECF No. 24-16); a December 7, 2022 Unifin Press Release (ECF No. 24-17); and, a

December 19, 2022 FactSet Credit Ratings Report for Unifin (ECF No. 24-18).  *See* Opp. at 7-13.

Citibank, on the other hand, argues that the Court can take judicial notice of these documents and the fact that, after the commencement of this action, on November 8, 2022, Unifin announced that it had initiated an insolvency proceeding in Mexico.  *See* Br. at 9. Citibank further asks the Court to take judicial notice of the fact that on November 28, 2022, the Mexican Stock Exchange suspended trading in Unifin's stock.  *Id.* at 9, 17.  Citibank argues that, even though Unifin's insolvency proceedings occurred after the filing of the Complaint, the Court may nonetheless take judicial notice of those proceedings under Federal Rule of Evidence ("FRE") 201(b).  *See id.* & n.6.  Additionally, Citibank asks the Court to take judicial notice of the fact that Moody's does not provide credit ratings for Unifin.  *See id.* at 12 n.8.

Pursuant to FRE 201(b), a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FRE 201(b); *see also Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).  Also, under FRE 201, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  FRE 201(c)(2).  "When considering a Rule 12(b)(6) or Rule 12(c) motion, the Court may take judicial notice of certain matters of public record without converting the motion into one for summary judgment."  *Wrights Mill Holdings*, 127 F. Supp. 3d at 166; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . . matters of which a court may take judicial notice."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("Of course, [the court

on a motion to dismiss] may also consider matters of which judicial notice may be taken under [FRE] 201.").

Therefore, on a motion for judgment on the pleadings under Rule 12(c), "courts have considered newspaper articles, documents publicly filed with the SEC or FINRA, documents filed with a Secretary of State, documents filed with governmental entities and available on their official websites, and information publicly announced on certain non-governmental websites, such as a party's official website." *Wrights Mill Holdings*, 127 F. Supp. 3d at 166 (collecting cases); *see Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" (quoting FRE 201(b))).  The Second Circuit has made clear that a court may take judicial notice of publicly-filed documents not "offered for the truth of the matter asserted," but instead offered for other relevant reasons, such as "to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015).

The Court will now address the particular arguments with respect to judicial notice.

### A.  Unifin Press Releases

Defendants first argue that the Court should not take judicial notice of the press releases, articles, and other materials filed in support of Unifin's purported credit downgrade: a March 16, 2022 Unifin Press Release (ECF No. 24-2); an August 9, 2022 Unifin Press Release (ECF No. 24-8); an August 10, 2022 Unifin Press Release (ECF No. 24-9); a December 6, 2022 Unifin Press Release (ECF No. 24-16); a December 7, 2022 Unifin Press Release (ECF No. 24-17); and

a December 19, 2022 FactSet Credit Ratings Report for Unifin (ECF No. 24-18).  *See* Opp. at 9-

10.  Generally, a court may take judicial notice of information published on a party's own

website.  *See Doron Precision Sys.*, 423 F. Supp. 2d at 179 n.8.  Courts have also taken judicial

notice of information published on a related entity's website, even when that entity is not a party,

when the parties "do[] not actually dispute the factual material reflected in these websites[, but]

simply would prefer that the Court not consider th[e]se materials."  *Wright Mill Holdings, LLC*,

127 F. Supp. 3d 156.  That is the case here; Defendants do not dispute the contents of these

documents but would simply prefer that they not be considered.  Moreover, at this stage, the

Court may "'take judicial notice of the *fact* that press coverage . . . contained certain

information' so long as [it does] not rely on the 'truth' of that information."  *N.J. Carpenters*

*Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 n.11 (2d Cir. 2013)

(quoting *Staehr*, 547 F.3d at 425).  Therefore, as to this set of documents, the Court will take

notice of the fact of publication.

### B.  November 2022 Unifin Documents

Next, Defendants argues that the Court should not consider the following documents

because they relate to events not pleaded in the Complaint: a November 8, 2022 Unifin Press

Release (ECF No. 24-12); a November 28, 2022 Unifin Press Release (ECF No. 24-13); a

November 28, 2022 Notice of Suspension from the Mexican Stock Exchange (ECF No. 24-14);

and a November 28, 2022 Bloomberg news article (ECF No. 24-15).  *See* Opp. at 11.  The Court

agrees.  The Unifin insolvency filing was not pleaded in the Complaint, the parties do not dispute

that these events occurred after the filing of the Complaint, and the documents were created after

this action began.  Citibank has not sought to amend its Complaint to encompass these

developments.  The Court agrees with other courts in this Circuit that have cautioned that judicial

notice should not "be interpreted as endorsement of a practice whereby rather than amending his or her complaint, a plaintiff seeks to 'support' the complaint by submitting extraneous documents and seeking judicial notice of them." *Galley Schuler v. Rainforest All., Inc.*, No. 14-cv-00226, 2016 WL 10516026, at *2 (D. Vt. Feb. 10, 2016) (citing *Pina v. Henderson*, 752 F.2d 47, 50 (2d Cir. 1985)); *see Pina*, 752 F.2d at 50 (warning that "Rule [201] was not meant to expand the use of judicial notice . . . [and a] court should not go outside the record to supply a fact that is an essential part of a party's case unless the fact is clearly beyond dispute" (alterations in original)).  Moreover, they are not documents filed in a court, or required to be published by law.  *See Kramer*, 937 F.2d at 774.  In light of all of these considerations, the Court will not take judicial notice of these documents.

### C.  Promexcap Insolvency Document

Defendants argue that the Court should not take judicial notice of a September 8, 2022 Notice from Promexcap filed in a Spanish court (ECF No. 24-11), because neither the notice, nor the translation, are publicly available, and the accuracy of the translation can be reasonably questioned.  *See* Opp. 11.  Defendants do not contend that the notice is inaccurate, nor do they propose an alternative translation to the certified translation provided to the Court.  *See id.* at 11-12.  Contrary to Defendants' arguments, courts can generally take judicial notice of a document filed in another court.  *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  Defendants do not argue that this document was not filed with a Spanish court, as the Rubin Declaration attests.  Instead, they point out that Citibank did not provide a website link to the document.  Opp. at 11.  That alone is not reason to question the accuracy of a document filed in a foreign court.  *See Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 300 n.4 (S.D.N.Y. 2021) ("The Court may take judicial notice of developments of the related criminal

proceedings in the Spanish courts.").  Moreover, Citibank has provided a properly certified translation of the filing, and Defendants do not substantively dispute its contents or provide any alternative certified translation.  Accordingly, the Court will take judicial notice of this September 8, 2022 filing.  *See Galley Schuler*, 2016 WL 10516026, at *5 (taking judicial notice of certified translation of complaint made to Mexican National Human Rights Commission).

### D.  Yahoo! Finance Document

Finally, Defendants object to the Court taking judicial notice of a chart purportedly listing Unifin's share prices from Yahoo! Finance (ECF No. 24-3), because it was not referenced in the Complaint, and there is no representation that the values identified in the chart are from the Mexican Stock Exchange.  *See* Opp. at 12-13.  Citibank does not appear to address Defendants' argument related to this exhibit in its reply brief.  *See generally* Reply.  While it is true that a "district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment," *Barilli v. Sky Solar Holdings, Ltd*., 389 F. Supp. 3d 232, 248 n.11 (S.D.N.Y. 2019) (internal citation omitted), the Court does not have enough information about this chart to understand the source of the data and conclude that its contents cannot be reasonably disputed.  Accordingly, the Court declines to take judicial notice of this document.

### II.    Alleged Events of Default on Note

Citibank argues that five Events of Default are not subject to material dispute, and thus Citibank is entitled to judgment against Defendants on its claims to recover the principal amount of approximately $35 million under the Note, plus interest.  Br. at 11-17.  Specifically, Citibank points to: (1) the Unifin credit-rating downgrade default under § 12(l)(A); (2) the bank and brokerage statement defaults under §§ 12(a)(ii) and 11(t); (3) the collateral coverage default

under §§ 12(a)(ii) and 11(i)-(j); (4) the Promexcap insolvency default under §§ 12(d) and (h); and (5) the Unifin insolvency defaults under §§ 12(l)(B) and (D).  *Id.*  The Court will address each purported Event of Default in turn.

### A.  Unifin Credit-Ratings Downgrade

Citibank contends that it is entitled to judgment that there has been an Event of Default because S&P downgraded Unifin's credit rating from BB- to B+ in March 2022, and then from B+ to D in August 2022, in alleged violation of § 12(l)(A) of the Note.  *See* Br. at 12-13.  Section 12(l)(A) provides that an Event of Default occurs if "[t]he long term foreign issuer (or equivalent) rating of the Unifin Shares shall be less than Ba3/BB-, as published by Moody's Investor Services, Inc. and Standard & Poors Ratings Group, respectively."  Note § 12(l)(A). While Defendants concede that S&P issued the two downgrade reports, they argue that these reports do not constitute an Event of Default under the Note because § 12(l) requires a rating from S&P and Moody's, and there is no rating from the latter entity.  *See* Opp. at 15-16. Citibank responds that Moody's does not provide credit ratings for Unifin, and therefore to require such a rating would essentially make the Credit Rating Default Provision meaningless. Reply at 8-9.

The Court must evaluate the language of the Credit Rating Default Provision to determine whether Citibank has shown as a matter of law that this Event of Default has occurred. Judgment as a matter of law regarding a contract claim is only "appropriate . . . where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning."  *Farago Advert., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001); *see also Barnet Marine Inc. v. Laurel D Shipping LLC*, No. 21-cv-05071 (VEC), 2022

WL 3018201, at *6 (S.D.N.Y. July 29, 2022) ("In a breach of contract case, the court may grant a motion for judgment on the pleadings only if the contract is unambiguous.").

"A contract term is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294-95 (2d Cir. 2015) (internal citation and quotation marks omitted). "Furthermore, the ambiguity analysis should be constrained by normal rules of contract interpretation: words and phrases . . . should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* (internal citation and quotation marks omitted). If a contract's language is unambiguous, "the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Maniolos v. United States*, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010) (quoting *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1210 (2d Cir. 2002)). On the other hand, a contract is ambiguous if its language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bank of N.Y. Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 635 (S.D.N.Y. 2007) (quoting *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Citibank is therefore only entitled to judgment on the pleadings with regard to the Credit Rating Default Provision if that provision is unambiguous, and the facts that may be considered demonstrate that the provision has been triggered as a matter of law.

The Court concludes that the language of this provision is sufficiently ambiguous to prevent Citibank from being entitled to judgment on the pleadings with respect to this default.

Looking first to the use of the forward slash between "Ba3" and "BB-," generally, a forward slash means "or" or "and or," and as such, a reasonable interpretation of the provision is that an event of default occurs if Unifin's shares receive a rating of Ba3 from Moody's *or* BB- from S&P.  "Slash," Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/slash (last viewed Aug. 25, 2023); *see also Marathon Res. Mgmt. Grp., LLC v. C. Cornell, Inc.*, No. 19-cv-00089, 2019 WL 5549195, at *6 (E.D. Va. Oct. 25, 2019) (concluding that "the forward slash separating the words . . .  likely functions as a designation of possible alternatives, such as 'and/or'"); *Howards v. Fifth Third Bank*, No. 18-cv-00869, 2023 WL 1778522, at *7 (S.D. Ohio Feb. 6, 2023) (concluding that "a forward slash, allow[s] the inference that [the terms preceding and succeeding it] are so closely related as to be interchangeable").  However, as Defendants point out, the contract also uses the conjunctive "and" when referring to Moody's and S&P, which implies "both."  *See* "And," Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/and (last visited Aug. 25, 2023).  Therefore, this language is ambiguous.

Citibank argues that, under the interpretation proposed by Defendants, § 12(l) would be rendered superfluous because Moody's does not rate Unifin.  *See* Reply 8-9.  The Court would be better able to evaluate this argument, and may well come to a different conclusion, if there was information that this Court could consider establishing that Moody's does not rate Unifin.  However, the pleadings themselves do not establish that Moody's does not rate Unifin, and while the Court has taken judicial notice of a December 19, 2022 FactSet Credit Ratings Report for Unifin (ECF No. 24-18), the absence of ratings from Moody's in this single report stating "No Current Moody's Rating Data" does not conclusively demonstrate that Moody's does not rate Unifin.  Based on the facts in the record, Citibank's argument that the provision would be surplusage fails.

Accordingly, the provision is sufficiently ambiguous at this juncture such that judgment as a matter of law is not appropriate on this purported Event of Default.

### B. Failure to Provide Bank and Brokerage Statements

Citibank contends that it is entitled to judgment on the pleadings because Defendants admit that they failed to provide bank and brokerage statements requested by Citibank pursuant to §§ 12(a)(ii) and 11(t) of the Note. *See* Br. at 13-14. Defendants indeed admit that on July 20, 2022, Citibank requested that Aralpa and Lebois furnish a statement of bank accounts, and that Defendants failed to furnish the statements of bank and/or brokerage accounts requested by Citibank. *See* Ans. at 11-12. However, they contend that they provided other account statements on July 28, 2022. *See* Opp. at 17 (citing Ans. at 8).

An Event of Default occurs under the Note if "[a]ny Obligor fails to . . . observe or comply with any of the covenants, terms or conditions of this Note or any other Credit Document." Note § 12(a)(ii). One such covenant is that Aralpa shall "[f]urnish to Lender" at times set forth in the Note, or "upon the request of Lender, bank and/or brokerage statements of Borrower and/or Guarantor, in respect of assets not held at Lender, in each case in form and substance satisfactory to Lender in its sole and absolute discretion." *Id.* § 11(t).

Defendants try to avoid this obligation by arguing that they essentially met this covenant obligation when Aralpa delivered certain financial statements to Citibank on July 28, 2022. Ans. at 8; Opp. at 17-18. Citibank responds that these statements, provided under § 11(r) and not § 11(t), are not bank/brokerage statements, and insofar as bank/brokerage statements were provided, they were in the name of a different, non-Borrower, non-Guarantor entity (Aralpa Inversiones SL). *See* Reply at 6; Compl. ¶ 43. Defendants respond that the plain language of § 11(t) does not require statements to be made "in the name of" Aralpa or Lebois, and an

20

interpretation of the covenant requiring that the statements be "in the name of" Aralpa and Lebois would at a minimum create an ambiguity.  Opp. at 17-18.  The Court agrees with Citibank.

As Citibank points out, Defendants' proposed interpretation assumes an ambiguity of an otherwise unambiguous provision.  Section 11(t) requires Defendants to provide "statements of Borrower and/or Guarantor," who are explicitly defined to be Aralpa and Lebois.  Note §§ 1, 2, 11(t).  Moreover, the language of the provision explicitly allows Citibank to articulate the "form and substance" of the statements, suggesting Citibank may exercise a certain level of discretion as to this provision.  *Id.* § 11(t).  Indeed, the covenant further states that the statements are to be provided "in form and substance satisfactory to [Citibank] in its sole and absolute discretion." *Id.*  Here, Defendants have admitted that they have not provided bank and brokerage statements from Aralpa or Lebois, as requested by Citibank pursuant to § 11(t), which is sufficient to constitute an Event of Default under the terms of the Note.  Ans. at 11-12.  Citibank indisputably put Defendants on notice of this default, and demanded immediate payment of the loan on August 29, 2022.  *See* August 29, 2022 Default Notice.  Absent any plausible defense from Defendants, Citibank is entitled to judgment on the pleadings for a default of this provision.

### C.  Collateral Coverage

Citibank next argues that there has been an event of default because the Collateral Value – the Unifin shares – has dipped below the Coverage Level defined in the Note.  Br. at 14-15.  Defendants dispute that the pleadings establish this Event of Default, and argue that, in any event, Citibank has waived its ability to proceed in litigation on this purported Event of Default.  Opp. at 18-21.

The relevant covenant in the Note provides that Aralpa shall "[n]ot, and shall cause each other Obligor to not, permit the Collateral Value at any time to be less than the Coverage Level (in such case, a 'Coverage Deficiency')."  Note § 11(i).  However, if there is a Coverage Deficiency, "[w]ithin five (5) Business Days of the occurrence," Aralpa shall provide sufficient additional assets, or make a partial payment, in accordance with the terms of the Note.  *See id.* § 11(j).  The Coverage Level is defined as a Collateral Value of at least 1.40.  *Id.* § 2.  The Collateral Value is the amount equal to the Unifin Shares Market Value, divided by the difference between the aggregate exposure under the Note and the individual loanable value of any securities assets other than Unifin Shares.  *Id.*  Defendants concede that the Unifin shares are the only collateral supporting the Note.  Ans. at 15.

Defendants have twice admitted to a default under the Coverage Deficiency Provision, and Citibank temporarily waived those defaults.  First, on May 11, 2022, Aralpa acknowledged that "[a]n Event of Default has occurred under Sections 11(i) [the Coverage Deficiency Provision], (j) and (p) of the Note, . . . and Sections 9(m), (n) and (s) of the Guaranty.  The Lender has agreed to waive Such Events of Default on the terms and conditions set forth herein[,] . . . [until] and including July 31, 2022."  May 11, 2022 Limited Waiver § 1; *see id.* § 2 (admitting Event of Default under § 11(p)); *see also supra* n.3.  Thus, in the May Waiver, Aralpa acknowledges an Event of Default under the Coverage Deficiency (and General Default) Provisions.

Again, on August 2, 2022, Aralpa acknowledged that "[a]n Event of Default has occurred under Sections 11(i) and (j) of the Note, . . . . and Sections 9(m) and (n) of the Guaranty.  The Lender has agreed to waive such Events of Default on the terms and conditions set forth herein . . . [until] and including October 15, 2022."  August 2, 2022 Limited Waiver § 1.  Thus, again,

in the August Waiver, Aralpa expressly admits to an Event of Default under the Coverage Deficiency (and General Default) Provisions.

Despite these admissions, Defendants contend that because Citibank agreed to limited waivers as to these Events of Default, they cannot now assert a breach of the Note based on those defaults here.  Opp. at 19.  To be sure, Citibank waived those Events of Default until October 15, 2022.  But this suit was filed after that waiver expired (on October 17, 2022).  Neither party contends that they agreed to a further explicit waiver of those admitted Events of Default. Moreover, Defendants do not contest that the Event of Default remained uncured after the limited waivers expired.  In fact, Defendants admit that the value of Lebois's Unifin shares plummeted from $223 million to $13 million on August 10, 2022, *see* Ans. at 11, and that there was an approximately 92% decline in Unifin's share price after August 8, 2022, *see id.* at 19.

The limited waivers only temporarily waived the Event of Default based on the collateral deficiency until October 15, 2022, and the waivers expressly state that they do not constitute consent to non-compliance by the borrowers or prejudice any future rights of the lender.  *See* May Limited Waiver; August Limited Waiver.  There is no basis for the Court to conclude that a temporary, limited waiver continues to have an effect past its expiration date.  To the extent that Defendants assert that these Events of Default are otherwise subject to their defenses of waiver and estoppel, the Court rejects that argument for the reasons articulated *infra* Discussion § V.

Moreover, the terms of the Note are explicit: "If an Event of Default is continuing, Lender has all the rights and remedies available to Lender under law . . . ."  Note § 31.  There are also additional non-waiver provisions in the Note.  *Id*.  In sum, Defendants have not demonstrated, based on the terms of the limited waivers, the Note itself, or caselaw, that Citibank could no longer enforce its rights on the admitted defaults after the limited waivers expired.

Once the waivers expired, Citibank was free to enforce its rights under the Note and it did so promptly.

Accordingly, Citibank is entitled to judgment on the pleadings for a default of this provision for the admitted Events of Default based on the collateral deficiency.

### D.  Promexcap Insolvency

Citibank next argues that it is entitled to judgment on the pleadings in light of Promexcap's insolvency.  *See* Br. at 16-17.  Defendants dispute that an Event of Default was triggered when Promexcap filed a Pre-Insolvency Notification in Spanish court.  *See* Opp. at 21-23.

Under § 12(d) of the Note, an Event of Default is triggered by "[t]he general nonpayment by an Obligor or Material Person of its respective debts as such debts become due, the admission in writing by such Obligor or Material Person of its inability to pay its respective debts generally, . . . or the commencement of any proceedings instituted by or against such Obligor or Material Person seeking to adjudicate it bankrupt or insolvent (or files a notice of its intention to do so), or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any federal, state or foreign law now or hereinafter in effect." Under § 12(h) of the Note, an Event of Default also occurs if and when "any Obligor or Material Person . . . , voluntarily or involuntarily, participate[s] or take[s] any action to participate in any facility or exercise involving the rescheduling of such Obligor's or Material Person's debts, as the case may be."

In their Answer, Defendants admit that "Promexcap filed the September 8 Pre-Insolvency Notification," and the Court has taken judicial notice of this document.  Ans. at 12; *see supra* Discussion § I(C).  Moreover, the parties agree that Citibank identified a violation of § 12(d) and

§ 12(h) in their August 10, 2022 Default Notice.  *See* Compl. ¶ 83; August 10, 2022 Default

Notice at 1; Ans. at 20.  The question for the Court is thus whether the September 8, 2022 Pre-

Insolvency Notification unambiguously constitutes an Event of Default under the Note.  The

notice by Promexcap states, among other things, that it is a "notice that they are insolvent and

that they have begun negotiations to reach an agreement on adherence to a preliminary

arrangement proposal and refinancing under articles 596 to 604 and 698 of the Consolidated Text

of the Bankruptcy Law (TRLC), also requesting the concession of the effects set out in articles

583 to 595 of the TRLC."  ECF No. 24-11 at 9.  There is no dispute that Promexcap is an

Obligor.  *See* Note at 5-6.

Citibank contends that this notice triggered an Event of Default under § 12(d) because

Promexcap declared that it was insolvent and the notification "constitutes a petition or

proceeding initiated by an Obligor that seeks to adjudicate it insolvent, or a notice of its intention

to do so."  Br. at 16; *see* Oral Arg. at 7:9-13, 45:16-24.  The notification also "constitutes an

action by Obligor to refinance and reschedule its debts" under § 12(h), according to Citibank.

Br. at 16.  Other than disputing that the Court should take judicial notice of the document, an

argument that the Court has rejected, Defendants maintain that the notice does not fall within the

scope of §§ 12(d) and 12(h) because, without Spanish law expertise, it is not clear from the face

of the document that Promexcap was "actually seeking to adjudicate it insolvent or has filed a

notice of its intention to do so."  Opp. at 22 (internal quotation marks omitted and alterations

adopted).

The Court agrees with Defendants that additional information regarding Spanish law is

required in order to determine whether the September 8, 2022 Pre-Insolvency Notification

constitutes the commencement of insolvency proceedings or even notice of the intention to

commence such proceedings under Spanish law for purposes of Section 12(d) of the Note.  In addition, on its face, the September 8, 2022 Pre-Insolvency Notification does not provide a basis for the Court to conclude that Promexcap was participating "in a facility or exercise involving the rescheduling" of its debts, as required for § 12(h).

However, as Citibank has emphasized, the filing contains a clear statement by Promexcap that it is insolvent.  ECF No. 24-11 at 9; Oral Arg. at 7:9-13 (noting that "document also states on its face that Promexcap is insolvent"); 45:16-24 (noting that document "states on its face" that Promexcap is "insolvent"); Reply at 8.  Section 12(d) is triggered not only with the commencement or notice of intent to commence an insolvency proceeding but also by "the admission in writing by such Obligor or Material Person of its inability to pay its respective debts generally."  Note § 12(d).  In the September 8, 2022 Pre-Insolvency Notification, Promexcap, an Obligor, has submitted in writing (in a publicly-filed notice to a judicial body) that "they are insolvent."  ECF No. at 24-11 at 9.  The word "[i]nsolvent" is defined as "unable to pay debts as they fall due in the usual course of business."  "Insolvent," Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/insolvent (last viewed Sept. 11, 2023).  Thus, the statement by an Obligor to a judicial body that it is insolvent is a written admission by that Obligor "of its inability to pay its . . . debts generally," and an Event of Default has occurred under § 12(d).

Defendants' contention that the translation of the notice cannot be trusted is rejected because the Court has been provided with a certified translation as required under court rules.  *See supra* Discussion § I(C).  Moreover, at oral argument, when pressed for any other basis for finding the translation of the notice declaring insolvency to be inaccurate, Defendants pointed only to footnote seven of their opposition brief, where they assert that Plaintiff has provided

different characterizations of the notice's language.  Oral Arg. at 31:3-18.  That Citibank referred

to the notice once in the Complaint as providing that Promexcap is "in a situation of insolvency,"

does not detract from the clear declaration in the actual notice of insolvency.  Opp. at n. 7 (citing

to Compl. ¶ 46).  Therefore, the Court agrees with Plaintiff that this filing provides the basis for

an Event of Default under § 12(d), absent any plausible defenses by Defendants.

### E.  Unifin Insolvency Filing

Finally, Citibank points to the recent filing of insolvency proceedings by Unifin on

November 8, 2022 as an Event of Default under § 12(l)(B) and (D) of the Note.  Br. at 17.

Because the Court is not taking judicial notice of the November 8, 2022 filing, see *supra*

Discussion § I(B), there is no basis on the pleadings for the Court to grant judgment for Citibank

with respect to an event of default based on the Unifin insolvency.  Indeed, a default based on the

Unifin insolvency filing was not pleaded in the Complaint.[5]

### III.  Effect of Events of Default

Based on the foregoing, the Court finds that Citibank has established at least three Events

of Default based on the failure of Defendants to provide bank and brokerage statements pursuant

to §§ 11(t) and 12(a)(ii), the collateral deficiency default pursuant to §§ 11(i), (j) and 12(a)(ii),

and an admission of Promexcap's insolvency pursuant to § 12(d).  Citibank has therefore

---

[5] However, without objection from Defendants, the Court is taking judicial notice of the earlier
August 8, 2022 announcement by Unifin that states that "the Company [Unifin] has resolved to
make no interest and principal payments on its debt as of this date and during the period
necessary to negotiate definitive agreements with its creditors for a strategic restructuring of the
Company."  ECF No. 24-6; *see also supra* Discussion § I at p.11.  Plaintiff alleges that this
public announcement constitutes an Event of Default under § 12(d) of the Note because it is an
admission by Unifin, a Material Person, of its inability to pay its debts as they become due.
Compl. ¶ 78.  While this certainly appears to be the case, Citibank did not raise this precise basis
for default in its present motion and, given that there are other Events of Default that have been
established on the pleadings, the Court need not find that an Event of Default was triggered by
this announcement.

established a breach of the Note and its entitlement to the principal amount and interest. *See* Note § 13 (if there are continuing Events of Default, the principal amount and interest is "immediately due and payable").

The Court is unpersuaded by Defendants' arguments that Citibank's loan accelerations in the August 10 and 29, 2022 Default Notices were ineffective, or otherwise insufficient to accelerate the loan on each of the purported Events of Default. Opp. at 24. The August 10, 2022 Default Notice identified the violation of § 12(d) and demanded payment. *See* Compl. ¶ 83; August 10, 2022 Default Notice at 1; Ans. at 20. The August 29, 2022 Default Notice also raised the failure to provide bank/brokerage statements, and requested immediate payment. That the acceleration notices did not refer to the collateral deficiency Event of Default – because the default was temporarily waived at the time – is inconsequential. Defendants have not provided any binding or persuasive authority for their argument that a separate notice of acceleration is a prerequisite for recovering on a breach of the Note based on an Event of Default that Defendants admit occurred, but was temporarily waived until October 15, 2022, after which time Citibank sued based in part on that default. Opp. at 14; *cf. PNC Bank, N.A. v. Dana Transport, Inc.*, No. 16-cv-07797 (RA), 2022 WL 3701441, at *6 n.6 (S.D.N.Y. Aug. 26, 2022) (rejecting argument that debt could not be accelerated because the breach was trivial, since the breach was not trivial and "the Lenders never actually accelerated the debt; they simply declared default").[6] In support of Citibank's right to bring a breach of contract claim, the Note also expressly provides that "[i]f

---

[6] The cases cited by Defendants to support their argument that acceleration is required prior to bringing an action, *see Chase Mortg. Co. v. Dwight Fowler*, 721 N.Y.S.2d 184, 184 (4th Dep't 2001); *U.S. Bank Nat'l Ass'n v. Sopp*, 95 N.Y.S.3d 261, 263 (2d Dep't 2019), do not stand for this proposition. Rather, they are mortgage-foreclosure cases that stand for the proposition that, if a mortgage holder elects to accelerate the debt, notice of that acceleration must be clear and unequivocal.

an Event of Default is continuing, Lender has all the rights and remedies available to Lender

under law."  Note § 13.  Section 13 also provides that, "[a]t Lender's option, Borrower's

Obligations owed to Lender will also become due and payable, also without notice or demand."

*Id.*

Defendants' contention that the Event of Default for failure to provide bank and

brokerage statements cannot form the basis for acceleration or recovery for breach of the Note

because it is trivial or inconsequential also fails.  *See* Opp. at 24.  The case cited by Defendants

in support of this argument states that "[a]greements providing for the acceleration of the entire

debt upon the default of the obligor are often enforced in accordance with their terms . . . but

where the breach asserted as the basis for the acceleration is trivial or inconsequential, the

forfeiture may be viewed as an unconscionable penalty and equitable principles come into play."

*Tunnell Publ'g Co. v. Straus Commc'ns, Inc.*, 565 N.Y.S.2d 572, 572 (3d Dep't 1991).  But,

Defendants have not articulated why this Note, between sophisticated parties, should not be

enforced on its terms, or why an acceleration based on an admitted failure to provide financial

statements in accordance with the terms of the Note would be an "unconscionable penalty" here.

Indeed, acceleration due to a trivial or technical breach is generally considered an

"unconscionable" penalty when that breach involves "failure to comply with a covenant

collateral to the primary obligation of the [borrower]."  *Fifty States Mgmt. Corp. v. Pioneer Auto*

*Parks, Inc*., 46 N.Y.2d 573, 577-78 (1979) (emphasis added).  Here, the financial statements

provision appears to be crucial to the primary obligations of Defendants, since that provision

would permit Citibank to monitor Defendants' financial health, and thereby ensure that the Note

would be paid.  *See KLS Diversified Master Fund, LP v. McDevitt*, 507 F. Supp. 3d 508, 536-37

(S.D.N.Y. 2020) (noting that "affirmative covenant[s]" to provide creditors with "information

rights" to receive "financial statements" are an "important set of protections" to limit risk to creditors). In addition, Defendants have admitted that they have not cured the default of providing these financial statements. Ans. at 11; *see Fifty States Mgt. Corp.*, 46 N.Y.2d at 579 (declining to excuse what was argued to be a trivial or inconsequential default in part because the borrower "made no attempt to cure its default after being notified"). In any event, Citibank's claim for breach of the Note is not based simply on the failure to provide financial statements, but also concerns the Promexcap insolvency and the collateral deficiency Events of Default, which Defendants do not contend are inconsequential or trivial.

Therefore, absent a plausible defense from Aralpa, based on several Events of Default, Citibank is entitled to judgment on the pleadings with respect to its claim for breach of the Note.

### IV.   Alleged Default on Guaranty

The parties agree that Citibank's claim under the Guaranty rises and falls with its claim under the Note. *See* Br. at 18-19; Opp. at 25. This is consistent with the terms of the Guaranty, which provide that Lebois, as Guarantor, "hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, to Lender [Citibank] and its respective successors and assigns the Guaranteed Obligations," which include Aralpa's payment obligations under the Note. Guaranty § 1 (defining "Guaranteed Obligations"); *see id.* § 2(a). The Guaranty further provides that Lebois "agrees that if Borrower [Aralpa] shall fail to pay in full when due (whether upon demand, as stated maturity, by required prepayment, by acceleration or otherwise) any of the Guaranteed Obligations, Guarantor will promptly pay the same, without any demand or notice whatsoever." *Id.* § 2(a). Accordingly, the Court concludes that, absent a plausible defense from Lebois, Citibank is entitled to judgment on the pleadings with respect to its claim for breach of the Guaranty for the reasons discussed *supra* Discussion § II.

## V.    Affirmative Defenses

Finally, the Court considers Defendants' affirmative defenses.  Defendants assert that,
regardless of whether Citibank has demonstrated an Event of Default on the pleadings, judgment
in Citibank's favor is precluded by Defendants' affirmative defenses of waiver and estoppel.  *See*
Opp. at 4-7.  Defendants argue that they should be permitted to provide evidence that Citibank
impliedly waived the Events of Default under the Note and are now estopped from asserting
those defaults.  *See id.* at 6; Sur-Reply at 2-3.  In response, Citibank contends that Defendants'
affirmative defenses are conclusory and insufficient to withstand a motion for judgment on the
pleadings.  Reply at 2-6.

Generally speaking, "[a]ffirmative defenses which amount to nothing more than mere
conclusions of law and are not warranted by any asserted facts have no efficacy."  *Shechter v.
Comptroller of City of N.Y.*, 79 F.3d 265, 270 (2d Cir. 1996) (internal citation and quotation
marks omitted, and alterations adopted); *see also Oneida Indian Nation v. Phillips*, 981 F.3d 157,
169 (2d Cir. 2020) (affirming district court's entry of judgment on the pleadings where no viable
affirmative defenses were raised).  However, "[a] defendant raising plausible affirmative
defenses in her answer will generally bar a plaintiff's motion for judgment on the pleadings."
*Allstate Ins. Co. v. Weiner*, No. 19-cv-00499 (NGG) (CLP), 2020 WL 4059556, at *2 (E.D.N.Y.
July 20, 2020) (citing *Oneida Indian Nation v. Phillips*, 397 F. Supp. 3d 223, 229 (N.D.N.Y.
2019)).  In considering the sufficiency of the affirmative defenses, "the Court need not limit
itself to the boilerplate language of an affirmative defense if sufficient factual content is pled

elsewhere to support the defense." *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-cv-05075 (LJL), 2020 WL 3472597, at *12 (S.D.N.Y. June 25, 2020).[7]

With respect to waiver, under New York law, "[a] contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned.'" *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006)).  This is a fairly high standard, as "waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection." *Id.* (internal quotation marks omitted).  "'[M]ere silence, oversight or thoughtlessness in failing to object' is insufficient to support an inference of waiver."  *Id.* (alteration in original) (quoting *Courtney-Clarke v. Rizzoli Int'l Publ'ns, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998)).

The Second Circuit has stated that the defense of equitable estoppel "is properly invoked where the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct."  *ABKCO Music, Inc. v.*

---

[7] Defendants also argue that the Court cannot consider the sufficiency of their affirmative defenses because Citibank never moved to strike those defenses.  *See* Sur-Reply at 1-2.  The cases that they cite in support of this argument, however, do not support this formalistic approach.  *See id.* (citing *Wireless Ink Corp. v. Facebook, Inc.*, 787 F. Supp. 2d 298, 300 (S.D.N.Y. 2011) (construing a motion to dismiss defenses pursuant to Rule 12(c) as a motion to strike those defenses under Rule 12(f)); *Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12-cv-05105 (NRB), 2014 WL 3950897, at *2 (S.D.N.Y. Aug. 13, 2014) (construing a motion under Rule 12(h), which pertains to waiving defenses, as one under Rule 12(f), which pertains to motions to strike); *FRA S. p. A. v. Surg-O-Flex of Am., Inc.*, 415 F. Supp. 421, 427 (S.D.N.Y. 1976) (denying the defendants' motion to strike portions of the *complaint* as "untimely as well as spurious")).  The caselaw is clear that affirmative defenses ought to be considered when a plaintiff makes a motion for judgment on the pleadings.  *See, e.g.*, *Oneida Indian Nation*, 397 F. Supp. 3d at 232 ("Furthermore, while affirmative defenses usually bar judgment on the pleadings, Defendants' defenses do not raise any issues of material fact that, if true, would bar the recovery sought by Plaintiff in its motion."), *aff'd*, 981 F.3d 157, 169 (2d Cir. 2020) ("In sum: the District Court correctly concluded that Phillips does not raise any viable affirmative defenses that would preclude judgment on the pleadings in favor of the Nation.").

*Sagan*, 50 F.4th 309, 321 (2d Cir. 2022) (internal quotation marks omitted); *see Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013) ("Under New York Law, a claim for equitable estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury." (internal quotation marks and citation omitted)).

Additionally, "[n]o-waiver clauses are enforceable under New York law." *Structured Cap. Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 825 (S.D.N.Y. 2016). To be sure, "the 'mere existence' of such a provision 'does not preclude waiver of a contract clause.'" *Morrison v. Buffalo Bd. of Educ.*, 741 F. App'x 827, 830 (2d Cir. 2018) (quoting *Stassa v. Stassa*, 999 N.Y.S.2d 116, 119 (2d Dep't 2014)). But there still must be sufficient allegations from which a court can infer a party knowingly waived their contractual rights. *See id.*

No such allegations exist here. The Note and Guaranty both contain a no-waiver clause, which is "routinely upheld as being enforceable" under New York law. *Equator Int'l, Inc. v. NH St. Invs., Inc.*, 978 N.Y.S.2d 817, 824 (Sup. 2014); *see also* Note § 31; Guaranty § 29.[8] Defendants do not contend that these provisions are ambiguous, but instead maintain that the limited waivers, and other "course of dealing and representations" made by Citibank, demonstrate that Citibank implicitly waived the Events of Default, and is estopped from bringing suit. *See* Opp. at 6. They contend that around the time of the August 10, 2022 Default Notice,

---

[8] In the Guaranty, Lebois also explicitly agreed that his "obligations under this Agreement shall be irrevocable, absolute and unconditional, irrespective of, and Guarantor hereby irrevocably waives any defense Guarantor may now have or hereafter acquire . . . relating to" a myriad of possible defenses, but specifically "the waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, Lender or any of its Affiliates with respect to any provision of the Credit Documents . . ." and "any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, any other Obligor against Lender." Guaranty § 4.

Defendants "were engaging in discussions with Citibank with respect to Aralpa's obligations under the Note and were sharing financial information with Citibank." *Id.* (citing Compl. ¶¶ 29-32; Ans. at 8-9). However, the portions of the Complaint and Answer to which Defendants point describe discussions around Lebois's Personal Financial Statements, related to §§ 11(o) and (u) of the Note. *See* Compl. ¶¶ 29-32. These allegations do not suggest that the parties were engaging in any discussions about the Events of Default at issue here.

To the extent there were discussions related to the Events of Default at issue here, *see supra* Discussion § II, Citibank only *temporarily* waived those defaults, *see* Ans. at 6-7; *see also* May Limited Waiver; August Limited Waiver. The limited terms of those waivers are clear, and Defendants do not contend otherwise. For example, the May 11, 2022 Limited Waiver states that "[a]n Event of Default has occurred under Sections 11(i) [the Coverage Deficiency Provision], (j) and (p) of the Note, . . . and Sections 9(m), (n) and (s) of the Guaranty." May 11, 2022 Limited Waiver § 1. It goes on to state that "[t]he Lender has agreed to waive such Events of Default on the terms and conditions set forth herein[,] . . . [until] and including July 31, 2022," and "[e]xcept as expressly modified by this Limited Waiver, the Note and the other Credit Documents shall continue in full force and effect." *Id.* In the August 2, 2022 Limited Waiver, the parties agreed that "[a]n Event of Default has occurred under Sections 11(i) and (j) of the Note, . . . . and Sections 9(m) and (n) of the Guaranty. The Lender has agreed to waive such Events of Default on the terms and conditions set forth herein . . . [until] and including October 15, 2022." August 2, 2022 Limited Waiver § 1. It also provides that the Note otherwise remains in full force and effect. *See id.* at 1. The waivers here are clearly limited in time and scope, and Defendants have not argued otherwise. The express terms of the waiver also clearly reserve Citibank's rights under the Note. *See* May Limited Waiver § 3 ("[N]othing in this Limited

Waiver shall be deemed to constitute a consent to non-compliance by Borrower or any other Obligor with respect to any other term, provision or condition of the Note . . . . or prejudice any right or remedy that Lender may now have or may have in the future . . . ."); August Limited Waiver § 2 (same).

The Second Circuit's decision in *Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 90 (2d Cir. 2013), which relates to the defense of equitable estoppel, is instructive on this point. There, the Second Circuit concluded that, where an agreement did not require the non-breaching party to put the breaching party on notice of an event of default, the non-breaching party's silence did not give rise to an equitable estoppel defense. *See* 720 F.3d at 90. In that case, the breaching party had argued that the non-breaching party had frequently waived certain requirements under the agreement, thereby modifying the terms of the agreement. *See id.* But the Second Circuit, reversing the district court, concluded that because the non-breaching party had "waived provisions of the [a]greement . . . expressly and in writing, while reserving all other rights, as required by the [a]greement," the parties' actions were in fact consistent with the agreement. *Id.* at 91. Thus, the non-breaching party's "course of performance, including its disregard of particular contractual obligations on [the breaching party's] part from time to time, was consistent with the Agreement, and the Agreement remain[ed] enforceable." *Id.*

Here, too, Defendants have not pointed to any behavior on the part of Citibank that would be inconsistent with the terms of the Note. To be sure, Citibank twice agreed to limited waivers of specific Events of Default, but it did so for a narrow period of time and explicitly emphasized that "nothing in this Limited Waiver shall be deemed to constitute a consent to non-compliance by Borrower or any other Obligor with respect to any other term, provision or condition of the Note . . . . or prejudice any right or remedy that Lender may not have or may have in the future."

August Limited Waiver § 2; May Limited Waiver § 3.  These waivers thus did not change the terms of the Note or Guaranty, as in *Gaia House Mezz*.  Moreover, Citibank clearly reserved its rights under the Note and Guaranty, which provide Citibank with "all the rights and remedies available to Lender under the law" and generally permit Citibank to proceed, in the Event of Default, without notice to Defendants.  *See* Note § 13; *see also* Guaranty § 5.

Defendants have not provided any non-speculative allegations that suggest that Citibank knowingly relinquished its rights under the Note or Guaranty.  In light of this, and in light of the no-waiver clauses and the terms of the limited waivers, Defendants' defense of waiver is not plausible.  *See 28th Highline Assocs., L.L.C. v. Roache*, No. 18-cv-01468, 2019 WL 917208, at *8 (S.D.N.Y. Feb. 25, 2019) (granting judgment on the pleadings and rejecting affirmative defense of waiver as implausible), *aff'd*, 826 F. App'x 70 (2d Cir. 2020) (affirming the district court in part because of a no-waiver clause in the agreement).

Defendants' equitable-estoppel defense fares no better, for largely the same reasons. Defendants have not pointed to any actions on the part of Citibank on which their purported affirmative defense of estoppel would be considered plausible.  *See VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 532 (S.D.N.Y. 2013) (granting judgment on the pleadings where affirmative defenses were not plausible); *Red Fort Cap., Inc v. Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 480 (S.D.N.Y. 2019) (same).

Defendants do not assert any other of their pleaded affirmative defenses (for breach of the implied covenant of good faith and fair dealing, unclean hands, and unjust enrichment) in opposition to Citibank's motion, or in their sur-reply, and therefore the Court considers them abandoned.  *See Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 310

(S.D.N.Y. 2010) (concluding that affirmative defenses were abandoned where the defendant did not brief them in opposition to the plaintiff's motion).

Accordingly, Defendants have failed to assert plausible affirmative defenses to the several Events of Default, and Citibank is entitled to judgment on the pleadings in the amount of the outstanding balance on the Note, plus interest, based on the breach of the Note. *See* Note § 13.  Defendants admit that approximately $35 million is due under the Note.  Ans. at 20.

### VI.    Motion for Prejudgment Attachment

Having concluded that Citibank is entitled to judgment as to certain of the Events of Default, and since judgment will be entered forthwith, the motion for an attachment prior to judgment is denied as moot.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Citibank's motion for judgment on the pleadings as to the two claims in its Complaint, and DENIES Citibank's motion for a prejudgment attachment as moot.  Judgment will therefore be entered in favor of Citibank against Aralpa and Lebois, jointly and severally, in the amount of the outstanding balance of the Note, plus interest.  IT IS HEREBY ORDERED that Plaintiff shall file a proposed judgment within **one day** of this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 22.

Dated:  September 14, 2023
        New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge