# EXHIBIT P

citi
Execution Copy

**SINGLE-DRAW TERM NOTE**

**ICE LIBOR RATE**  **DATED AS OF:** June 16, 2017

### 1. PROMISE TO PAY.

For value received, the undersigned, Aralpa Holdings Limited Partnership, a New Brunswick limited partnership, by its general partner Yukon Mining LLC ("Borrower") hereby unconditionally promises to pay at the office of Citibank, N.A. ("Lender") located at 153 East 53rd Street, New York, New York 10043, to the order and for the account of the designated funding branch or office as Lender may designate from time to time, the principal sum of TWENTY MILLION Dollars ($20,000,000.00) (the "Credit Limit") or such other amount necessary to repay in full the then unpaid principal amount of the Advance (as defined below) made under this Note (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Note") on June 16, 2018 (the "Maturity Date") and any other amounts which may be owing to Lender by Borrower under this Note, plus simple interest accrued thereon at the rate or rates and at the times described below.

Borrower shall use all proceeds of the Advance to refinance existing indebtedness and for other lawful purposes; provided that no proceeds of the Advance shall be used (i) to finance gambling enterprises, to purchase military arms or to finance or make contributions to political candidates or organizations or (ii) in a way that violates, or causes Lender to violate, Regulations T, U and X. Subject to the preceding sentence, Borrower may use the proceeds of the Advance to purchase or carry margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

Borrower shall not intentionally engage in transactions with any Person that it knows is a non-bank Affiliate of Citibank, N.A. with the specific intent of transferring the proceeds of any Advance to such non-bank Affiliate of Citibank, N.A.  For the avoidance of doubt, Borrower's execution of transactions with any non-bank Affiliate of Citibank, N.A. in the ordinary course of Borrower's business shall not constitute a breach of this provision; provided that Borrower does not enter into such transactions with the specific intent of transferring the proceeds of an Advance to such non-bank Affiliate in violation of Section 23A of the Federal Reserve Act or any regulations promulgated thereunder.

### 2. DEFINITIONS.

In this Note, the following terms have the meanings specified below:

"Accounts" has the meaning set forth in the Security Agreement.

"Advance" means the advance made pursuant to, and evidenced by, this Note and shall be a LIBOR Rate Advance or an Alternate Base Rate Advance.

"Affiliate" means, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  If such first Person is an individual, "Affiliate" shall include any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is or limited partnership whose general partner is such individual or one or more members of such immediate family and any Person who is controlled by any such member or trust.

"Alternate Base Rate" means, for any day, a rate per annum equal to the highest of: (a) the rate of interest announced publicly by Citibank, N.A. in New York City from time to time as its base rate in effect on such day; or (b) the Federal Funds Rate in effect on such day plus 2.0% per annum.

"Alternate Base Rate Advance" means an Advance bearing interest with reference to the Alternate Base Rate, as provided herein.

"AML Legislation" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)* and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" applicable laws, whether within Canada or elsewhere, including any regulations, guidelines or orders thereunder.

"Borrowing Notice" means the notice to be delivered by Borrower in the form attached as Exhibit A hereto.

"Breakage Amount" has the meaning set forth in Section 6.

"Business Day" means any day that is not a Saturday, Sunday or other day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such State are authorized or required by law to close; provided that, when used in connection with a LIBOR Rate Advance, the term "Business Day" means any such day that is also a day in which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Change in Law" means the occurrence, after the date of this Note, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means, as to Borrower and Grantor, a Person, other than an Existing Shareholder, acquires Control of Borrower or Grantor.

"Collateral" means all of the property (tangible and intangible) purported to be subject to the lien or security interest purported to be created by the Security Agreement or other security document heretofore or hereafter executed by any Person as security for all or any part of the Secured Obligations.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Control" means the possession, directly or indirectly, of (a) the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, or (b) the power, directly or indirectly, to vote more than fifty percent (50%) of the voting stock of such Person. "Controlling" and "Controlled" shall have meanings correlative thereto.

"Country" means the Province of New Brunswick, Canada.

"Coverage Deficiency" has the meaning set forth in Section 11(i).

"Coverage Level" means a market value of Collateral (as determined pursuant to 11(i)) of 2.00 times the Credit Limit.

"Coverage Level at Inception" means a market value of Collateral (as determined pursuant to 10(u)) of 1.33 times the Credit Limit.

"Credit Documents" means, collectively, this Note and all other agreements, instruments or other documents executed and delivered by or on behalf of Borrower or any other Obligor pursuant to or in connection with this Note, including without limitation, the Security Agreement, the Guaranty, any account control agreement or other agreement or document pursuant to which any Obligor guarantees or grants security for the repayment of the Obligations or agrees to purchase the Advance subject to the terms thereof, and all Derivative Contracts.

"Default" means any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"Derivative Contract" means any agreement, whether or not in writing, relating to a transaction that is an interest rate swap, basis swap, forward transaction, currency swap or currency option, equity or equity index swap or equity option (puts and/or calls), interest rate option, cap, collar or floor transaction, or any other similar transaction (including any option to enter into any of the foregoing) or any combination of the foregoing, and, unless the context otherwise clearly requires, any master agreement or confirmation relating to or governing any or all of the foregoing in each case, with Lender or one of its Affiliates under which Borrower hedges its risk with respect to the fluctuation of interest or the value of currency to be paid under the Credit Documents to which it is a party or the fluctuation of the value of any Collateral.

"Derivative Obligations" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Derivative Contracts and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Derivative Contract transaction.

"Dollar Equivalent" means, with respect to any amount in Pesos, the Dollar equivalent that would result from the conversion of such Peso amount into Dollars at a rate quoted by Banco de México in the Official Gazette of the Federation (*Diario Oficial de la Federación*), as the exchange rate for the payment of obligations denominated in foreign currency in Mexico (*tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana*), as of the close of business for the applicable determination date, or, in the event that such rate is no longer published or is otherwise unavailable, the Dollar-Peso exchange rate as determined by Lender at its main office in New York, New York.

"Dollars" and "$" mean the lawful currency of the United States of America.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act and the applicable rules issued by the Commodity Futures Trading Commission and/or the United States Securities and Exchange Commission.

"Effective Date" has the meaning set forth in Section 3(b).

"Event of Default" means any of the events set forth in Section 12.

"Excluded Derivative Obligation" means, with respect to any Person, any Specified Derivative Obligation if, and to the extent that, all or a portion of a guarantee of such Person of, or the grant by such Person of a security interest to secure, such Specified Derivative Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Person's failure for any reason to constitute an ECP at the time such guarantee of such Person or the grant of such security interest becomes effective with respect to such Specified Derivative Obligation. If a Specified Derivative Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Specified Derivative Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following taxes imposed on or with respect to Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, or required to be withheld or deducted from a payment to any such recipient, (a) income, net profits, or capital taxes imposed on or measured by net income, and franchise taxes imposed (i) by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or conducts business, in which its principal office is located or in which its applicable lending office is located or (ii) with respect to Lender and any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing the tax (other than a connection arising from the execution, delivery, enforcement of, or performance under, or receipt of payments under any Credit Document, or from the sale or assignment of an interest in the Advance or any Credit Document) and (b) any branch profits taxes or any similar tax imposed by the jurisdiction where Borrower is located.

"Existing Shareholder" means Mr. Rodrigo Lebois Mateos.

"Federal Funds Rate" means, for any day, a rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the preceding Business Day) by the Federal Reserve Bank of New York, or if such rate is not so published for any day that is a Business Day, the average of the quotations at approximately 11:00 a.m. (New York City time), for the day for such transactions received by Lender from three Federal funds brokers of recognized standing selected by it.

"Federal Reserve Act" means the Federal Reserve Act (12 U.S.C. Section 226).

"Foreign Corrupt Practices Act" means the Foreign Corrupt Practices Act of 1977 (15 U.S.C. Sections 78dd-1, et seq.).

"Foreign Sovereign Immunities Act" means the US Foreign Sovereign Immunities Act of 1976 (28 U.S.C. Sections 1602-1611).

"Governmental Authority" means any Federal, state, local, foreign or supranational court or governmental agency, authority, instrumentality or regulatory body.

"Grantor" means Banco Invex, S.A., Institución de Banca Multiple, Invex Grupo Financiero, acting exclusively in its capacity as trustee of Trust 2452.

"Guarantor" means Mr. Rodrigo Lebois Mateos.

"Guaranty" means that certain Guaranty, dated as of the date hereof, duly executed by Guarantor in favor of Lender, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvent" means, with respect to a Person, a Person that is not Solvent.

"Interest Margin" means 0.95% per annum.

"Interest Payment Date" means (a) in relation to any LIBOR Rate Advance, the last day of each Interest Period applicable to such LIBOR Rate Advance and the Maturity Date and (b) in relation to any Alternate Base Rate Advance, the last Business Day of each calendar quarter commencing on the first such date to occur after the disbursement of such Alternate Base Rate Advance and the Maturity Date.

"Interest Period" means, with respect to any LIBOR Rate Advance, a period of three months; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. The first Interest Period shall begin on the date such LIBOR Rate Advance is disbursed and each subsequent Interest Period shall begin on the last day of the immediately preceding Interest Period. No Interest Period shall extend beyond the Maturity Date.

"LIBOR Rate" means, in relation to any LIBOR Rate Advance, (a) the applicable Screen Rate for such LIBOR Rate Advance or (b) if no Screen Rate is available for the currency or Interest Period of such LIBOR Rate Advance, the Alternate Base Rate, in each case as of 11:00 a.m. (London time) on the Quotation Day for the currency of the Advance and for a period comparable to the Interest Period of the Advance and, if that rate is less than zero, LIBOR Rate shall be deemed to be zero.

"LIBOR Rate Advance" means any Advance bearing interest with reference to the LIBOR Rate, as provided herein.

"Material Adverse Effect" means a material adverse effect on: (a) the operations, business, assets, nature of assets, properties, condition (financial or otherwise), liabilities or prospects of Borrower or any other Obligor (as applicable), (b) the ability of Borrower or any of the other Obligors to perform any of their respective obligations under this Note or any of the other Credit Documents, (c) the legality, validity or enforceability of this Note or any of the other Credit Documents, (d) the rights and remedies of Lender under this Note or any of the other Credit Documents, (e) the creation, perfection or priority of Lender's lien on or security interest in the Collateral, if any, securing the payment of any of the Obligations or (f) the value of the Collateral.

"Material Person" means, collectively, any Obligor or each Obligor's beneficial owners, settlors, trustees, members, managers, partners, participants or other Affiliates (as applicable).

"Obligations" means (a) the obligation of any Obligor to pay, as and when due and payable (by scheduled maturity, on demand or otherwise), all amounts from time to time owing by any Obligor in respect of the Credit Documents (including, without limitation, any extensions, modifications, substitutions, amendments, amendments and restatements or renewals thereof), direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Obligor of any proceeding under bankruptcy or insolvency law, regardless of whether such interest or fees are allowed claims in such proceeding, (b) the obligation of any Obligor to perform or observe all other obligations of any other Obligor, covenants and duties from time to time existing under any Credit Document and (c) all Derivative Obligations owing to Lender and its Affiliates; provided that the definition of "Obligations" shall not create any guarantee by any Obligor or any other Person, or grant of security interest by any Obligor or any other Person to support, as applicable, any Excluded Derivative Obligations of any Obligor or such Person for purposes of determining any obligations of such Obligor or such Person.

"Obligor" means Borrower, Grantor, Guarantor or any other Person or entity which guarantees, or grants security for all or any part of the Obligations from time to time, or agrees to purchase the Advance; it is the understanding that notwithstanding any provision herein to the contrary, the Grantor's liability with respect to payment hereunder shall be limited to the Securities Assets and Grantor assumes no personal or other liability with respect to payment under this Note.

"OFAC" means the Office of Foreign Assets Control, Department of the Treasury.

"Organizational Documents" means, with respect to any Person, all formation, organizational and governing documents, instruments and agreements, including the following (or any other equivalent document) and any amendments thereto (i) with respect to any corporation, its certificate or articles of incorporation or organization and its bylaws or its *estatutos sociales*, as applicable, (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (iii) with respect to any general partnership, its partnership agreement, (iv) with respect to any limited liability company, its articles of organization and its operating agreement and (v) with respect to a trust, the trust agreement. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from receipt or perfection of a security interest under, or otherwise with respect to any Credit Document.

"Patriot Act" means USA Patriot Act 2001, 107 Public Law 56 (October 26, 2001) and other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices, related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001.

"Person" means an individual, corporation, partnership, limited liability company or partnership, association, joint stock company, trust, unincorporated organization, joint venture or Governmental Authority or other regulatory body.

"Pesos" means the lawful currency of the United Mexican States.

"Principal Payment Date" means the Maturity Date; provided that if such day would be a day that is not a Business Day, then the Principal Payment Date shall be the next succeeding Business Day, unless there is no such Business Day in that calendar month, in which case the Principal Payment Date shall be the last Business Day of such calendar month.

"Quotation Day" means, in relation to any period for which an interest rate is to be determined, two Business Days before the first day of that period.

"Regulations T, U and X" means Regulations T, U and X of the Board of Governors of the Federal Reserve System of the United States (the "Board") as in effect from time to time, or any regulation of the Board which replaces Regulations T, U or X.

"Screen Rate" means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other Person which takes over the administration of such rate) for the relevant currency of the Advance for the relevant period, displayed on the appropriate page of the Reuters screen (or any replacement Reuters page which displays such rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters. If such page or service ceases to be available, Lender may specify another page or service displaying the appropriate rate after consultation with Borrower.

"Secured Obligations" has the meaning set forth in the Security Agreement.

"Securities Assets" means (a) the Unifin Shares, not representing more than 10% of the total outstanding Unifin Shares, (b) such other securities or property acceptable to Lender in its sole and absolute discretion and, in the cases of clauses (a) and (b) above, are in each case (i) 100% directly owned by Grantor, (ii) not subject to any encumbrance or liens other than the first priority perfected security interest of Lender, (iii) may be sold by Lender on any Business Day, without restriction or volume limitation and (iv) are, held in or transferred to the applicable Account.

"Security Agreement" has the meaning set forth in Section 3(b).

"Solvent" means, with respect to any Person, that such Person is solvent, is able to pay its debts as they become due and now owns property having a value both at fair valuation and a present fair salable value greater than the amount required to pay such debts as they mature, and will not be rendered Insolvent, or be left with insufficient capital, or be unable to pay its debts as they mature, by the execution, delivery and performance of any Credit Document or by the transactions contemplated hereunder or thereunder.

"Specified Derivative Obligation" means, with respect to any Person, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than fifty percent (50%) of (a) the issued and outstanding voting stock of such corporation, (b) the interest in the capital or profits of such limited liability company, partnership or joint venture or (c) the beneficial interest in such trust or estate, is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Taxes" means all present and future taxes, levies, imposts, duties, deductions, assessments, fees or other charges and withholdings (including back-up withholding) imposed by any Governmental Authority, including any interest, expenses, additions to tax or penalties applicable thereto.

"Unifin Shares" means the freely transferable common shares of Unifin Financiera, S.A.B., de C.V. S.O.F.O.M. E.N.R., a public non-regulated enterprise, which shares are listed on the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V.*) under the ticker "UNIFIN".

3. **ADVANCE; CONDITIONS PRECEDENT.**

(a) Advance. At the request of Borrower, provided all of the conditions precedent in Sections 3(b) and 3(c) hereof are satisfied, Lender may, in its sole and absolute discretion, and subject to the terms and conditions of this Note, make a single Advance to Borrower on the Effective Date, in the principal amount equal to the Credit Limit. For the avoidance of doubt, no more than one Advance shall be made hereunder. Borrower's request for the Advance shall be (i) irrevocable and binding on Borrower and (ii) made by the delivery to Lender of a duly completed and signed Borrowing Notice by Borrower no later than 11:00 a.m. (New York City time) three Business Days prior to the date of such requested Advance (or such fewer number of days as Lender may permit in its sole and absolute discretion). The proceeds of the Advance shall be credited to account no. 6780967681 maintained with Citibank, N.A. in the name Aralpa Holdings Limited Partnership, except as Borrower and Lender may otherwise agree in writing.

(b) Conditions to Effectiveness. Notwithstanding anything to the contrary in any Credit Document, nothing in any Credit Document shall be deemed to create or imply the existence of any commitment or obligation by Lender to make the Advance to Borrower. Lender reserves the right to, at any time, refuse to grant the Advance requested by Borrower. Furthermore, this Note shall not become effective, and Lender will not agree to make the Advance to Borrower, unless the following conditions precedent have been satisfied (such date, the "Effective Date"):

(i) Lender shall have received each of the following documents in form and substance satisfactory to Lender in its sole and absolute discretion and duly signed and delivered by each applicable Obligor:

(A) The Note;

(B) The New York law governed Security Agreement, dated on or about the date hereof, by Grantor in favor of Lender in form and substance satisfactory to Lender (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement");

(C) The Guaranty;

(D) A Federal Reserve Form U-1, if required by Lender;

(E) Reserved; and

(F) All information necessary to identify the Obligors as required under the Patriot Act.

(ii) Each Obligor, who is not an individual, shall have delivered to Lender a certificate of an officer in form and substance satisfactory to Lender, attaching and attesting to its Organizational Documents and the resolutions of the governing body of such Obligor, the good standing, existence or equivalent (if applicable) of such Obligor and the incumbency of the officers of such Obligor.

(iii) Grantor (A) shall have established and pledged to Lender the Accounts and other acceptable Collateral and (B) shall have funded the applicable Account with Securities Assets.

(iv) Lender shall have received (A) a favorable legal opinion of New York Counsel to Lender, (B) a favorable legal opinion of Mexican counsel to Guarantor and Grantor, and (C) a favorable opinion of New Brunswick counsel to Lender, each

dated the Effective Date and addressed to Lender, in form and substance acceptable to Lender.

(v) Each Obligor shall have caused to be delivered to Lender a letter indicating appointment of CT Corporation System (or any replacement thereof as provided below, "Process Agent"), with offices at 111 Eighth Avenue, 13th Floor, New York, New York 10011, as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any Action (as defined below), in form and substance satisfactory to Lender in its sole and absolute discretion.

(vi) Guarantor shall have delivered personal financial statements to Lender, in form and substance satisfactory to Lender.

(vii) The Obligors shall have disclosed all material agreements, events or other information which reasonably could be expected to have a Material Adverse Effect.

(viii) The Obligors shall have paid all reasonable and documented accrued fees and expenses of Lender (excluding in any case the accrued fees and expenses of counsel to Lender).

(ix) Each Obligor shall provide any other documents as Lender may reasonably request, including any documents required under the laws of (A) the United Mexican States and (B) the Country.

(c) Conditions to Advance. Lender shall have no commitment or obligation to make the Advance. Furthermore, Lender will not agree to make the Advance to Borrower unless the following conditions precedent have been satisfied on or prior to the date of the Advance:

(i) Lender shall have received a Borrowing Notice in accordance with the requirements hereof.

(ii) The Effective Date shall have occurred.

(iii) The representations and warranties of each Obligor contained in each Credit Document are true and correct as of the date of the Advance, before and after giving effect to the Advance and the use of proceeds therefrom, as though made on and as of such date.

(iv) No Default or Event of Default shall have occurred and be continuing or would result from the Advance.

(v) Lender shall have received such other approvals or documents reasonably requested by Lender in its sole and absolute discretion, each duly executed by the applicable Obligors (if applicable).

(vi) There shall be no impediment, restriction, limitation or prohibition imposed under law or by any Governmental Authority, as to the proposed financing under this Note or repayment thereof or as to rights created under any Credit Document or as to application of proceeds or the realization of such rights.

**4. INTEREST.**

(a) Except as otherwise provided in paragraph (b), Borrower promises to pay simple interest on the outstanding principal balance of the Advance made hereunder in arrears on each Interest Payment Date at an interest rate per annum equal at all times during such Interest Period to (i) the Interest Margin plus the LIBOR Rate for the applicable Interest Period or (ii) if the circumstances in Section 8 exist, the Interest Margin plus the Alternate Base Rate in effect from time to time.

(b) Borrower promises to pay on demand interest on past due principal and any other amount due and payable hereunder but not paid when due (whether by required prepayment, acceleration, demand or otherwise) at the rate of (in lieu of the rate in effect at such time) 4.00% per annum plus the LIBOR Rate plus the Interest Margin from the date of such non-payment until such amount is paid in full.

(c) All computations of interest shall be made by Lender on the basis of a year of 360 days for the actual number of days (including the first day, but excluding the last day) for which such interest is payable. Each determination by Lender of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error. For purposes of the *Interest Act (Canada)* and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day year, the yearly rate of interest to which the rate used in such calculation is the equivalent of the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360. The rates of interest under this Note are nominal rates, and not effective rates or yields. The principal of deemed reinvestment of interest does not apply to any interest calculation under this Note.

(d) If at any time and for any reason whatsoever, the interest rate payable on the Advance shall exceed the maximum lawful rate of interest ("Maximum Rate") permitted to be charged by Lender to Borrower under applicable law, such interest rate shall be limited to the Maximum Rate and, to the extent lawful, the interest that would have been payable in respect of the Advance but was not payable as a result of the operation of this paragraph shall be cumulated and the interest payable to Lender in respect of other periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by Lender. If any provision of this Note would obligate Borrower to make any payment of interest or other amount payable to Lender in an amount, or calculated at a rate that would be, prohibited by applicable law or would result in receipt by Lender of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code (Canada)*), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in receipt by Lender of "interest" at a "criminal rate".

(e) The Advance will continue as a LIBOR Rate Advance at the time of expiration of the then current Interest Period.

**5. PAYMENTS.**

(a) Borrower shall repay the aggregate outstanding principal amount of the Advance on the Principal Payment Date or when such amount otherwise becomes due and payable in accordance with this Note.

(b) The Advance, once repaid or prepaid, may not be re-borrowed.

(c) All payments of principal, interest and other amounts due under this Note shall be paid on the date when due in lawful money of the United States not later than 12:00 noon (New York City time) and if paid by check or other instrument, shall be made to Lender at Citi Private Bank, 1615 Brett Road, Ops III, New Castle, DE 19720. If Borrower wishes Lender to deduct interest payments

automatically from a designated account, Borrower will sign the Auto-Debit Authorization included herein.

(d) All payments made hereunder shall be applied first to the payment of any fees or charges outstanding hereunder, second to accrued interest, and third to the payment of the principal amount outstanding hereunder.

(e) All payments of principal, interest and other amounts payable hereunder shall be made without reduction for any defense, claim or counterclaim, or any assertion or exercise of a right of setoff or recoupment by Borrower.

6. **OPTIONAL PREPAYMENTS.**

Borrower may prepay this Note in whole or in part upon (i) in the case of a LIBOR Rate Advance, five, and (ii) in the case of an Alternate Base Rate Advance, three, Business Days' prior written notice to Lender, together with accrued interest to the date of such prepayment on the amount prepaid. Any such notice of prepayment shall state the proposed date and principal amount of such prepayment, which shall be in multiples of $1,000,000, or, if a lesser amount, the amount equal to the Obligations then outstanding at the time of making the prepayment. If Borrower prepays a LIBOR Rate Advance (or part thereof) on a day other than the last day of the applicable Interest Period, then, in addition to accrued interest, Borrower shall pay any amounts required to compensate Lender for any additional losses, costs or expenses which Lender may reasonably incur as a result of such prepayment, including, without limitation, any loss (including loss of anticipated profits of which Lender shall supply to Borrower reasonable calculations), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by Lender to fund or maintain the Advance but, in any event, no less than $500 on account of each such prepayment (the "Breakage Amount"). All calculations and determinations by Lender of the Breakage Amount shall be conclusive absent manifest arithmetic error.

7. **INCREASED COSTS; CHANGE IN LAW.**

(a) Change in Law. If any Change in Law occurs that (i) subjects Lender to any Taxes (other than Indemnified Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (ii) shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by Lender; or (iii) shall impose on Lender any other condition affecting any Credit Document or the Advance, and the result of any of the foregoing in paragraphs (i), (ii) and (iii) shall be to increase the cost to Lender of making or maintaining the Advance hereunder or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or otherwise), then Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on its capital or on the capital of its holding company, if any, as a consequence of this Note or the Advance made by it, to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy and liquidity), then from time to time Borrower will pay to Lender, as the case may be, such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered.

(c) Certificate from Lender. A certificate of Lender setting forth the amount necessary to compensate it or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 7 shall be delivered to Borrower and shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within 10 days after receipt thereof (unless demanded by Lender prior to such time, in which case, the amount shall be payable at the time demanded by Lender).

8. **ILLEGALITY.**

If Lender shall notify Borrower that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any Governmental Authority asserts that it is unlawful, for Lender to perform its obligations hereunder to make or maintain any LIBOR Rate Advance, the right of Borrower to request a LIBOR Rate Advance shall be suspended hereunder until Lender shall notify Borrower that the circumstances causing such suspension no longer exist and Borrower shall forthwith prepay in full any existing LIBOR Rate Advance, together with interest accrued thereon, unless Borrower, within five Business Days of notice from Lender, elects in writing to convert any LIBOR Rate Advance to an Alternate Base Rate Advance. In addition, if Lender notifies Borrower that, by reason of circumstances affecting the London interbank market for Dollar deposits, there are no adequate and reasonable means for ascertaining any LIBOR Rate for an Interest Period, then, on the last day of the then existing Interest Period, any LIBOR Rate Advance shall automatically convert to an Alternate Base Rate Advance (which Borrower shall be deemed to have accepted) until Lender shall notify Borrower that circumstances requiring such conversion no longer exist.

9. **TAXES.**

Any and all payments made by Borrower hereunder shall be made free and clear of, and without deduction for, any Indemnified Taxes. If Borrower shall be required by any law to make any such deduction from any payment hereunder, then (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 9) Lender receives an amount equal to the sum Lender would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant Governmental Authority or Person at the time and in the manner required by applicable law. In addition, Borrower agrees to pay all Other Taxes to the relevant Governmental Authority or Person at the time and in the manner required by applicable law. As soon as practicable after any payment of Indemnified Taxes by Borrower to a Governmental Authority or Person pursuant to this Section 9, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority or Person evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender. If no Taxes are payable in respect of any payment, Borrower will furnish to Lender upon request a certificate from each appropriate taxing authority, or an opinion of counsel acceptable to Lender, in either case stating that such payment is exempt from or not subject to Taxes. Borrower shall indemnify Lender for the full amount of Indemnified Taxes (including any Indemnified Taxes imposed by any jurisdiction on, or asserted on or attributable to, amounts payable under this Section 9) paid by Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority or Person. This indemnification payment shall be made promptly but in any event within thirty days from the date Lender makes written demand therefor. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

10.  **REPRESENTATIONS AND WARRANTIES.**

To induce Lender to make the Advance under this Note, Borrower represents and warrants as follows on the date hereof (which representations and warranties shall be deemed to be repeated on the date the Advance is made under this Note if after the date hereof):

(a) Borrower (i) is a limited partnership duly organized, validly existing and in good standing under the laws of the Country; (ii) is duly qualified and in good standing as a foreign business entity in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify and (iii) has all requisite power and authority (including all governmental licenses, agreements and other approvals) to own, lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted;

(b) Borrower has the legal capacity and authority to execute and deliver, and to perform its obligations under, the Credit Documents to which it is a party;

(c) The execution, delivery and performance by Borrower of the Credit Documents to which it is a party (i) does not contravene any law, rule, regulation, court decree or order or contractual restriction binding on or affecting Borrower or any of Borrower's property, (ii) will not result in a breach of, or entitle any party to terminate or call a default under, or result in the acceleration or required prepayment of, its Organizational Documents (if applicable) or any loan agreement, indenture, mortgage, note, lease or other agreement binding on or otherwise affecting Borrower or any of its properties, (iii) will not result in or require the creation of any lien, security interest or other encumbrance on any properties, revenues or assets of Borrower other than pursuant to the Credit Documents to which it is a party and (iv) are within Borrower's powers and have been duly authorized by all necessary action;

(d) No consent, authorization or approval or other action by, and no notice to or registration or filing with, any Governmental Authority or other Person is required for Borrower's due execution, delivery and performance of this Note and the other Credit Documents to which it is a party;

(e) This Note and the other Credit Documents to which it is a party have been duly executed and delivered by Borrower, and are Borrower's legal, valid and binding obligations, enforceable against Borrower in accordance with their respective terms, except for applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally;

(f) Except as disclosed in writing to Lender prior to the date hereof, there is no (i) unsatisfied order, judgment or other proceeding affecting Borrower, (ii) pending tax assessment affecting Borrower, (iii) lien (including tax liens) or other security interest affecting any property of Borrower or (iv) pending or, to Borrower's knowledge, threatened, investigation, litigation or proceeding affecting Borrower that, in each case, (A) could be reasonably expected to have a Material Adverse Effect or (B) purports to affect the legality, validity or enforceability of any Credit Document or the consummation of the transactions contemplated hereby or thereby or the performance hereunder or thereunder;

(g) None of the reports, financial statements, certificates or other information furnished by or on behalf of Borrower to Lender in connection with this Note or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(h) Borrower, and to the best of its knowledge and belief, each other Obligor and each of their respective Affiliates, Subsidiaries, directors and officers, (i) is not a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) is not a Person who engages in any dealings or transactions prohibited by Section 2 of such executive order, or, to Borrower's knowledge, is otherwise associated with any such Person in any manner violative of Section 2 of such executive order or any other applicable law, rule, regulation or order of any Governmental Authority, (iii) is not a Person on the list of countries, territories, individuals and/or entities prohibited pursuant to any law, regulation, or executive order administered by OFAC, including the List of Specially Designated Nationals and Blocked Persons administered by OFAC, (iv) is not a Person who is otherwise a target of the economic sanctions, laws, regulations, embargoes or restrictive measures administered or enforced by the United States government or the Canadian government, including, without limitation, OFAC and the United States Department of State, (v) if an entity, is not, and does not provide services to, a prohibited "shell bank" as defined in Section 313 of the Patriot Act and (vi) has operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Lender for Lender's review and inspection during normal business hours and upon reasonable prior notice;

(i) All tax returns required to be filed by Borrower in any jurisdiction have been filed timely, and all Taxes upon Borrower, or upon any of Borrower's property or income, which are shown to be due and payable on such returns have been paid, except for those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been established. Borrower is not aware of any proposed additional tax assessment or Tax to be assessed against or applicable to Borrower;

(j) Borrower is Solvent and the execution, delivery and performance of its obligations under the Credit Documents to which it is a party will not render Borrower Insolvent;

(k) Borrower is in compliance with and not in default of any obligation for borrowed money, any purchase money obligation or any lease, commitment, contract, instrument or other obligation, except as disclosed to Lender in writing;

(l) Each of Borrower and its Subsidiaries (if applicable) is in compliance in all respects with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, including, without limitation, foreign exchange laws, rules and regulations. Borrower is in compliance with all AML Legislation;

(m) Borrower is not an "investment company" registered, required to be registered or subject to regulation under, the Investment Company Act of 1940;

(n) Borrower has disclosed to Lender all agreements, instruments and corporate or other restrictions that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect on the Collateral;

(o) The Credit Documents are in proper legal form under the laws of the Country to be valid, legal, effective, enforceable or admissible into evidence in the courts of the Country except for (i) any official or certified translation into the national language of the Country that may be required or (ii) any other procedural steps that have been taken or that can be taken at any time without significant expense or delay and without prejudice to any rights or remedies Lender may have under the Credit Documents;

(p) It is not necessary that any Credit Document or any other document be filed, registered or recorded with, or executed or notarized before, any court, public office or other authority in the Country or that any registration charge or stamp or similar tax be paid on or in respect of any Credit Document or any other document in order to ensure the legality, validity, effectiveness, enforceability, priority or admissibility in evidence of such Credit Document;

(q) In any proceeding in the Country to enforce any Credit Document governed by New York law, the choice of New York law as the governing law of such Credit Document will be recognized and applied, the irrevocable submission of it to the non-exclusive jurisdiction of the courts of the State of New York or of the United States of America for the Southern District of New York will be valid, legal, binding and enforceable, and any judgment obtained in such a court will be recognized and enforceable in the Country without reconsideration as to the merits of such judgment;

(r) Borrower has executed and delivered this Note and the other Credit Documents to which it is a party outside the State of Florida;

(s) Borrower has the ability to lawfully pay solely and exclusively in Dollars the total amount which is, or may become, payable by it to Lender under the Credit Documents and has complied with any reporting obligations to the applicable Governmental Authority of the Country with respect to exchange controls;

(t) Neither Borrower, nor to the knowledge of Borrower, any agent or other Person acting on behalf of Borrower, has (i) directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by Borrower (or made by any Person acting on its behalf of which Borrower is aware) which is in violation of law, or (iv) violated in any respect any provision of the Foreign Corrupt Practices Act or the *Corruption of Foreign Public Officials Act (Canada)*; and

(u) The Dollar Equivalent market value of the Collateral, as determined in accordance with the closing price of the Collateral as quoted on the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V.*) on the Business Day immediately preceding the date of determination (provided that if the closing price is not available as of such day, the market value shall be determined as of the first preceding Business Day such closing price is available on the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V.*)), equals or exceeds the Coverage Level at Inception and all Collateral is Securities Assets.

**11. COVENANTS.**

So long as any Obligations shall remain outstanding and unpaid, Borrower shall, unless Lender otherwise consents in writing:

(a) Comply in all respects with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, (i) causing any agent or other Person acting on behalf of Borrower to comply with the Foreign Corrupt Practices Act, (including maintaining and complying with all policies and procedures to ensure compliance with such Act), and (ii) paying before the same become delinquent all Taxes imposed upon Borrower or Borrower's property, except to the extent contested in good faith by appropriate proceedings and for which appropriate reserves have been established;

(b) Not (i) at any time, be or become subject to any law, regulation or list of any government agency (including OFAC or the Canadian Department of Finance or the Canadian Office of the Superintendent of Financial Institutions) that prohibits or limits Lender from making the Advance to Borrower or from otherwise conducting business with Borrower, or (ii) fail to provide documentary and other evidence as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the Patriot Act;

(c) Preserve and maintain its existence, rights (charter and statutory) and franchises, including its legal name, legal form of organization and jurisdiction of organization;

(d) (i) Furnish to Lender from time to time, such other information, including management letters, financial statements, tax returns, investment statements and other information, as Lender may reasonably request and (ii) keep Lender fully informed of and promptly notify Lender in writing of any event affecting any Obligor's financial condition that could reasonably be expected to result in a Material Adverse Effect;

(e) Notify Lender immediately in the event Borrower receives any notice that any Obligor or Material Person becomes listed on Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering;

(f) Deliver to Lender a statement, as soon as possible and in any event within five days after the occurrence of each Default continuing on the date of such statement, setting forth the details of such Default and the action that Borrower has taken and proposes to take with respect thereto;

(g) Provide notice to Lender promptly after the commencement of all actions and proceedings before any court, Governmental Authority or arbitrator affecting any Obligor or the Collateral, and of any event or omission that has resulted, or could reasonably be expected to result, in a Material Adverse Effect;

(h) Not make any material change in the nature of its business as carried on at the date hereof;

(i) Not, and shall cause each other Obligor to not, permit the Dollar Equivalent market value of the Securities Assets constituting Collateral, as determined in accordance with the closing price of the Securities Assets constituting Collateral as quoted on the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V.*) on the Business Day immediately preceding the date of determination (provided that if the closing price is not available as of such day, the market value shall be determined as of the first preceding Business Day such closing price is available) to be less than (i) from the Effective Date until the date that is three (3) Business Days from the Effective Date, the Coverage Level at Inception, and (ii) thereafter, the Coverage Level (to the extent such Coverage Level is less, it shall be a "Coverage Deficiency");

(j) Within five (5) Business Days of the occurrence of a Coverage Deficiency, shall, and shall cause each other Obligor to, provide Lender sufficient additional Securities Assets in order to remedy such Coverage Deficiency. For the avoidance of doubt, the failure to remedy the Coverage Deficiency within five (5) Business Days of the incurrence of such Coverage Deficiency, as contemplated by the previous sentence, shall constitute an Event of Default pursuant to Section 12(a)(ii), and Lender may immediately exercise its rights against the Collateral;

(k) Each Obligor shall not create or suffer to exist, or permit any Obligor's Subsidiary to create or suffer to exist, any lien on, or with respect to, the Collateral; and

(l) Within 15 Business Days from the date hereof, Guarantor and Grantor shall each have caused to be delivered to Lender a Mexican irrevocable power of attorney for lawsuits and collections granted before a Mexican notary public in favor of the Process Agent, duly apostilled.

## 12. DEFAULT

Borrower will be in Default under this Note and an Event of Default shall occur if any of the following shall occur and be continuing:

(a) Any Obligor fails to (i) pay when due any amount payable under this Note or any other Credit Document or fails to perform when due any Obligation or (ii) observe or comply with any of the covenants, terms or conditions of this Note or any other Credit Document; or

(b) Any representation or warranty made by an Obligor or Material Person, or any of their respective officers (to the extent applicable), under or in connection with any Credit Document or certificate delivered in connection therewith is incorrect when made or deemed to be made, as reasonably determined by Lender; or

(c) An Obligor or Material Person (i) fails to pay any principal of or premium or interest on any of its respective outstanding debt of a principal or notional amount of $1,000,000 (or its equivalent) in the aggregate or more when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such debt or (ii) breaches or defaults on any of its other obligations under any agreement, if the effect of such breach or default is to cause such obligations thereunder to become due or redeemed, or to permit the holder or holders of such obligations to declare such obligations due or require such obligations to be redeemed prior to their stated maturity; or

(d) The general nonpayment by an Obligor or Material Person of its respective debts as such debts become due, the admission in writing by such Obligor or Material Person of its inability to pay its respective debts generally, or the making by such Obligor or Material Person of a general assignment for the benefit of creditors, or the filing of any petition by or against an Obligor or Material Person, or the commencement of any proceedings instituted by or against such Obligor or Material Person seeking to adjudicate it bankrupt or insolvent (or files a notice of its intention to do so), or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any federal, state or foreign law now or hereinafter in effect, including without limitation, the *Bankruptcy and Insolvency Act (Canada),* relating to bankruptcy, *concurso mercantil*, winding up, insolvency or reorganization or relief of debtors (including the *Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada)* and any applicable corporations legislation), or seeking the entry of an order for relief or the appointment of a receiver, trustee, *sindico, conciliador, liquidador*, custodian or other similar official for it or for any substantial part of its property; or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur, or the taking of any action by such Obligor or Material Person to authorize any of the foregoing; or

(e) Any money judgment (other than a money judgment covered by insurance, provided the insurer has admitted liability with respect to such money judgment), writ or warrant of attachment, or similar process shall be entered or filed against any Obligor or Material Person involving in any case an amount, after taking into account any undisputed insurance coverage, individually or in the aggregate, in excess of $1,000,000 (or its equivalent), and either (A) enforcement proceedings shall have been commenced by any creditor upon any such judgment, or (B) there shall be any period of more than thirty consecutive days during which such judgment is not either (1) discharged or (2) subject to a stay of enforcement by reason of pending appeal or otherwise; or

(f) Either (i) any provision of this Note or any other Credit Document shall cease to be valid and binding on or enforceable against Borrower or any other applicable Obligor, or Borrower or any other Obligor shall so assert or so state in writing, or (ii) the obligations of Borrower or any other applicable Obligor under this Note or the other Credit Documents in any way become illegal, or (iii) any lien granted pursuant to any Security Agreement shall for any reason at any time cease to be a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby, or (iv) any Security Agreement or any other document related to Collateral shall for whatever reason be terminated or cease to be in full force and effect or any Obligor shall take any action to discontinue or to assert the invalidity or unenforceability of any Security Agreement, the Guaranty or any other document related to Collateral or (v) Lender considers any Obligations insecure or any guaranty, Collateral or security for Obligations unsafe, insecure, inadequate, impaired or insufficient; or

(g) Either (i) any Governmental Authority or any Person or entity acting or purporting to act under governmental or judicial authority takes any action to investigate, condemn, seize, or appropriate or to assume custody or control of any Obligor or Material Person or any of their property, or to curtail an Obligor's authority in the conduct of Borrower's business or the authority of any Material Person in its business or (ii) any Obligor or Material Person or any of their property is attached or becomes subject to a court order or subpoena anywhere; or

(h) Either (i) any authority asserting or exercising governmental or police powers in the Country or the United Mexican States take any action, including a general moratorium, cancelling, suspending or deferring the obligation of an Obligor or any Material Person to pay any amount of principal or interest payable under this Note or the other Credit Documents, or preventing or hindering the fulfillment by such Obligor or any Material Person of its obligations under this Note or the Credit Documents, or having any effect on the currency in which such Obligor may pay its obligations under this Note or the Credit Documents, or on the availability of foreign currencies in exchange for the national currency of the Country or the United Mexican States (including the requirement for the approval to exchange foreign currencies for the national currency of the Country or the United Mexican States) or otherwise or (ii) any Obligor or Material Person shall, voluntarily or involuntarily, participate or take any action to participate in any facility or exercise involving the rescheduling of such Obligor's or Material Person's debts, as the case may be, or the restructuring of the currency in which such Obligor or Material Person, as the case may be, may pay its obligations; or

(i) Any Obligor or Material Person (i) if a natural person, dies or becomes incompetent or (ii) if any entity, is dissolved or otherwise ceases to exist; or

(j) An event shall have occurred which, in Lender's reasonable opinion, would have a Material Adverse Effect; or

(k) A Change of Control occurs; or

(l) (A) The long term foreign issuer (or equivalent) rating of the Unifin Shares shall be less than Ba3/BB-, as published by Moody's Investor Services, Inc. and Standard & Poors Ratings Group, respectively, (B) the delisting of the Unifin Shares, or (C) the bankruptcy, insolvency, liquidation, winding up, reorganization, arrangement, adjustment, protection relief or composition of it or its debts under any law relating to bankruptcy, *concurso mercantil* or insolvency of Unifin Financiera, S.A.B., de C.V. S.O.F.O.M,, E.N.R..

### 13. LENDER'S RIGHTS.

If an Event of Default is continuing, (a) Lender may declare the principal amount outstanding under this Note, all interest thereon and all other amounts payable under this Note to be immediately due and payable, at which time all such principal, interest and other amounts will become immediately due and payable and (b) Lender may terminate any obligation it may have to make the Advance in connection with this Note, in each case, without presentment, protest, demand or further notice of any kind, all of which are hereby expressly waived by Borrower; provided, however that in the event of any actual or deemed entry of an order for relief with respect to Borrower under the Federal Bankruptcy Code or any comparable provision under the laws of another country or territory (including the Mexican Bankruptcy Law (*Ley de Concursos Mercantiles*)), this Note, all interest and all other amounts due hereunder shall automatically become and be due and payable, all without presentment, protest, notice or demand of any kind, all of which are expressly waived by Borrower. If this Note is so declared due and payable on a day other than the last day of an Interest Period, Borrower will also pay Lender on demand any Breakage Amount as a result of this Note becoming due prior to the end of an Interest Period, a certificate by Lender to Borrower stating the Breakage Amount being conclusive. At Lender's option, Borrower's Obligations owed to Lender will also become due and payable, also without notice or demand. If an Event of Default is continuing, Lender has all the rights and remedies available to Lender under law, including but not limited to, any rights and remedies available under any applicable Credit Document in Lender's or its Affiliate's favor.

### 14. RIGHT OF SET-OFF.

In addition to, and not in limitation of, all rights of set-off that Lender or any of its Affiliates may have under applicable law, Lender and its Affiliates shall have the right at any time and from time to time, to the fullest extent permitted by law, with or without notice to Borrower, to place an administrative hold upon or set-off, appropriate and apply to the payment or reduction, either in whole or in part, of the amount of the Obligations now or hereafter existing under any Credit Document whether or not Lender has made any demand for payment under the Credit Documents, all deposits (general or special, time or demand, provisional or final) and other obligations at any time held or owing to Lender or any of its Affiliates by Borrower and to sell, liquidate, transfer and otherwise apply any assets or securities of Borrower held by Lender, its Affiliate or a securities intermediary (for the benefit of Lender).

### 15. COSTS/EXPENSES; INDEMNIFICATION.

(a) Costs/Expenses. Borrower hereby agrees to pay on demand: (i) all fees, costs and expenses (to include, without limitation, any fees, charges and disbursements of legal counsel) in connection with the (A) administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of the Credit Documents; (B) protection of Lender's rights hereunder and thereunder, including in connection with any workout, restructuring or negotiations in respect thereof and (C) custody, preservation, use or sale of, collection or other realization upon any Collateral; (ii) all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Credit Document or any other document referred to therein and (iii) any civil penalty or fine assessed by OFAC against, and all reasonable costs and expenses (including any fees, charges and disbursements of counsel) incurred in connection with defense thereof, by Lender or its Affiliates as a result of the default hereunder by any Obligor or any Subsidiary thereof which default violates a sanction enforced by OFAC.

(b) Indemnification. Borrower hereby agrees to indemnify and hold harmless Lender, its Affiliates and each of their partners, directors, officers, employees, agents, trustees, administrators, managers, representatives and advisors (an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, costs and expenses (including, without limitation, fees, charges and disbursements of counsel for any Indemnified Party) which may be incurred by or asserted or awarded against any Indemnified Party in connection with, arising out of or by reason of (including, without limitation, in connection with) any investigation, subpoena, litigation or proceeding or preparation of a defense in connection therewith, (i) the execution or delivery of any Credit Document (or any agreement or instrument contemplated hereby or thereby), the performance by the parties hereto or thereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Advance or the use or proposed use of proceeds of the Advance or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by an Obligor, and regardless of whether any Indemnified Party is a party thereto; provided that such indemnity shall not, as to any Indemnified Party, be available to the extent that such claims, damages, losses, liabilities, costs or expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Indemnified Party. To the fullest extent permitted by applicable law, Borrower also agrees not to assert, and hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or otherwise relating to, this Note, any other Credit Document or any agreement or instrument contemplated hereby or thereby, any of the transactions contemplated herein or therein, the Advance or the use or proposed use of the proceeds of the Advance. No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Note or the other Credit Documents or the transactions contemplated hereby or thereby.

### 16. INFORMATION EXCHANGE.

Lender may exchange information about this Note, the related Security Agreement, the related Guaranty, any other Credit Document and other documents with Lender's Subsidiaries, Affiliates and proposed transferees, which shall, for the avoidance of doubt, be subject to the confidentiality provisions in Section 17.

### 17. ASSIGNMENT.

Borrower may not assign or otherwise transfer any of its rights or obligations under this Note or any other Credit Document without the prior written consent of Lender. Lender may assign or sell participations to one or more banks or other entities all or a portion of its rights under this Note and the other Credit Documents. In the event of an assignment of all of its rights, Lender may transfer this Note to the assignee. Borrower shall cooperate with Lender and any assignee or participant in executing any new notes and other documents necessary or desirable to complete such assignment or participation,

and any related transfer of collateral. Lender may, in connection with any assignment or participation or proposed assignment or proposed participation, disclose to the assignee or participant or proposed assignee or proposed participant any information relating to Borrower furnished to Lender by or on behalf of Borrower, provided that, except in connection with a pledge or assignment of a security interest as described below, the assignee or participant or proposed assignee or proposed participant shall agree to preserve the confidentiality of any confidential information related to Borrower received by it from Lender. Notwithstanding anything herein to the contrary, Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Note and the other Credit Documents to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release Lender from any of its obligations under this Note or any other Credit Document or substitute any such pledgee or assignee for Lender as a party to this Note or any other Credit Document.

**18. JUDGMENT.**

If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder in one currency ("the first currency") into another currency ("the second currency"), the rate of exchange which shall be applied shall be that at which Lender could purchase the first currency with the second currency in New York City at 11:00 a.m. (New York City time) on the Business Day preceding that on which final judgment is given. Borrower's obligation in respect of any such sum due from Borrower to Lender hereunder shall, notwithstanding any judgment in such other currency, be discharged only to the extent that on the Business Day following receipt by Lender of any sum adjudged to be due hereunder in the second currency, Lender may, in accordance with normal banking procedures, purchase the first currency with the second currency and, if the first currency so purchased is less than the sum originally due to Lender in the first currency, Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Lender against such loss.

**19. WAIVER OF PRESENTMENT.**

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest of the Note.

**20. SUCCESSORS AND ASSIGNS.**

Borrower's obligations under this Note will also be binding on its successors and permitted assigns and legal representatives, as applicable. Borrower's successors and permitted assigns shall include, without limitation, a receiver, successor trustee or debtor-in-possession for Borrower.

**21. NOTICES.**

All notices to be given under the Credit Documents shall be in writing and sent by certified or registered mail, return receipt requested, by overnight delivery service, with all charges prepaid, by messenger, email or facsimile transmission or by any other method then authorized by Lender in writing. Notices shall be sent to the address for Lender and Borrower as set forth on Schedule 1 attached hereto or to the most recent address of Borrower shown on Lender's account records. Notice will be deemed received, if to Lender, upon actual receipt, and if to Borrower, on the fourth Business Day after depositing such notice in the United States Post Office in the case of certified or registered mail, or upon reliable confirmation of delivery if sent by any other means. If Borrower refuses any such delivery, a notice so refused shall nonetheless be deemed delivered.

**22. INTERPRETATION.**

For purposes of this Note, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The definitions given for any defined terms in the Note shall apply equally to both the singular and plural forms of the terms defined and, wherever from the context it appears appropriate, pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. Unless the context otherwise requires, references herein to: (a) Sections, Exhibits and Schedules mean the Sections of, and Exhibits and Schedules attached to, this Note; (b) an agreement, instrument or other document means such agreement, instrument or other document as amended, amended and restated, supplemented or otherwise modified from time to time to the extent permitted by the provisions thereof; and (c) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Note shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Note to the same extent as if they were set forth verbatim herein.

**23. HEADINGS.**

The headings in this Note are for reference only and shall not affect the interpretation of this Note.

**24. SEVERABILITY.**

In case any term, provision in or obligation under this Note or any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining terms, provisions or obligations, or of such term provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**25. COUNTERPARTS; ENTIRE AGREEMENT; EXECUTION.**

Any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. This Note and the other Credit Documents constitute the entire understanding between the parties hereto with respect to the subject matter hereof and thereof and supersede any prior or contemporaneous agreements, written or oral, with respect thereto. Borrower may effectively deliver an executed counterpart of a signature page of any Credit Document by facsimile or in electronic ("pdf" or "tif") format, however Borrower shall also deliver to Lender manually-executed originals of each Credit Document, but the failure of Borrower to do so shall not affect the validity, enforceability or binding effect of any Credit Document as against Borrower.

**26. GOVERNING LAW.**

This Note and the other Credit Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note or any other Credit Document (except, as to any other Credit Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of New York.

**27. JURISDICTION; WAIVER OF VENUE; SERVICE OF PROCESS.**

(a) Without limiting the right of Lender to bring any action, litigation, proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise (an "Action") against Borrower or against the property of Borrower arising out of or relating to any obligation of Borrower under this Note or any other Credit Document in the courts of other jurisdictions, Borrower hereby irrevocably and unconditionally agrees to submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in

New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any Action arising out of or relating to this Note or any other Credit Document, or for recognition or enforcement of any judgment and Borrower hereby irrevocably and unconditionally agrees that all claims in respect of any such Action may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court.

(b) Borrower hereby irrevocably waives, to the fullest extent it may effectively do so by applicable law, any objection that it may now or hereafter have to the laying of venue of any Action arising out of or relating to this Note or any other Credit Document in any court referred to in paragraph (a) of this Section 27. Borrower waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of any Action in any such court.

(c) To the extent required pursuant to Section 3(b)(v), Borrower hereby designates, appoints and empowers the Process Agent as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any Action and, if such designee, appointee or agent shall cease to be available to act as such, Borrower agrees to designate a new designee, appointee and agent in New York City on the terms and for the purposes satisfactory to Lender. Borrower hereby irrevocably agrees that the summons and complaint or any other process in any Action in any jurisdiction may be served by first-class, registered, certified or overnight mail addressed to any address specified as a notice address for Borrower hereunder or by hand delivery to an individual Person of suitable age and discretion at any of such addresses. Such service will be complete on the date such process is so mailed or delivered. Borrower may also be served in any other manner permitted by applicable law.

### 28. WAIVER OF IMMUNITY.

To the extent that Borrower may be or become entitled to claim for itself or its property or revenues, any immunity on the ground of sovereignty or the like from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment or execution of a judgment, and to the extent that, in any jurisdiction, there may be attributed such an immunity (whether or not claimed), Borrower hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity with respect to its obligations under this Note and the other Credit Documents and agrees that the waivers set forth in this sentence shall have the fullest scope permitted under the Foreign Sovereign Immunities Act and applicable law and are intended to be irrevocable for purposes of such Act or applicable law.

### 29. JURY TRIAL WAIVER.

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS NOTE OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 29.**

### 30. EFFECT OF WAIVERS.

Each waiver of any rights by Borrower contained herein is given by Borrower knowingly and intentionally and, unless otherwise expressly provided herein, for all times and forever.

### 31. NO DEEMED WAIVERS; REMEDIES CUMULATIVE.

No failure or delay by Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of Lender hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have. Failure by Lender at any time or times hereafter to require strict performance by Borrower, any other Obligor or any other Person of any of the provisions, warranties, terms and conditions contained in the Credit Documents shall not waive, affect or diminish any right of Lender at any time or times hereafter to demand strict performance thereof. Any final determination by a court of competent jurisdiction of the amount of the Obligations, shall be conclusive and binding on Borrower irrespective of whether Borrower was party to the suit or action in which such determination was made. No waiver of any provision of this Note or consent to any departure by any Obligor therefrom shall in any event be effective unless the same shall be permitted by Section 32, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of the Advance shall not be construed as a waiver of any breach of this Note or any other Credit Document, regardless of whether Lender may have had notice or knowledge of such breach at the time.

### 32. AMENDMENTS.

No term or provision of this Note may be waived, altered, modified or amended except in writing signed by Borrower and Lender.

### 33. SURVIVAL.

All covenants, agreements, representations and warranties made by Borrower herein (including for the avoidance of doubt, the provisions of Section 10) and in the certificates or other instruments delivered in connection with or pursuant to this Note (including the other Credit Documents to which it is a party) shall be considered to have been relied upon by Lender and shall survive the execution and delivery of this Note and the making of the Advance, regardless of any investigation made by Lender or on its behalf and notwithstanding that Lender may have had notice or knowledge of any incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Advance or any fee or any other amount payable under this Note is outstanding and so long as any other Obligations (including for the avoidance of doubt Derivative Obligations) are outstanding. The provisions of Sections 7, 8, 9, Sections 14 to 34 and Sections 36 to 37 (inclusive) and any obligation of Borrower to make payment of any Breakage Amount, shall survive and remain in full force and effect regardless of payment in full of the Advance and other Obligations and the termination of this Note or any provision hereof.

### 34. ENGLISH LANGUAGE.

This Note and each other Credit Document has been negotiated and executed in English. All certificates, reports, notices and other documents and communications given or delivered by any party hereto pursuant to this Note or any other Credit Document shall be in English or, if not in English, accompanied by a certified English translation thereof. The English version of any such document shall control the meaning of the matters set forth herein.

### 35. CREDIT REPORTS.

Borrower hereby agrees and authorizes Lender and its Affiliates to obtain credit reports on it from time to time until the Obligations are paid in full.

### 36. INCONSISTENCY.

In the event of any conflict or inconsistency between the provisions of the other Credit Documents and this Agreement, the provisions of this Agreement shall prevail *mutatis mutandis*.

### 37. APPLICATION UNDER THE CCAA.

Borrower acknowledges that its business and financial relationships with Lender is unique from its relationship with any of its creditors. Borrower shall not file any plan of arrangement under the Companies' Creditors Arrangement Act (the "CCAA Plan") which provides for, or would permit, directly or indirectly, Lender to be classified in the same class as any other creditor of Borrower for purposes of such CCAA Plan.

### 38. PATRIOT ACT NOTICE.

Borrower understands, and shall be responsible for notifying each other Obligor, that pursuant to the requirements of the Patriot Act, Lender is required to obtain, verify and record information that will allow Lender to identify such Obligor in accordance with the Patriot Act. Borrower shall, promptly following a request by Lender from time to time, provide all documentation and other information that Lender requests in order to comply with its ongoing obligations under the Patriot Act.

*Signatures on the following page.*

IN WITNESS WHEREOF, the Borrower has executed and delivered this Note on the date first written above.

Aralpa Holdings Limited Partnership

By: Yukon Mining LLC
Its: General Partner

By: JTC Directors (Suisse) Limited
Its: Sole Manager

By: _____
Name: RACHEL HIGHAM & DIRK OPPELAAR
Title:

## Auto-Debit Authorization and Agreement ("Authorization")

I authorize and direct Citibank, N.A. ("Citi") to initiate scheduled debit entries ("Debits") to my Citi account located in the United States indicated below to pay interest due under this Note monthly in arrears. This Authorization shall remain in effect until I terminate it by written or electronic notice to Citi. At least 10 days in advance of each Debit, Citi will notify me of the estimated amount of the Debit based on the "Alternate Base Rate" or the "LIBOR Rate" in my Note followed by notice of the actual amount of the Debit sent at the time of the actual Debit. I understand that the actual amount of the Debit to my account may differ from the estimated amount due to changes in my rate or account balance at the time the actual Debit is initiated.

I understand that I have the right to stop these Debits by calling or writing to Citi at the address listed in Schedule 1, in time for Citi to receive my request 3 Business Days or more before the actual Debit is scheduled to be made. I also understand that I have the right to end these authorized payments at any time by calling or writing to Citi at the same address. Citi reserves the right to cancel the terms of this Authorization if there are insufficient funds in my account for any three consecutive Debits. I understand and agree that if my account does not have sufficient funds to make my interest payment, Citi will not be responsible or liable for any penalties or charges assessed as a result of such insufficiency. Citi also reserves the right to change the terms and conditions of this Authorization after 21 days' prior written notice to me.

Account Number: [REDACTED] 7681          Date: June 12, 2017

Aralpa Holdings Limited Partnership

By: Yukon Mining LLC
Its: General Partner

By: JTC Directors (Suisse) Limited
Its: Sole Manager

By: _____
Name: RACHEL HIGHAM   DIRK OPPELAAR
Title:

[Aralpa] CPB (LatAm) Term Note (USD, Multi-Draw, Revolver)

**SCHEDULE 1**

to

Note

**NOTICE ADDRESS:**

**Lender:**

**Citibank, N.A.**
c/o Citi Private Bank
201 S. Biscayne Blvd. Suite 3300,
Miami, FL, 33131
Attn: Thomas M. Campbell
Email: thomas.m.campbell@citi.com

**with a copy to:**

**Citibank, N.A.**
Credit Risk Management Services (CRMS)
Attn: Richard Scaduto, CoE Buffalo, 2nd Floor
580 Crosspoint Parkway
Getzville, NY 14068
Email: richard.scaduto@citi.com


**Borrower:**

**Aralpa Holdings Limited Partnership**

**Address:**

Av. Presidente Masaryk 111, Piso 5
Col. Polanco V Sección, CP 11560
Ciudad de México, México

**Email:** alo@aralpacapital.mx

**EXHIBIT A**

NOTICE OF BORROWING

_____, 20__

Originating Office

**Citibank, N.A.**
c/o Citi Private Bank
201 S. Biscayne Blvd. Suite 3300,
Miami, FL, 33131
Attn: Thomas M. Campbell
Email: thomas.m.campbell@citi.com

Ladies and Gentlemen:

The undersigned, refers to the Note dated as of June __, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Note"), pursuant to which you have made a discretionary line of credit (the "Line") available to us. Capitalized terms used herein without definition shall have the meanings given to such terms in the Note referenced therein. Pursuant to the Note, we hereby give you notice that we hereby irrevocably request the Advance under the Line and in that connection set forth below the following information relating to the Advance (the "Proposed Advance"):

    (a)    The Business Day of the Proposed Advance is _____, 20__.
    (b)    The amount of the Proposed Advance is $_____.
    (c)    The interest rate applicable to the Proposed Advance is LIBOR Rate plus the Interest Margin.

We hereby certify that:

    (a)    all of the representations and warranties contained in the Note and the other Credit Documents delivered in connection therewith are true and correct as of the date hereof;

    (b)    no Default or Event of Default has occurred and is continuing as of the date hereof or will result from the Proposed Advance; and

    (c)    the conditions set forth in Section 3(b) and 3(c) of the Note have been satisfied.

Very truly yours,

**Aralpa Holdings Limited Partnership**

By: Yukon Mining LLC
Its: General Partner

By: JTC Directors (Suisse) Limited
Its: Sole Manager

By:_____
Name:
Title: