UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIBANK, N.A.,

                              Plaintiff,

            -against-

ARALPA HOLDINGS LIMITED PARTNERSHIP
and RODRIGO LEBOIS MATEOS,

                              Defendants.

Case No. 1:22-cv-08842 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Citibank, N.A. ("Plaintiff" or "Citibank") has obtained a money judgment against Rodrigo Lebois Mateos ("Lebois") and Aralpa Holdings Limited Partnership ("Aralpa Holdings" and, together with Lebois, "Defendants"). Dkt. 55. Citibank now moves for the issuance of turnover orders pursuant to Federal Rule of Civil Procedure ("Rule") 69 and New York Civil Practice Law and Rule ("CPLR") 5525 and 5528; an order pursuant to Rule 69 and CPLR 5226 directing Lebois and nonparty One57 36B, LLC ("One57") to make installment payments to Citibank of all rental income that they will receive from the leasing of certain properties in New York and Miami; and a preliminary injunction. Dkt. 195 ("OTSC"). Defendants and nonparties One57 and Aralpa Investments, LLC (together, the "Nonmovants") oppose the motion. The Court held a hearing on the Order to Show Cause on September 30, 2025.

Based on the parties' written submissions and presentations at the hearing, and for the following reasons, the Court GRANTS Plaintiff's motion to appoint a receiver, for turnover orders, and for installment payment orders, and DENIES the motion for a preliminary injunction as MOOT.

1

**BACKGROUND**

The following facts are undisputed unless otherwise noted, and are drawn from the declarations of Adam Kauff, Bruno Plotnicki, Almudena Lebois Ocejo ("Ocejo"), and Adam Ford, *see* Dkt. 202 ("Kauff Decl."); Dkt. 200 ("First Plotnicki Decl."); Dkt. 236 ("Second Plotnicki Decl."); Dkt. 227 ("Ocejo Decl."); Dkt. 229 ("Ford Decl."), and the exhibits attached thereto.  Where necessary, the Court also incorporates its previous findings in *Citibank, N.A. v. Aralpa Holdings Ltd. Partnership*, No. 22-cv-08842 (JLR), 2023 WL 5971144 (S.D.N.Y. Sept. 14, 2023) (*Citibank I*), and *Citibank, N.A. v. Aralpa Holdings Ltd. Partnership*, 714 F. Supp. 3d 416 (S.D.N.Y. 2024) (*Citibank II*), *aff'd*, No. 24-423, 2025 WL 289499 (2d Cir. Jan. 24, 2025) (*Citibank III*) (summary order).

**I.  The Parties and Nonparties**

Citibank is a national banking association organized under the laws of the United States. *Citibank II*, 714 F. Supp. 3d at 424.  Lebois is a businessman and is a citizen and domiciliary of Mexico.  *Id.* at 425.  One57 is a New York LLC formed on September 7, 2016.  *Id.*  Aralpa Miami Investments, LLC ("Aralpa Miami") is a Georgia LLC formed on January 24, 2018.  *Id.* at 426.  Aralpa Miami's sole member is Aralpa Capital, a Mexican corporation.  *Id.* at 425-26.  Aralpa Investments is a Delaware limited liability company that was formed on March 27, 2015.  First Plotnicki Decl. ¶ 25.  Its sole member is also Aralpa Capital.  *Id.* ¶ 26.  When Aralpa Investments and Aralpa Miami were formed, Lebois was the President and owner of Aralpa Capital.  First Plotnicki Decl. ¶ 26; *see also Citibank II*, 714 F. Supp. 3d at 425.  Following a resolution executed on October 1, 2020, Lebois's daughter, Ocejo, became the sole manager of Aralpa Investments; she is also an "authorized signer" for Aralpa Miami.  First Plotnicki Decl. ¶ 36; *Citibank II*, 714 F. Supp. 3d at 426.

## II.    The New York Property, the Miami Condos, and the Note and Guaranty

In January 2018, One57 obtained a $5.22 million mortgage for a building at 157 West

57th Street in Manhattan (the "New York Property") from Citibank.  *Citibank II*, 714 F. Supp. 3d

at 425-26.  Lebois signed the mortgage agreement for the New York Property.  *Id.* at 426.

Among other properties, Lebois owns and leases five apartments in Miami, Florida at the Bond

on Brickell, 1080 Brickell Avenue, Miami, Florida, 33131, Units 1400, 1809, 2006, 2302, and

2306 (the "Miami Condos").  First Plotnicki Decl. ¶ 42.[1]

As recounted in detail in *Citibank I* and *Citibank II*, Citibank agreed to provide Aralpa

Holdings with a $20 million credit facility on June 16, 2017 (the "Note"), and required Lebois to

personally guaranty the repayment of any funds borrowed by Aralpa Holdings (the "Guaranty").

*Citibank II*, 714 F. Supp. 3d at 428; *see also* Dkt. 78-16 (the "Note"); Dkt. 78-15 (the

"Guaranty"); First Plotnicki Decl. ¶ 4.  Under the terms of the Guaranty, Lebois represented that

he had a net worth of "not less than $200 million" and agreed to provide personal financial

statements to Citibank on a semi-annual basis.  First Plotnicki Decl. ¶ 5.  Bruno Plotnicki, a

"Risk Senior Credit Officer" of Citi Private Bank, attests that "Citibank relied on the Guaranty,

including the representations and covenants therein, when it agreed to provide the credit facility

to Aralpa Holdings.  Had Lebois not provided a Guaranty, represented he had a net worth of at

least $200 million and agreed to provide periodic financial statements, Citibank would not have

agreed to provide the credit facility to Aralpa Holdings."  *Id.* ¶ 6.

---

[1] Defendants claim that on February 2, 2021, Lebois entered into a contract with another of his purported creditors, Luis Barroso, to transfer the Miami Condos to Barroso, but now "appears[] [to be] in breach of that contract," and thus, at some unspecified point, "arranged for Mr. Barroso to receive the rent payments."  Dfs. Opp. at 9.; *see* Dkt. 229-9 at 7-8.  Defendants have not submitted any evidence that Barroso actually receives rent payments from the Miami Condos.

The Note and the Guaranty were each amended and restated several times between July 2018 and November 2021, with more favorable terms to Aralpa Holdings each time (principally, extending the maturity date of the Note and increasing the amount of the credit facility). First Plotnicki Decl. ¶¶ 7-10. The amended Note and Guaranty required Lebois to maintain a net worth of "'not less than $400,000,000' and to provide Citibank with periodic personal financial statements." *Id.* ¶¶ 7-8 (citation omitted). Plotnicki attests that "Citibank agreed to amend the Note and extend the maturity date for repayment of the funds borrowed by Aralpa Holdings because Lebois guaranteed repayment and because of the covenants in the Guaranty and the Note that required Lebois to maintain a net worth of at least $400 million and to provide periodic personal financial statements to Citibank." *Id.* ¶ 9. He also stated in his declaration that "Citibank also agreed to amend the Note and extend the maturity date for repayment of the funds borrowed by Aralpa Holdings because Lebois had been providing personal financial statements in which he repeatedly represented his net worth to be in excess of $400 million." *Id.* ¶ 10.

As required under the terms of the Note and Guaranty, Lebois provided Citibank with personal financial statements on an annual and sometimes semi-annual basis. First Plotnicki Decl. ¶¶ 11-16. Each of the personal financial statements submitted by Lebois from March 31, 2020, to June 30, 2022, listed specific assets owned, including art, boats, and jewelry; "Personal Real Estate," including an asset labeled "NY, NY," and another labeled "Miami, FL (Fisher Island and the Bond in Brickell)." *See, e.g.*, Dkt. 200-5 (March 31, 2020 personal financial statement). According to Plotnicki, "Citibank understood that the assets included on the personal financial statements submitted by Lebois were ultimately owned by Lebois and it agreed to amend the Note and extend the maturity date of the credit facility on multiple occasions, as well as to provide Aralpa Holdings with waivers of default on the Note after March 2022, based on

Lebois's representations and its understanding that Lebois ultimately owned these assets and that they could be used to repay the loan if Aralpa Holdings did not repay it."  First Plotnicki Decl. ¶ 17.

### III.    Citibank Sues Defendants

On October 17, 2022, Citibank filed the instant lawsuit, bringing claims against Defendants for breach of the Note and the Guaranty.  Dkt. 1.  Defendants answered the Complaint on December 9, 2022.  Dkt. 21.

On September 14, 2023, the Court granted Citibank's motion for judgment on the pleadings.  *See Citibank I*, 2023 WL 5971144, at *1.  On September 15, 2023, the Court entered judgment in Citibank's favor of "thirty-five million dollars ($35,000,000.00), plus interest on the principal in the amount of $3,578,670.43 at the contractual default rate of interest from the date of the default (August 11, 2022) through the entry of this judgment, plus post-judgment interest at the federal statutory rate set forth in 28 U.S.C. § 1961, and, if and when the Court orders, an amount of attorneys' fees to be determined."  Dkt. 55.

### IV.    Postjudgment Enforcement

Defendants have not satisfied their outstanding judgment to Citibank.  On October 24, 2023, in aid of its postjudgment enforcement efforts, Citibank served an information subpoena and restraining notice on Lebois.  *Citibank II*, 714 F. Supp. 3d at 430.  In Lebois's sworn response, he stated that he had an interest in assets collectively valued at approximately $30 million, $17.8 million of which consisted of shares of Unifin Financiera, S.A.B. de C.V. ("Unifin") — a much lower amount than the hundreds of millions of dollars in assets he had previously represented to Citibank.  *Id.*

### A.  The February 2024 Writ of Execution and Turnover Order

On December 14, 2023, Citibank moved *ex parte* for the Court to order Defendants, One57, and Aralpa Miami "to show cause why the Court should not (1) issue a writ of execution and turnover order to enforce the judgment against One57 and Aralpa Miami, (2) attach the assets of One57 and Aralpa Miami, and (3) compel Lebois to respond more fully to the information subpoenas regarding his assets." *Citibank II*, 714 F. Supp. 3d at 430.

Following briefing and oral argument, the Court granted Citibank's motion for a writ of execution with respect to the New York Property and granted Citibank's motion for a turnover order directing One57 and Aralpa Miami to pay Citibank the assets in certain identified accounts. *Citibank II*, 714 F. Supp. 3d. at 452.  As relevant here, the Court concluded that Citibank could reverse-pierce the corporate veils of One57 and Aralpa Miami, and thus that the Court had personal jurisdiction over Aralpa Miami.  *Id.* at 432-33, 446.[2]  On January 24, 2025, the Second Circuit affirmed this decision in full.  *See generally Citibank III*, 2025 WL 289499.

### B.  The August 2024 TRO and Postjudgment Discovery

On April 10, 2024, the Court granted Citibank's motion to compel and ordered Lebois to provide "the location, estimated value, and title information" for "all of the assets encompassed by the June 2022 [personal financial statement]," including artwork.  Dkt. 116 at 2, 8.  On April 22, 2024, Lebois provided a declaration to Citibank stating, among other things, that "[t]itle [for the art] is held by Lebois family members, excluding myself," and that the estimated value of the art was "approximately $27,700,000."  Dkt. 202-3 ¶ 3(l).  He submitted a chart attached to his declaration listing the artwork (the "Art") and the itemized value of each asset.  Dkt. 202-4.  He

---

[2] One57, a New York LLC, did not challenge the Court's exercise of personal jurisdiction.  *See Citibank II*, 714 F. Supp. 3d at 425, 432 n.5.

also represented that jewelry with an approximate value of $28,900,000 was the property of

Maria de la Almudena Ocejo Aja, Lebois's wife (the "Jewelry").  Dkt. 202-3 ¶ 3(k).

On August 14, 2024, Citibank moved *ex parte* for the Court to order Defendants, Ocejo,

Maria de la Almudena Ocejo Aja, Rodrigo Lebois Ocejo, Alvaro Lebois Ocejo, and Patricio

Lebois Ocejo (collectively, the "Lebois Family Members") to show cause why the Court should

not (1) issue a turnover order directing the Lebois Family Members to deliver their shares

representing ownership in Aralpa Capital; (2) issue a turnover order directing the Lebois Family

Members to deliver the Jewelry and the Art, and (3) issue a preliminary injunction restraining

and enjoining Aralpa Holdings, Lebois, and the Lebois Family Members from "transferring,

selling, pledging, assigning, or otherwise disposing" of (or causing any other person to do the

same) the Aralpa Capital shares, the assets of Aralpa Capital, and the Jewelry and Artwork.  Dkt.

132 at 1-2.  On August 15, 2024, the Court issued an Order to Show Cause and a temporary

restraining order.  *Id.*

However, on August 19, 2024, Defendants moved for an extension of time to oppose the

Order to Show Cause while the Lebois Family Members were being personally served.  Dkt.

140.  The Court held a conference the same day to address the issues raised in Defendants' letter,

and subsequently granted the requested extension of time "on the understanding that Defendants

consent to abide by the terms of the temporary restraining order . . . entered on August 15, 2024,

until the Court holds a hearing on the [Order to Show Cause] and issues its decision."  Dkt. 143.

On January 15, 2025, the Court directed Citibank to provide an update as to efforts to

serve the Lebois Family Members.  Dkt. 151.  On January 20, 2025, Citibank explained that

because the Lebois Family Members had not agreed to accept service, Citibank was in the

process of serving them via the Hague Convention.  Dkt. 152.

Meanwhile, on October 11, 2024, Citibank served Lebois with a subpoena requesting, among other things, documents "concerning any income" Lebois had received "since September 15, 2023," the income he currently received, and the income he expected to receive.  Dkt. 202-5 ¶ 106.  That subpoena was the subject of significant disputes, and eventually resulted in an order from the Court that, among other things, directed Lebois to pay for a third-party vendor to collect and produce ESI, including emails and electronically stored documents, from his and Ocejos's accounts.  Dkt. 188.  Lebois ultimately made the production on July 31, 2025.  Kauff Decl. ¶ 11.

Among the documents produced by Lebois are documents showing that title to the Art is not held by "Lebois family members," as Lebois represented in his April 22, 2024 Declaration, Dkt. 202-3 ¶ 3(l), but that it is instead titled in the name of Aralpa Investments, First Plotnicki Decl. ¶ 24; *see* Dkt. 200-12 (emails from Ocejo representing that Aralpa Investments holds only the Art); Dkt. 200-14 (purchase agreement for art by Miro and Warhol purchased by Aralpa Investments).  Since Citibank filed the instant lawsuit, Lebois and Aralpa Investments have made repeated efforts to pledge and sell the Art.  First Plotnicki Decl. ¶¶ 37, 39.  On June 1, 2023, Aralpa Investments entered into an agreement with Callia Art to sell five pieces of Art.  *Id.*  In 2024, Lebois explored the possibility of obtaining a $2.5 million loan from Sotheby's secured by eighteen pieces of the Art.  *Id.* ¶ 37.  In May 2024, Lebois and Aralpa Investments sold a Salvador Dali painting they had valued at $1,000,000 for €165,000.  *Id.* ¶ 40; Dkt. 202-4.  In July 2024, Ocejo sought Lebois's permission to sell another piece of the Art.  First Plotnicki Decl. ¶ 37.  On March 18, 2025, Ocejo received an email containing terms regarding the sale or buy back of Art that Lebois had acquired from Rodrigo Halcyon's gallery.  *Id.* ¶ 41.

Ocejo claims that Citibank was aware that Aralpa Investments intended to use the Art to satisfy other debts and obligations to third parties.  Ocejo Decl. ¶ 10.  Ocejo submitted a

declaration on September 16, 2025 in connection with the present proceedings stating that on November 26, 2024, she participated in a call with Citibank's counsel, Adam Kauff and Jon Perelle, and that during the call Citibank was told "that in the near future, the art would likely not be available to satisfy the Citibank debt given the sizeable debts and obligations to third-parties." *Id.* Citibank disputes this, and Plotnicki avers that "[a]t no time during the call did Almudena Lebois Ocejo or any other Lebois representative state that the Art was pledged, that they intended to pledge the Art, or that the Art would not be available to satisfy the Judgments." Second Plotnicki Decl. ¶ 5. The Court need not resolve this dispute for purposes of the present motion.

Ocejo now also represents that on December 17, 2024, two pieces of the Art were pledged to Unifin, and that a February 2025 amended pledge agreement (that has not been provided to this Court) "expanded the portfolio of pledged assets to include all of the [A]rt for which Citibank seeks a turnover order." Ocejo Decl. ¶¶ 11-14. Citibank was unaware of this. *See* Second Plotnicki Decl. ¶ 9 ("Citibank first learned that Art had been pledged when Aralpa Investments filed its opposition to Citibank's motion on September 16, 2025.").

On August 14, 2025, Citibank moved *ex parte* for the Court to order Lebois, Aralpa Investments, and One57 to show cause why the Court should not issue (1) a turnover order directing Aralpa Investments to turn over the Art; (2) a turnover order directing Lebois and One57 to turn over to Citibank all rental income in their possession or custody that has been received from the leasing of the New York Property and the Miami Condos; (3) an order directing Lebois and One57 to make installment payments to Citibank of all rental income they will receive from the leasing of the New York Property and the Miami Condos; and (4) a preliminary injunction restraining and enjoining Lebois, Aralpa Investments, and One57 from

"transferring, selling, pledging, assigning, encumbering, or otherwise disposing" of the Art and the rental income received, and that will be received, from the leasing of the New York Property and the Miami Condos. *See* OTSC. On August 25, 2025, the Court issued an Order to Show Cause and a temporary restraining order, and set a briefing schedule and hearing for the Order to Show Cause. *Id.*

On August 27, 2025, Defendants' then-counsel, Kobre & Kim LLP, renewed its earlier motion to withdraw as counsel due to nonpayment. Dkts. 206 to 208. The Court held a hearing on the motion to withdraw on September 2, 2025, at which Ford O'Brien Landy LLP appeared and informed the Court that it had agreed to represent Defendants. Dkts. 214, 215. Due to the appearance of substitute counsel, the Court permitted Kobre & Kim LLP to withdraw, and extended the briefing schedule for the Order to Show Cause and hearing date to the dates requested by Defendants' new counsel, in order to allow them time to familiarize themselves with the record. Dkt. 215. The Court also extended the TRO on consent of the parties and nonparties until the Court resolved the Order to Show Cause. *Id.*

The motion is now fully briefed, and the Court held a hearing on the Order to Show Cause on September 30, 2025. *See* Dkt. 226 ("Aralpa Opp."); Dkt. 228 ("Dfs. Opp."); Dkt. 234 ("Reply").[3]

## LEGAL STANDARD

"A motion under Rule 69(a) is treated like a summary judgment motion." *Major League Baseball Props., Inc. v. Corporación de Televisión y Microonda Rafa, S.A.*, No. 19-cv-08669 (MKV), 2023 WL 2625794, at *3 (S.D.N.Y. Mar. 24, 2023) (citation omitted). Thus, on a Rule 69(a) motion, "[a] court may grant summary relief where there are no questions of fact, but it

---

[3] Citations to "Tr." are to the September 30, 2025 Hearing Transcript.

must conduct a trial on disputed issues of fact on adverse claims." *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 473 (2d Cir. 2018) (quotation marks and citation omitted). A court must view the evidence in the light most favorable to the nonmoving party, *Jones v. Goodrich Pump & Engine Control Sys., Inc.*, 86 F.4th 1010, 1017 (2d Cir. 2023), but the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," *PACA Tr. Creditors of Lenny Perry's Produce, Inc. v. Genecco Produce Inc.*, 913 F.3d 268, 275 (2d Cir. 2019) (citation omitted), and the "mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient," *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration adopted) (citation omitted).

## DISCUSSION

### I. Personal Jurisdiction

The Court first addresses a threshold issue, namely, whether it may exercise personal jurisdiction over Aralpa Investments. No one disputes that the Court has personal jurisdiction over Lebois, and, at the hearing on the Order to Show Cause, counsel for Aralpa Investments agreed that if the Court holds that Aralpa Investments is Lebois's alter ego, the Court has personal jurisdiction over Aralpa Investments. Tr. at 30:8-19; *see also China Nat'l Chartering Corp. v. Pactrains Air & Sea, Inc.*, 882 F. Supp. 2d 579, 596 (S.D.N.Y. 2012) ("[W]here 'personal jurisdiction exists over [a defendant], jurisdiction over his alter ego is proper as well'" (second alteration in original) (quoting *SEC v. Montle*, 65 F. App'x 749, 753 (2d Cir. 2003) (summary order))).

### A. Choice of Law

In determining whether Aralpa Investments is Lebois's alter ego, the Court must first determine the applicable law. Citibank argues that New York law should apply. *See* Br. at 12 n.3. Nonmovants did not address the issue in their papers, but they cited to New York law in

those papers and there was agreement at the hearing that New York law applies to the veil-piercing question, Tr. at 25:5-17.  The Court will apply New York law because the parties' "briefs rely on and indicate their assent to the application of New York law and the Court has not identified a strong countervailing public policy."  *Heath v. EcoHealth Alliance*, No. 23-cv-08930 (JLR), 2024 WL 5168072, at *3 (S.D.N.Y. Dec. 19, 2024), *aff'd*, No. 25-100, 2025 WL 2658252 (2d Cir. Sept. 17, 2025); *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (explaining that if "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is . . . sufficient to establish the applicable choice of law'" (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001))). Notwithstanding this consensus, the Court would apply New York law in any event, since there is no conflict between New York and Delaware law as to reverse veil-piercing.

"A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits . . . to resolve conflict-of-law questions."  *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  "Under New York choice-of-law rules, 'the first step in any choice of law inquiry is to determine whether there is an "actual conflict"' between the rules of the relevant jurisdictions." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (quoting *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419-20 (2d Cir. 2001)).

At the first step, the Court concludes that no conflict exists between New York and Delaware law.  "Under New York law, . . . a plaintiff may (assuming the requisite conditions are met) 'reverse-pierce' the veil — that is, hold a corporation liable for actions taken by its owner." *Citibank II*, 714 F. Supp. 3d at 433 (collecting cases).  Delaware law also "allows for reverse veil-piercing in limited circumstances and in circumscribed execution," including when an

12

"outside third party, frequently a creditor," seeks to pierce the corporate veil. *Manichean Cap.,*

*LLC v. Exela Techs, Inc.*, 251 A.3d 694, 710 (Del. Ch. 2021) (quoting *Sky Cable, LLC v.*

*DIRECTV, Inc.*, 886 F.3d 375, 386 (4th Cir. 2018)); *see id.* at 714-15 (outlining conditions under

which courts may reverse-pierce the corporate veil). Since creditors may reverse-pierce the

corporate veil under both New York and Delaware law, no conflict exists between Delaware and

New York law. *See, e.g.*, *Spinnell v. JP Morgan Chase Bank, N.A.*, 873 N.Y.S.2d 626, 626

(App. Div. 2009) (affirming trial court's use of New York law "because there is no conflict with

Delaware law with respect to 'reverse veil-piercing'").

     In sum, since the parties consent to the application of New York law, and because no

conflict exists between New York and Delaware law, the Court will apply New York substantive

law to Citibank's attempt to reverse-pierce the corporate veil of Aralpa Investments.

### B. Reverse Veil Piercing

     Plaintiff is entitled to reverse-pierce the veil of Aralpa Investments. As explained in

*Citibank II*, "New York law does not confine veil-piercing or reverse-veil-piercing claims solely

to claims against legal owners," 714 F. Supp. 3d at 440, and under the doctrine of equitable

ownership, "veil piercing can apply to someone who is not a legal owner of a corporation if he

exercises sufficient control and uses that control to commit a fraud or wrong," *id.* (quoting

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 733

(S.D.N.Y. 2017)).

     "Generally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners

exercised complete domination of the corporation in respect to the transaction attacked; and

(2) that such domination was used to commit a fraud or wrong against the plaintiff which

resulted in plaintiff's injury." *Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 203

(N.Y. 2018) (citation omitted). "The same requirements apply when seeking to reverse-pierce

the corporate veil." *Citibank II*, 714 F. Supp. 3d at 439 (collecting cases). "[P]roof of fraud . . . is not essential" to piercing the corporate veil, *Julien J. Studley, Inc. v. Lefrak*, 401 N.E.2d 187, 188 (N.Y. 1979), and "the corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego," *Tabchouri v. Hard Eight Rest. Co.*, 194 N.Y.S.3d 505, 511 (App. Div. 2023) (citation omitted). However, "in the absence of any wrongdoing or resulting inequity vis-a-vis the plaintiff," "evidence of domination," by itself, "will not suffice." *Id.*

### 1.  *Lebois Exercises Complete Domination Over Aralpa Investments*

The Court finds that Plaintiff has shown that Lebois has exercised domination over Aralpa Investments such that Aralpa Investments is "a mere instrumentality" of Lebois. *Citibank II*, 714 F. Supp. 3d at 441 (citation omitted). In assessing corporate domination, "a court may consider the following factors":

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm[']s length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Citibank III*, 2025 WL 289499, at \*2 (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)). "Every *Passalacqua* factor need not be present and no one factor is decisive." *Id.* at \*3.

First, Aralpa Investments is inadequately capitalized — a fact that Aralpa Investments does not contest, *see* Aralpa Opp. at 17 — and Lebois pays or guarantees its debts. Aralpa Investments does not have a bank account; its sole asset is the Art, and its single purpose is to hold the Art; expenses for the Art, such as insurance, were paid for by Lebois; and Lebois, not Aralpa Investments, paid for the Art invoiced to Aralpa Investments. First Plotnicki Decl. ¶¶ 27, 29-30, 37. These facts weigh in favor of veil-piercing. *See Citibank II*, 714 F. Supp. 3d at 441 (concluding that One57 and Aralpa Miami's reliance on deposits from Lebois's personal accounts, combined with carrying of minimal balance, demonstrated inadequate capitalization and weighed in favor of veil-piercing); *Okapi Partners, LLC v. Holtmeier*, No. 18-cv-06381 (PKC), 2019 WL 1517553, at \*2, \*4 (S.D.N.Y. Apr. 8, 2019) (veil-piercing justified where dominated corporation "never had regular operating income," did not have a bank account of its own, and "relied wholly on the defendants' capital contributions in order to meet its obligations").

Second, Aralpa Investments uses Lebois's personal addresses in Masaryk, Czechoslovakia (the "Masaryk Address") and in Mexico City (the "Chapultepec Address") as its own. "Lebois has listed the Masaryk Address and the Chapultepec Address as his personal addresses throughout his dealings with Plaintiff, including on the Guaranty." *Citibank II*, 714 F. Supp. 3d at 442. Aralpa Investments listed the Masaryk Adress as its address on invoices it sent, Dkts. 200-16 to 200-18, as well as contracts for the Art, Dkt. 200-33 at 2. *See Citibank II*, 714 F. Supp. 3d at 442 (sharing of addresses supported piercing of corporate veil).

Third, Lebois used the Art held by Aralpa Investments "as if it were [his] own." *Passalqua*, 933 F.3d at 139. The Art is located in addresses associated with Lebois — for example, in the New York Property and Miami Condos, and in residences in Mexico and Spain that Lebois once included in his personal financial statements but now claims are held by his family members — and, most importantly, Lebois listed the Art in five personal financial statements submitted to Citibank. Plotnicki Decl. ¶¶ 22, 38. He has also used the Art as his own by offering it "as collateral to Citibank" in negotiations to resolve the Guaranty, *id.* ¶ 37, and in attempting to obtain a loan from Sotheby's secured by several pieces of the Art, *id.* As in *Citibank II*, "Lebois certainly 'used' [the Art] as his own when he repeatedly listed [it] as his assets in documents provided to Plaintiff for the purpose of obtaining favorable changes to the terms of the Note and the Guaranty," 714 F. Supp. 3d at 442 (concluding that the fact that Lebois listed the New York and other property in Miami as his assets in documents provided to Citibank weighed in favor of veil-piercing), and in using it as collateral in other negotiations and transactions.

Fourth, and finally, Lebois exercised business discretion over transactions made with respect to the Art. Though Ocejo, Lebois's daughter, is the "manager of Aralpa Investments," Ocejo Decl. ¶ 14, and she conclusorily denies "Citibank's assertion that Aralpa Investments is completely dominated by Mr. Lebois," *id.* ¶ 6, the record supports that Lebois made major decisions affecting Aralpa Investments. Lebois, not Aralpa Investments, made decisions about whether to purchase the Art. Plotnicki Decl. ¶¶ 29-30. Even after Ocejo was appointed as sole manager of Aralpa Investments in October 2020, Lebois directed Ocejo to explore sales of the Art and made decisions about whether to insure the Art, ultimately paying for that insurance. *Id.* ¶ 37; Dkt. 200-31 at 5, 8 (payments for the 2023 insurance made from Lebois's personal bank

account); Dkt. 200-32 at 11 (email stating that the Art would not be insured based on Lebois's orders). Ocejo also sought Lebois's approval for decisions related to the Art, including asking him whether a price and fee for a contract to sell a piece of the Art was "ok" in July 2024. Dkt. 200-27 at 6. This factor also supports a finding of domination. *See, e.g.*, *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, No. 12-cv-05754 (LAK) (AJP), 2013 WL 1274561, at *9 (S.D.N.Y. Mar. 29, 2013) (finding defendant "had little or no discretion over major business decisions affecting it" where "[t]he transfer of [defendant's] business occurred pursuant to orders from [individual] who was not employed by [defendant]"), *aff'd sub nom. NYKCool A.B. v. Ecuadorian Line, Inc.*, 562 F. App'x 45 (2d Cir. 2014) (summary order).

Taken together, these facts show that Lebois dominated Aralpa Investments, such that Citibank may, upon a showing of fraud or wrong, reverse-pierce its corporate veil and enforce the judgment against it. Aralpa Investments' arguments to the contrary are unavailing. Specifically, Aralpa Investments argues that showing undercapitalization or that there was a shared address is "not dispositive," and that "the assertion that Lebois treated Aralpa Investments' assets as his own" does not "satisfy Citibank's heavy burden to show complete dominance." Aralpa Opp. at 17. That might be true if Citibank were relying on just one of those factors. But, as addressed above, Citibank has satisfied many more than just one or two of the *Passalacqua* factors.[4] Indeed, the Second Circuit affirmed the Court's earlier veil-piercing

---

[4] As a consequence, many of the cases that Aralpa Investments relies on are distinguishable and thus unpersuasive, since the plaintiffs in those cases made a much weaker showing of domination. *See Waite v. Schoenbach*, No. 10-cv-03439 (RMB), 2010 WL 4456955, at *4 (S.D.N.Y. Oct. 29, 2010) (rejecting veil-piercing where plaintiff alleged only that defendants "operate[d] at the same location and share employees, officers, owners, and bank accounts"); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404 (S.D.N.Y. 2007) (allegations of common address, common ownership, and common principals, without more, were insufficient to plead veil-piercing claim); *OOO v. Empire United Lines Co.*, 557 F. App'x 40, 46 (2d Cir. 2014) (summary order) (lack of corporate formalities alone did not demonstrate domination because

decision where Citibank made a similar showing "that Lebois dominated One57 and Aralpa Miami," *Citibank III*, 2025 WL 289499, at *3.  Just as in *Citibank III*, the "uncontested facts" here — that Lebois listed the Art "as his own assets on his personal financial statements" submitted to Citibank, that Aralpa Investments was "inadequately capitalized," that "Lebois also paid and guaranteed" Aralpa Investment's debts, and that Aralpa Investments used Lebois's personal address as its own — "indicate that Citibank has met its burden of showing that Lebois dominated" Aralpa Investments.  *Id*.  And the uncontested facts here present an even more stark picture of Lebois's domination of Aralpa Investments given that Lebois exercised significant discretion over Aralpa Investments' business decisions regarding the Art.

       2.   *Fraud or Wrong*

       Turning to the second step of the veil-piercing analysis, the Court concludes that Lebois's domination of Aralpa Investments "was used to commit a fraud or wrong" against Citibank, which resulted in an injury to Citibank.  *Citibank II*, 714 F. Supp. 3d at 443-44 (quoting *Cortlandt*, 96 N.E.3d at 203).

---

plaintiff did not "point to any evidence of," among other things, defendant "conducting business for [the purported alter ego]'s personal benefit").

*138-77 Queens Blvd LLC v. Silver*, 682 F. Supp. 3d 271 (E.D.N.Y. 2023), is also unhelpful to Aralpa Investments, though for different reasons.  Aralpa Investments cites *Queens Blvd*, *see* Br. at 17, for the uncontroversial proposition that "undercapitalization alone is generally insufficient to warrant piercing the corporate veil."  *Id*. at 281 (quoting *Tycoons Worldwide Grp. (Thailand) Pub. Co. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 206-07 (S.D.N.Y. 2010)).  But in the rest of that sentence (which Aralpa Investments omits), the court explained that "that [was] not the case [t]here, where many allegations . . . point to [d]efendant's intimate involvement with and ultimately, domination over, [the company]."  *Id*.  Those allegations included facts similar to those at issue here, namely, that defendant's son (nominally the principal and sole member of the business) "solicit[ed] [d]efendant's advice regarding a third party officer to purchase [part of the] business," that defendant provided funding to the business, and that the defendant was highly involved with "engaging with and procuring legal counsel for" the business.  *Id*.  This case therefore supports the Court's conclusion that Aralpa Investments is dominated by Lebois.

This requirement "can be satisfied either by showing outright fraud, or another type of wrong, such as a breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 649 (S.D.N.Y. 2018) (quotation marks and citation omitted). "The law requires only that the shareholder's wrongdoing 'resulted in' [the] plaintiff's injury," not that the injuries suffered by the plaintiff "were caused by the [shareholder's] wrongful conduct to the exclusion of all other possible influences." *Lakah v. UBS AG*, No. 07-cv-02799 (LAP), 2017 WL 7245365, at *91 (S.D.N.Y. Feb. 14, 2017) (quoting *Morris v. N.Y. State Dep't of Taxation*, 623 N.E.2d 1157, 1161 (N.Y. 1993)).

Lebois used his domination of Aralpa Investments to commit a "fraud or wrong" against Citibank. Again, in *Citibank III*, the Second Circuit concluded that Lebois had used his domination of One57 and Aralpa Miami to commit a "fraud or wrong" against Citibank because Lebois "listed the New York and Miami Properties as his assets on personal financial statements to induce Citibank to provide the Note and subsequent amendments to it, only to disclaim any control of One57 and Aralpa Miami, and their assets, when Citibank attempted to collect on its judgment." 2025 WL 289499, at *3. The Second Circuit agreed that "[t]his sort of judgment-proofing is a well-recognized 'fraud or wrong' that authorizes piercing the veil." *Id.* (quoting *Citibank II*, 714 F. Supp. 3d at 444). Lebois has continued with his judgment-proofing efforts. Here too, Lebois claimed Aralpa Investment's assets as his own when it benefitted him — in applying for the Note and subsequent beneficial adjustments to it — "only to disclaim any control" of Aralpa Investments and its assets when Citibank attempted to collect on its judgment. *Id.* Moreover, Lebois has since played shell games with Aralpa Investments to frustrate Citibank's efforts to collect on its judgment against Defendants. When the Court directed Lebois

19

to identify who held title for the Art for the purpose of postjudgment enforcement, Lebois falsely represented that his family members who lived in Mexico held title to the Art, not Aralpa Investments, a Delaware LLC.  Dkt. 202-3 ¶ 3(l).  As a result, Citibank then attempted to recover the Art from the Lebois Family Members, who would not consent to service, resulting in months of costly, prolonged efforts to serve the Lebois Family Members under the Hague Convention. *See* Dkts. 132, 143 to 152.  Citibank did not learn that Aralpa Investments held title to the Art until more than a year after Lebois's declaration, after the Court ordered Lebois to hire a third-party vendor to collect ESI because Lebois consistently insisted he had no responsive emails. Only after being ordered by the Court to search the emails again with the use of an independent vendor did Lebois reveal emails reflecting that the Art was actually held by Aralpa Investments, a Delaware entity that could have been served over a year ago.  Lebois's use of Aralpa Investments, and failure to disclose its ownership of the Art, in order to conceal his assets from the reach of Citibank also supports reverse-piercing the veil of Aralpa Investments.  Therefore, for many of the same reasons articulated in *Citibank II*, and based on the undisputed factual record presented, the Court concludes that it has personal jurisdiction over Aralpa Investments because it is Lebois's alter ego and Citibank may seek to satisfy its judgment against Lebois through the assets of Aralpa Investments.  *See Citibank II*, 714 F. Supp. 3d at 432-33, 441-46; *S. New Eng. Tel. Co. v. Glob. NAPS Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) ("It is . . . well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process.").

## II.     Service of Restraining Notices on Nonparties

Before addressing whether Citibank is entitled to the relief it seeks, the Court must next address Nonmovants' argument that Citibank was required to serve restraining notices before proceeding with its request for the turnover of assets.  *See* Dfs. Opp. at 6-10; Aralpa Opp. at 8-9.

For the reasons that follow, the Court concludes that Citibank properly followed the processes required by the CPLR before initiating this motion.

"A motion to enforce a money judgment is governed by Rule 69(a), which provides that 'proceedings supplementary to and in aid of judgment or execution . . . must accord with the procedure of the state where the court is located.'" *CSX Transp.*, 879 F.3d at 468 (quoting Fed. R. Civ. P. 69(a)). "In New York, C.P.L.R. article 52 governs the enforcement and collection of money judgments." *Id.* (citing N.Y. C.P.L.R. 5201-5252). Four rules are at issue here: CPLR 5222, 5225, 5226, and 5239.

Nonmovants argue that CPLR 5222 and 5239 require Citibank to serve restraining notices before seeking relief under CPLR 5225 or 5226. The Court disagrees. None of these provisions requires service of a *restraining notice* on a third party before initiating a proceeding under CPLR 5225 or 5226 — and indeed, the Nonmovants cannot identify any provision of CPLR 5222, 5225, or 5226 that expressly requires such a step. The Second Circuit's decision in *CSX Transportation* guides the Court's analysis here. In that case, the Second Circuit held that "a party seeking a money judgment against a non-party garnishee may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." 879 F.3d at 469. In explaining its reasoning, the Second Circuit noted that "a party in federal district court in New York" need not "strictly adhere[] to" "the special proceeding requirements . . . 'as long as there is no prejudice to the opposing party in giving notice of the claims and framing the issues.'" *Id.* (quoting *Vera v. Republic of Cuba*, 802 F.3d 242, 244 n.3

(2d Cir. 2015)).  Adequate notice was provided to the Nonmovants with respect to the current

Order to Show Cause proceeding.[5]

Nonmovants' citations to *Allstar Marketing Group, LLC v. 158*, No. 18-cv-04101

(GHW), 2019 WL 3936879 (S.D.N.Y. Aug. 20, 2019) (*Allstar I*), and *Allstar Marketing Group,*

*LLC v. AFACAI*, No. 20-cv-08406 (JPC), 2021 WL 2555636 (S.D.N.Y. June 22, 2021) (*Allstar*

---

[5] While the Court previously delayed adjudication of the August 2024 Order to Show Cause pending service on the Lebois Family Members based on representations that the Art (as well as other assets) was in their possession, *see* Dkt. 143, documents turned over during postjudgment discovery revealed that the Art is possessed by Aralpa Investments, not the Lebois Family Members.  *See* Reply at 1.  Adjudication of the present Order to Show Cause can thus proceed because Aralpa Investments has notice of the motion for a turnover order based on Citibank's service of those motion papers, as reflected on the docket.  *See* Dkt. 205.

As for Unifin and Barroso, neither is a necessary party to this proceeding under Federal Rule of Civil Procedure 19.  Their absence will not prevent the Court from granting "complete relief among those already parties," required for joinder, Fed. R. Civ. P. 19(a)(1)(A), because Citibank can obtain its sought-after relief here based on the record presented regarding Lebois's relationship with Aralpa Investments and the invalidity of any pledges of the Art, and the failure of Lebois to present evidence of Barroso's receipt of any rent or entitlement to receive future rent, *see infra* pp. 26-30, 35-36.  *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 385 (2d Cir. 2006) (concluding nonparty that held contractual rights to sponsorship rights was not a necessary party because court could grant the sought-after relief — enjoining the defendant from awarding sponsorship rights to another entity, including the nonparty — without the nonparty's presence, even if further litigation might ensue).  Similarly, under Rule 19(a)(1)(B), "[i]t is the absent party that must 'claim an interest,'" *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) (quoting Fed. R. Civ. P. 19(a)(1)(B)), not an individual or entity already party to the litigation, *see id.* (rejecting attempt by defendant "to assert on behalf of [nonparty] its supposed concern about" the subject matter of the action).  And to the extent that nonjoinder of these nonparties would leave Lebois or Aralpa Investments "subject to a substantial risk of incurring . . . inconsistent obligations because of the interest," Fed. R. Civ. P. 19(a)(1)(B)(ii), any potentially inconsistent obligations would be the result of Lebois's misfeasance in pledging assets in violation of the Court's Order and Lebois's admitted breach of any agreement with Barroso coupled with current leases listing Lebois as the owner and recipient of rent for the Miami Condos, *see infra* pp. 26-30, 35-36, not by the nonparties' absence in the case.  *See MasterCard*, 471 F.3d at 388 ("[T]he substantial risk of inconsistent obligations must be *caused by* the nonparty's absence in the case.  [The] risk of multiple obligations is not a result of [the nonparty]'s absence in this lawsuit; it is the result of [defendant] allegedly breaching its contract . . . and awarding [the nonparty] sponsorship rights it was contractually prohibited from granting.").

*II*), do not compel a contrary conclusion.  In the *Allstar* cases, the plaintiff sought an order that would have "authorized [it] to require that any bank, financial institution, credit card company, or payment processing agency holding those assets transfer them to [p]laintiff in satisfaction of the judgment without further action by the [c]ourt."  *Allstar I*, 2019 WL 3936879, at *1; *see also Allstar II*, 2021 WL 2555636, at *1 (similar).  The *Allstar* courts concluded that *this* proposed relief — not all turnover orders served prior to a restraining notice — was "the exact inverse of the procedure set forth" in CPLR 5222 and 5225 for two reasons: (1) it was "essentially equivalent to a 'fill in the blank' order, which [p]laintiff [could] serve at will in the future to brandish the [c]ourt's authority over unknown third-parties, the identities of whom are unknown to the [c]ourt and over whom the [c]ourt may not possess personal jurisdiction," and (2) the "proposed order [did] not provide the third-party an opportunity to assert its rights to the seized assets before the transfer [was] effectuated."  *Allstar I*, 2019 WL 3936879, at *4; *see also Allstar II*, 2021 WL 2555636, at *7 ("The fundamental and fatal problem is that Allstar's Proposed Order does not allow a third party to defend any interests that the third party may have in the property or funds at issue.").  Here, by contrast, not only is Aralpa Investments, the third party against whom Citibank seeks a turnover order, known to the Court, but it has also had the requisite "notice and an opportunity to challenge a proposed turn over order *before* the order is issued" pursuant to New York law.  *Allstar II*, 2021 WL 2555636, at *7 (quoting *Allstar I*, 2019 WL 3936879, at *4).  Thus, the *Allstar* cases do not persuade the Court that the CPLR requires a restraining notice before Citibank can move for relief under CPLR 5225 and 5226, so long as "there is no prejudice to the opposing party in giving notice of the claims and framing the issues," *CSX Transp.*, 879 F.3d at 469 (quoting *Vera*, 802 F.3d at 244 n.3).

Thus, the Court finds that the notice provided here was sufficient for the adjudication of this turnover application.  *See Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991) (listing requirements for court to issue turnover order pursuant to CPLR 5225(b) and omitting any mention of service of a restraining notice, where third-party garnishee received notice of motion via service of order to show cause); *LaBarbera v. Audax Constr. Corp.*, 971 F. Supp. 2d 273, 282-83 (E.D.N.Y. 2013) (to initiate special proceeding pursuant to CPLR 5225(b), plaintiffs were required to serve the third parties "in the same manner as a summons in an action," requiring compliance with Rule 4 and relevant sections of CPLR Article 3 (quoting N.Y. C.P.L.R. 403)); *Fabric Selection, Inc. v. A & T Trading US, Inc.*, No. 20-mc-00864 (ARR) (VMS), 2021 WL 811371, at *5 (E.D.N.Y. Feb. 5, 2021) (plaintiff properly served subject of CPLR 5225(b) proceeding "by serving copies of the Order to Show Cause, the motion, and supporting papers" in compliance with Rule 4), *report and recommendation adopted*, 2021 WL 810340 (E.D.N.Y. Mar. 3, 2021); *cf. Saregama India, Ltd. v. Mosley*, No. 12-mc-00045 (LAK), No. 11-mc-00084 (LAK), 2012 WL 955520, at *1-2 (S.D.N.Y. Mar. 20, 2012) (to initiate CPLR 5225(b) proceeding, plaintiff was required to serve nonparty garnishees in compliance with Rule 4 and New York service requirements under CPLR Article 3).  Indeed, this is the very process that was used by Citibank previously in this action, and the Second Circuit approved the turnover of assets.  *See Citibank II*, 714 F. Supp. 3d at 430-31 (describing application for TRO and subsequent order to show cause hearing); *see generally Citibank III*, 2025 WL 289499 (affirming *Citibank II*).

## III.    Turnover Order as to the Art

Having addressed the aforementioned preliminary issues, the Court moves to the merits of the request and finds that Citibank is entitled to a turnover order as to the Art in Aralpa Investments' possession.  CPLR 5225(b) permits a judgment creditor to recover "money or other

personal property in which the judgment debtor has an interest" to satisfy a judgment.  N.Y. C.P.L.R. 5225(b); *accord Citibank II*, 714 F. Supp. 3d at 447.  It "provides for a two-step analysis in determining whether property belonging to a judgment debtor — but in the possession of a third party — should be turned over to a judgment creditor." *Beauvais*, 942 F.2d at 840.

Citibank has satisfied the first requirement, that "the judgment debtor 'has an interest' in the property the creditor seeks to reach." *Beauvais*, 942 F.2d at 840.  Because Aralpa Investments is Lebois's alter ego, Lebois has interests in the property of Aralpa Investments.  *See Citibank II*, 714 F. Supp. 3d at 447.

At the second step, the Court "must find either that the judgment debtor is 'entitled to the possession of such property,' or it must find that 'the judgment creditor's rights to the property are superior' to those of the party in whose possession it is." *Beauvais*, 942 F.2d at 840 (emphasis omitted).  Aralpa Investments contends that Citibank cannot satisfy this requirement because although Aralpa Investments is in possession of the Art, it has pledged the Art to Unifin (the "Pledge"), and that Unifin has "filed documents reflecting [its] security interest under the Mexican Single Registry for Security Interests in Personal Property."  Aralpa Opp. at 20; Ocejo Decl. ¶¶ 14, 20 (attesting that the Art pledged to Unifin "is being held as pledged assets by the depositary," who is Ocejo on behalf of Aralpa Investments, "in accordance with the agreements").

The Court disagrees that the Pledge bars Citibank from obtaining a turnover order as to the Art.  Of the Art listed in the exhibit to Mr. Lebois's April 22, 2024 Declaration, *see* Dkt. 202-4, the documentary evidence supplied by Aralpa Investments demonstrates that only two pieces of the Art have been pledged to Unifin — a work of art by Pablo Picasso acquired on May 12,

2015, and a work of art by Marc Chagall acquired on October 12, 2015 (the "Pledged Art"), *see*

Dkt. 227-3 at 26.  By contrast, Aralpa Investments has not submitted any evidence — other than

an unsubstantiated statement in the Ocejo Declaration based on Ocejo's understanding — that

the Pledge was expanded to include the other 40 pieces of Art at issue (the "Unpledged Art").

*See* Ocejo Decl. ¶ 14 ("I understand that a February 2025 amended pledge agreement expanded

the portfolio of pledged assets to include all of the art for which Citibank seeks a turnover

order.").  Given the lack of evidence that the Pledge covers the Unpledged Art, the Court

concludes that Lebois remains entitled to it, and orders turnover with respect to the Unpledged

Art.

 Even assuming that all the Art was pledged, however, any such pledge is void and

unenforceable.  First, the Pledge is void and unenforceable because it violated the Court's

temporary restraining order issued on August 15, 2024.  Setting aside the impact of the

temporary restraining order on the other entities listed in that Order, that Order undisputedly

restrained Lebois as well as his "respective agents, designees, representatives, servants, officers,

employees, members, managers, attorneys, *or anyone else acting on [his] behalf*, . . . from

transferring, selling, *pledging*, assigning, encumbering, or otherwise disposing, or causing any

other person to [do the same], the . . . artwork encompassed in the April 22, 2024 Declaration of

Rodrigo Lebois Mateos."  Dkt. 132 at 2-3 (emphases added); *see also* Dkt. 143 at 1 (August 19,

2024 Order granting Defendants' request to respond to the August 2024 Order to Show Cause

"on the understanding that *Defendants consent to abide by the terms of the temporary restraining

order* . . . entered on August 15, 2024, *until the Court holds a hearing on the OSC* and issues its

decision" (emphases added)).  On its face, the Order precludes Lebois or those acting on his

behalf, like Aralpa Investments, from pledging the Art.  Rule 65(d)(2) provides that an order

under Rule 65 binds, in addition to the parties and their agents, "other persons who are in active

concert or participation" with the parties or their agents. Fed. R. Civ. P. 65(d)(2). Aralpa

Investments is Lebois's legal alter ego, just as it was in August 2024 given that their relationship

was the same then as it is today. Thus, the August 15, 2024 temporary restraining order

precluded Lebois from pledging the Art through Aralpa Investments. *See Cablevision Sys. Corp.*

*v. Muneyyirci*, No. 90-cv-02997 (RJD), 1995 WL 362541, at *1 (E.D.N.Y. June 2, 1995) ("An

injunction binds not only the defendants to an action, but any person 'legally identifiable' with

the defendants, and any person in active concert or participation with a party who has notice of

the order."); *id.* at *2 (nonparty company "effectively controlled" by defendants was bound by

court order because it was "legally identifiable" with defendants, "as a corporation subject to

their control"); *Thaxton v. Vaughan*, 321 F.2d 474, 478 (4th Cir. 1963) ("Action as an alter ego,

or in collusion, is required to find concert or participation under [R]ule 65(d)."); *cf., e.g.*, *In re*

*Hypnotic Taxi, LLC*, No. 15-bk-43300, 2017 WL 4464876, at *14 n.9 (Bankr. E.D.N.Y. Oct. 4,

2017) ("[B]ecause [defendant] and the [t]rusts are alter egos, the notice given to [defendant] is

imputed to the [t]rusts."); *Glory Wealth Shipping Pte Ltd. v. Indus. Carriers, Inc.*, 590 F. Supp.

2d 562, 564 (S.D.N.Y. 2008) ("Where one defendant is subject to personal jurisdiction and

service of process, its alter egos are subject to personal jurisdiction and may be served by serving

it." (citing *Passalacqua*, 933 F.2d at 142-43)). The Pledge of the Art on December 17, 2024

(and in February 2025, if that pledge occurred) then violated the Court's Order. *See generally*

Dkt. 227-3.[6]

---

[6] Aralpa Investments' reliance on *JSC Foreign Economic Ass'n Technostroyexport v. International Development & Trade Services, Inc.*, 295 F. Supp. 2d 366 (S.D.N.Y. 2003), is misplaced. *JSC* concerned whether a restraining notice under CPLR 5222 could be served on a third party "in anticipation of a finding that those third parties are alter egos or hold assets of alleged alter egos of the judgment debtor." *Id.* at 392-93. Here, the Court did not issue a

*Pelican Equity, LLC v. Brazell*, No. 09-cv-05927 (NRB), 2010 WL 3377452 (S.D.N.Y.
Aug. 17, 2010), is instructive.  In that case, Fairstar Resources Ltd. ("Fairstar"), plaintiffs in Utah
state court, "obtained a $2.3 million judgment" against American Institutional Partners, LLC
("AIP"), AIP Lending, LLC (an AIP affiliate), and their principal, Mark Robbins ("Robbins").
*Id.* at \*2.  Fairstar subsequently obtained an order from the Utah court requiring AIP, AIP
Lending, LLC, and Robbins to appear for an examination concerning their property, and
restraining them from "dispos[ing] of any non-exempt property owned by them pending" the
examination.  *Id.* (citation and emphasis omitted).  Despite this, Robbins and AIP assigned to
Pelican Equity, LLC ("Pelican") all intellectual property and other confidential information
related to AIP's stock lending business, and all rights and claims against certain entities.  *Id.* at
\*1-2.  The *Pelican Equity* court concluded that the assignment was void and unenforceable
because it violated the Utah restraining order.  *Id.* at \*5.  The court reasoned that even though
Pelican was a nonparty to the Utah proceeding, Pelican was still bound by the Utah restraining
order because Pelican and its principals were "in active concert or participation with AIP" given,
among other things, the common management and ownership of AIP and Pelican.  *Id.* at \*5
(citation omitted).  Similarly here, although Aralpa Investments was not a party to this
proceeding, as an alter ego of Lebois it was bound by the Court's August 2024 order restraining
Lebois and his "agents, designees, representatives, servants, officers, employees, members,
managers, attorneys, or anyone else acting on his behalf, . . . from transferring, selling,
*pledging*, . . . or otherwise disposing, or causing any other person to transfer, sell, *pledge*, . . . or

---

restraining notice under CPLR 5222 on a third party and instead issued an order in 2024, served
on Lebois, precluding any sale or pledge of the Art by Lebois and, consistent with the order's
terms and Rule 65(d), those acting on his behalf, which includes Aralpa Investments.  *See supra*
pp. 26-27.

otherwise dispose of, . . . the jewelry and *artwork* encompassed in the April 22, 2024 Declaration

of Rodrigo Lebois Mateos, other than to pay legitimate business expenses of Aralpa Capital."

Dkt. 132 at 2-3 (emphases added).  The Pledge to Unifin plainly violated this order, rendering

the Pledge void and unenforceable.  *See Pelican Equity*, 2010 WL 3377452, at *5; *Skiff-Murray*

*v. Murray*, 793 N.Y.S.2d 243, 245 (App. Div. 2005) (explaining that deed and subsequent

mortgage would be void if property was transferred by the defendant's alter ego in violation of a

restraining order); *see, e.g.*, *Crane v. New York Council 66*, 475 N.Y.S.2d 165, 166-67 (App.

Div. 1984) (contract approved in violation of temporary restraining order was "invalid" and

required that the court "restore the *status quo*").

The Court also finds the Pledge invalid under its inherent authority to enforce its own

orders.  "A court can take 'any reasonable action . . . to secure compliance,' and the 'scope of a

district court's equitable powers to remedy past wrongs is broad.'"  *In re Tronox*, 855 F.3d 84,

112 (2d Cir. 2017) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985)).  Lebois has

shown significant disregard for this Court's orders.  On April 10, 2024, the Court ordered Lebois

to "provide the location, estimated value, and *title information* for each of the[] assets [listed in

the June 2022 personal financial statement]," including the Art.  Dkt. 116 at 8; *see also id.* at 2.

Lebois then filed the April 22, 2024 Declaration in which he, among other things, attested that

the "Title [to the Art] is held by Lebois family members, excluding myself."  Dkt. 202-3 ¶ 3(l).

As a consequence, Citibank — based on Lebois's representation — sought a turnover order for

the Art from the Lebois Family Members.  *See* Dkt. 132.  The Court paused adjudication of this

motion to permit service on the Lebois Family Members under the Hague Convention because it,

like Citibank, understood the Art was titled in the names of the Lebois Family Members.  Dkt.

143.  Only now, after protracted postjudgment discovery disputes during which Lebois

represented he had no responsive documents, more than a year's worth of efforts to serve the

Lebois Family Members under the Hague Convention, and the Court's intervention in

postjudgment discovery to compel Lebois to collect ESI using an independent vendor, Citibank

has finally learned that title to the Art is not held by the Lebois Family Members but rather by

Aralpa Investments.  Lebois's April 22, 2024 Declaration plainly violated the Court's order

directing him to provide title information for the Art, delaying Citibank's recovery of the Art by

more than a year, and giving Aralpa Investments time to frustrate Citibank's enforcement efforts

by pledging the Art in violation of the Court's August 15, 2024 Order.  The Court does not take

these machinations lightly, and finds the Pledge invalid in an exercise of its power to enforce its

own orders and remedy past violations.

Thus, the Court finds that Citibank has a priority interest in the Art over Unifin, and

authorizes the issuance of turnover orders with respect to the Art.

## IV.    Appointment of a Receiver

Citibank asks that the Court compel Aralpa Investments to turn over to a receiver the Art

subject to the turnover order so that it can be sold to satisfy the Judgments. Br. at 2.

Specifically, Citibank asks that the Court appoint its counsel, Kauff Laton Miller LLP, as

receiver.  *Id.* at 19 n.5.  Nonmovants oppose this request and argue that Citibank's counsel

should not be appointed as a receiver.  *See* Dfs. Opp. at 14-16; Aralpa Opp. at 11 n.2.  The Court

will grant Citibank's request.

Under CPLR 5225(b), personal property subject to a turnover order is turned over to a

"designated sheriff."  N.Y. C.P.L.R. 5225(b).  However, "CPLR 5240 says that the court may

modify the use of any enforcement procedure," *79 Madison LLC v. Ebrahimzadeh*, 166 N.Y.S.3d

126, 129 (App. Div. 2022), including the default rule that "personal property other than money

will be delivered to the [designated] sheriff," *id.*  CPLR 5228 permits the Court, "upon motion of

the judgment creditor, [to] order the turnover of the judgment debtor's property, real or personal, to a receiver." *Freeman v. Giuliani*, No. 24-mc-00353 (LJL), 2024 WL 4546883, at *3 (S.D.N.Y. Oct. 22, 2024). However, "a receiver should only be appointed when a special reason appears to justify one." *Id.* at *3. Courts considering whether to order a receivership consider factors including "(1) alternative remedies available to the creditor; (2) the degree to which receivership will increase the likelihood of satisfaction, and (3) the risk of fraud or insolvency if a receiver is not appointed." *Id.* (quoting *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202, 1212 (N.Y. 2010)).

Citibank contends that appointing a receiver is appropriate because the Art "is precisely the type of specialized property that would likely bring a substantially higher price if sold in a private sale rather than a public auction by a sheriff levying an execution." Br. at 19. Nonmovants object to the request to appoint Citibank's counsel as receiver and ask the Court to appoint an independent receiver instead, arguing that Citibank's counsel is unqualified to serve as a receiver for the Art and that Citibank and Aralpa Investments have a conflict of interest with regard to maximizing the sale value of the Art. *See* Dfs. Opp. at 15-16; Aralpa Opp at 11 n.2. The Court finds this objection unpersuasive. At the Order to Show Cause hearing, Citibank's counsel represented that it would use a reputable, established auction house, like Sotheby's or Christie's, to sell the Art. Tr. at 10:1-10, 15:24-16:8. Not only is the Art at issue the sort of asset that would benefit from the appointment of a receiver, rather than sale by a sheriff, Citibank (and its counsel) share Aralpa Investments' interest in maximizing the sale value of the Art. *See Freeman*, 2024 WL 4546883, at *6 (directing turnover to plaintiff because plaintiffs as judgment creditors had greatest interest in maximizing sale value of assets, and the assets at issue — various watches, sports memorabilia, a diamond ring and costume jewelry, among other

things — were the sort of assets best suited to a receivership, rather than turnover to a sheriff for public sale). An independent receiver would also add an additional unwarranted cost to the sale process for Citibank. *See* CPLR 5228 (acknowledging that judgment creditor could be appointed receiver but "shall not be entitled to compensation"). Thus, the Court will appoint Citibank's counsel as receiver for the Art pursuant to CPLR 5228.

## V.    The New York Property

Next, Citibank seeks an order pursuant to CPLR 5225 directing One57 to turn over to Citibank all rental income in its possession or custody that has been received from the leasing of the New York Property since September 15, 2023. OTSC at 2. Citibank also seeks an order pursuant to CPLR 5226 directing One57 to make installment payments to Citibank of all rental income that One57 will receive in the future from the leasing of the New York Property. *Id.* One57 does not oppose either motion. Tr. at 25:23-26:11. The Court begins with the motion for a turnover order.

Citibank is entitled to a turnover order for the rental income in One57's possession or custody that has been received from the leasing of the New York Property since September 15, 2023. *See Citibank II*, 714 F. Supp. 3d at 447 (authorizing issuance of writ of execution with respect to the New York Property); First Plotnicki Decl. ¶ 45 (stating that on March 14, 2025, One57 transferred $381,028.04 to Citibank, which amounts to past rent collected on the New York Property); Br. at 19-20 (representing that Lebois has not turned over at least $155,000 in rent payments from the New York Property). Defendants do not contest that the past rental income is in One57's possession. As a result, CPLR 5225(b)'s requirements govern, and the Court concludes that both are met. As explained in *Citibank II*, Citibank has already shown that Lebois has an interest in the property of One57 because Lebois and One57 are alter egos of one another. 714 F. Supp. 3d at 447. The lessee of One57 is required to pay $31,000 each month to

the owner, One57, and thus the prior writ of execution entitled Citibank to those rents.  *See* Dkt. 200-36 at 2.  Therefore, the Court authorizes the issuance of a turnover order with respect to the rental income from the leasing of the New York Property since September 15, 2023.

Citibank is also entitled to an order under CPLR 5226 directing One57 to make installment payments for rent it will receive under the present lease on the New York Property. CPLR 5226 provides:

> Upon motion of the judgment creditor, upon notice to the judgment debtor, where it is shown that the judgment debtor is receiving or will receive money from any source, or is attempting to impede the judgment creditor by rendering services without adequate compensation, the court shall order that the judgment debtor make specified installment payments to the judgment creditor.

N.Y. C.P.L.R. 5226.  Under CPLR 5226's "burden-shifting framework," the "judgment creditor must show that the judgment debtor is receiving or will receive money from any source." *Hamway v. Sutton*, 228 N.Y.S.3d 440, 447 (App. Div. 2025).  "If the judgment creditor makes that showing, the burden shifts to the judgment debtor to establish his or her reasonable requirements (and those of any dependents)." *Id.*

At the first step of the burden-shifting analysis, Citibank contends it is entitled to an installment payment order because it has shown Lebois will receive money in the form of rent paid for the New York Property.  Br. at 20-21.  Citibank has submitted a lease reflecting that the New York Property's current tenant has signed a lease through December 31, 2025.  Dkt. 200-36 at 2.  The monthly rent set forth in the lease is $31,000.  *Id.*  This satisfies Citibank's burden to show that One57 is receiving and will continue to "receive money from any source."

Proceeding to the second step of the burden-shifting analysis, the Court considers whether Lebois has "met his burden to establish his . . . reasonable requirements (and those of any dependents)." *Hamway*, 228 N.Y.S.3d at 447.  Lebois has not carried this burden — indeed,

he has not made any attempt to establish reasonable requirements that the Court should take into consideration in calculating the amount of the installment payments and does not object to the present motion.  Since "[i]t is the defendant's burden to establish such reasonable requirements" and Lebois has made no effort to do so, "the Court does not attempt to fix with specificity defendant's reasonable requirements."  *Lowy v. Bobker*, 383 F. Supp. 2d 606, 615-16 (S.D.N.Y. 2005).

Having considered the required factors, and without objection by Lebois or One57, the Court will require that One57 make installment payments to Citibank of $31,000 per month through December 31, 2025, based on rent due from the New York Property.

## VI.    The Miami Condos

Citibank also seeks a turnover order with respect to past rent from the Miami Condos since September 15, 2023, and an order directing Lebois to make installment payments to Citibank of all rental income that Lebois will receive from the leasing of the Miami Condos. OTSC at 2-3.  Defendants argue that Citibank is not entitled to either order because Luis Barroso ("Barroso"), another of Lebois's alleged creditors, has an interest in the Miami Condos.  Dfs. Opp. at 8-10.  The Court is not persuaded.

As for the turnover order for the past rental income in Lebois's possession or custody that has been received from the leasing of the Miami Condos since September 15, 2023, CPLR 5225(a)'s requirements govern.  "Under Section 5225(a), a judgment creditor may recover money or property owed a judgment creditor through a court order directing the turnover of such money or property to the judgment creditor, either directly or to the sheriff for sale." *245 Park Member LLC v. HNA Grp. (Int'l) Co.*, 674 F. Supp. 3d 28, 39 (S.D.N.Y. 2023).  "To obtain such an order, the judgment creditor need only establish that the judgment debtor owns and possesses the property at issue." *Id.*  "Once this showing is made, 'the court shall order that the judgment

debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor.'" *Id.* (quoting N.Y. C.P.L.R. 5225(a)).  Citibank has submitted five lease agreements between Lebois and the tenants of the Miami Condos listing Lebois as the owner of the Condos and directing the tenants to make payments to him.  *See generally* Dkt. 200-37.  Defendants argue in their brief that despite the plain terms of the lease agreements, Barroso, not Lebois, receives the rent payments for the Miami Condos.  Dfs. Opp. at 9.  According to Defendants, Lebois entered into a contract with Barroso on February 2, 2021, to transfer the Miami Condos to Barroso, but now "appears[] [to be] in breach of that contract," and thus, at some unspecified point, "arranged for Mr. Barroso to receive the rent payments." *Id.* at 9.  In support of this claim, Defendants direct the Court to two agreements signed with Barroso: (1) a December 17, 2020 Letter of Amendment agreement between Promexcap, Lebois's company, and Barroso under which Promexcap promised to pay Barroso through the transfer and payment in kind of property including the Miami Condos, Dkt. 229-9 at 7-8; *see* First Plotnicki Decl. ¶ 38; and (2) a February 2, 2021 "agreement for the recognition of debt and partial assignment of debt" between Promexcap, Lebois, and Barroso (the "Assignment"), Dkt. 229-10 at 11, under which Lebois agreed to "transfer[] and giv[e] in payment to Mr. Barroso the [Miami Condos]," *id.* at 13 (citing Dkt. 229-9); *see* Dkt. 229-9 at 7-8.  Given that Lebois is admittedly in breach of the Assignment, *see* Dfs. Opp. at 9, the Assignment does not establish that the Miami Condos were in fact transferred to Barroso, and the leases (some signed as recently as July and August 2025) still list Lebois as the owner, *see* Dkt. 200-37 at 3, 24, 45, 64, 83.  Other than argument in Defendants' brief, there is no record evidence of any past transfers of rent to Barroso or Barroso's future entitlements to any rents from the Miami Condos.  Because neither of the agreements shows that Barroso, as opposed to Lebois, receives rents from the Miami Condos, and because the leases

direct the tenants to pay rent to the owner who is listed as Lebois, the Court concludes that

Lebois is in possession of the rents for the purpose of the CPLR 5225(a) motion.  The Court thus

grants Citibank's application for a turnover order as to the past rent from the Miami Condos.

Citibank is also entitled to an installment payment order pursuant to Rule 69 and CPLR

5226 for future rental income from the Miami Condos under the present leases.  At the first step

of the burden-shifting analysis, *see Hamway*, 228 N.Y.S.3d at 447, Citibank contends it is

entitled to an installment payment order because it has shown Lebois will receive money in the

form of rent paid for the Miami Condos.  Br. at 19-21.  As with the New York Property, Citibank

directs the Court to lease agreements between Lebois and the tenants of the Miami Condos.  Two

of the lease agreements expired in August 2025, but the three still in effect entitle Lebois to

(1) $5,000 per month through July 4, 2026 for unit 1400, Dkt. 200-37 at 3; (2) $5,000 per month

for unit 1809 through November 19, 2025; *id.* at 24; and (3) $3,900 per month for unit 2006

through August 13, 2026, *id.* at 45.  Defendants repeat their argument that Lebois is not actually

receiving this rent because the rental income from the Miami Condos "go[es] to an interested

nonparty, Luis Barroso."  Dfs. Opp. at 3; *see also id.* at 9.  For the same reasons set forth above,

Defendants have not established (through evidence as opposed to argument in their brief) that

Barroso, not Lebois, will receive the rents from the Miami Condos.  As such, Citibank has

satisfactorily shown through the lease agreements that Lebois is receiving and will continue to

receive rent from the Miami Condos.  Proceeding to the second step of the burden-shifting

analysis, the Court again concludes that Lebois has not met his burden "to establish his . . .

reasonable requirements (and those of any dependents)."  *Hamway*, 228 N.Y.S.3d at 447; *see*

*supra* pp. 33-34.  Having considered the required factors, and exercising its discretion, the Court

will order Lebois to make installment payments based on rent due from the Miami Condos of

$13,900 a month through November 30, 2025; $8,900 a month from December 1, 2025 through July 4, 2026; and then $3,900 per month through August 13, 2026.  If future installments are sought based on additional leases, Citibank may make additional applications.

## VII.    Preliminary Injunction

Because the Court has now adjudicated the present motions and granted the turnover orders and orders for installment payments, Citibank's motion for a preliminary injunction is DENIED as moot.

## VIII.    Sealing

In making its *ex parte* motion, Citibank moved to seal certain documents and filed its briefs with redactions of references to the documents being filed under seal.  Dkts. 197, 237. These documents were filed under seal because of the initial *ex parte* procedural posture and/or confidentiality designations by the parties, not because the Court provisionally deemed them worth sealing based on their contents.  *See* Dkts. 197, 237.

First, the Court orders that all documents at Dkts. 200, 202, 204, and 236, including attachments thereto, shall be unsealed, with the exception of Exhibit 2 to the Kauff Declaration, Dkt. 202-2, and Exhibit 10 to the first Plotnicki Declaration, Dkt. 200-10.  Those documents shall remain under seal for the reasons articulated in *Citibank II*.  *See Citibank II*, 714 F. Supp. 3d at 451-52.

As for the remaining documents, "[t]he common law right of public access to judicial documents is firmly rooted in our nation's history."  *Stafford v. Int'l Bus. Machs. Corp.*, 78 F.4th 62, 69 (2d Cir. 2023) (citation omitted).  "The presumption of access is based on the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice."  *Id.* (citation omitted); *accord In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994)

(the "strong presumption of public access to court records . . . helps safeguard the integrity, quality, and respect in our judicial system" (quotation marks and citation omitted)).

The Second Circuit takes a three-step approach to sealing. "First, the court determines whether the record at issue is a 'judicial document' — a document to which the presumption of public access attaches." *Stafford*, 78 F.4th at 69-70 (citation omitted). "Second, if the record sought is determined to be a judicial document, the court proceeds to determine the weight of the presumption of access to that document." *Id.* at 70 (quotation marks and citation omitted). "Third, the court must identify all of the factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access." *Id.*

All of the documents at issue are judicial documents. *See Stafford*, 78 F.4th at 69-70. "A 'judicial document' or 'judicial record' is a filed item that is relevant to the performance of the judicial function and useful in the judicial process." *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (further quotation marks and citation omitted). Citibank submitted the documents in support of its motion for the issuance of turnover orders and an installment payment order, and for an order to show cause. These documents concern the value of the Art and Ocejos's attempts to resell the Art. Given that this action involves execution of a money judgment against the assets of various individuals and entities, including Lebois and Aralpa Investments, the documents are therefore plainly "relevant to the performance of the judicial function and useful in the judicial process." *Id.* (citation omitted). Indeed, the Court relied on many of these documents in issuing the initial TRO, and in ruling on the present Order to Show Cause.

The Court next considers the weight of the presumption in favor of access. *See Stafford*, 78 F.4th at 70. "The weight of the presumption is a function of (1) the role of the material at issue in the exercise of Article III judicial power and (2) the resultant value of such information to those monitoring the federal courts, balanced against competing considerations such as the privacy interests of those resisting disclosure." *Bernstein*, 814 F.3d at 142 (quotation marks and citation omitted). "[W]here documents directly affect an adjudication or are used to determine litigants' substantive legal rights, the presumption of access is at its zenith and thus can be overcome only by extraordinary circumstances." *Id.* (quotation marks and citations omitted). The Second Circuit has also held that a document "submitted to a court in connection with a summary-judgment motion is entitled to a strong presumption of access." *Id.* Although Citibank's motion here was not a summary-judgment motion, courts have analogized a Rule 69 proceeding to summary judgment. *See CSX Transp.*, 879 F.3d at 473; *Major League Baseball*, 2023 WL 2625794, at *3.

All of the documents — including the invoices for the Art, emails between Ocejos and various individuals related to selling the Art, and the Aralpa Investments LLC Agreement — directly affected the adjudication of this postjudgment proceeding and were used to determine substantive legal rights. The Court relied on these documents in the veil-piercing analysis in particular, which required a close examination of Lebois's involvement in Aralpa Investments' affairs, as well as in considering Aralpa Investments' efforts to sell the Art in violation of the Court's prior temporary restraining order. The information contained in these documents is valuable to citizens seeking to monitor the work of the federal courts, as is their right and civic duty. No party has contended that extraordinary circumstances are present here that would justify keeping any of the documents under seal.

At the third step, the Court "must identify all of the factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access." *Stafford*, 78 F.4th at 70 (citation omitted). At the Order to Show Cause hearing, Nonmovants did not make specific arguments for any of the documents to remain under seal. On the other hand, the public has a well-established interest in having access to documents involved in judicial proceedings. The Court finally notes that these documents were filed under seal because of the *ex parte* procedural posture or confidentiality designations by the parties, not because the Court provisionally deemed them worth sealing based on their contents.

For these reasons, Dkts. 200, 202, 204, and 236, including the attachments thereto, shall be unsealed, with the exception of Exhibit 2 to the Kauff Declaration, Dkt. 202-2, and Exhibit 10 to the first Plotnicki Declaration, Dkt. 200-10, which may remain under seal. In addition, the proposed redactions of the Brief, the First Plotnicki Declaration, and the Reply Brief are rejected. These redactions encompass information about the relationship between Aralpa Investments and Lebois, the value of the Art, and related topics. The information that is redacted was relevant to, and played a significant role in, the Court's decision to grant the TRO and to issue the turnover order as to the Art. The Court finds that the presumption of public access to these documents outweighs the privacy interests at stake. Therefore, Citibank shall file unredacted versions of these documents.

## CONCLUSION

The Court, having reviewed the present motions, and for the foregoing reasons, issues the following orders:

- Plaintiff's motions pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law 5225(b) regarding turnover of the Art and the appointment of Kauff Laton

Miller LLP as a receiver are GRANTED, and Aralpa Investments is ORDERED to immediately turn over the Art to Citibank's counsel as receiver, Kauff Laton Miller LLP, and Kauff Laton Miller LLP shall use an established auction house to conduct the auction of the Art;

- Plaintiff's motion pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law 5225(b) regarding turnover of past rent from the New York Property is GRANTED, and One57 is ORDERED to immediately pay to Plaintiff the rent from the New York Property collected since September 15, 2023;

- Plaintiff's motion pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law 5225(a) regarding turnover of past rent from the Miami Condos is GRANTED, and Lebois is ORDERED to immediately pay to Plaintiff the rent from the Miami Condos collected since September 15, 2023;

- Plaintiff's motion pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law 5226 regarding installment payments for future rent from the New York Property and Miami Condos is GRANTED, and One57 and Lebois are ORDERED to pay to Plaintiff the rent they will collect under the current leases for the New York Property and Miami Condos within five days of collection as follows:

  o Based on rent due from the New York Property, One57 shall make installment payments of $31,000 per month through December 31, 2025; and

  o Based on rent due from the Miami Condos, Lebois shall make installment payments of $13,900 a month through November 30, 2025; $8,900 a month from December 1, 2025 through July 4, 2026; and then $3,900 per month through August 13, 2026;

- Plaintiff's motion pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction is DENIED as moot; and

- Plaintiff shall file an unredacted version of the Brief, the First Plotnicki Declaration, and the Reply Brief by **October 10, 2025.**

The Clerk of Court is respectfully directed to unseal — that is, to convert to public view with no restrictions — all docket entries (including attachments) at Dkts. 200, 202, 204, and 236, except for Dkts. 200-10 and 202-2.

Dated:  October 3, 2025
       New York, New York

SO ORDERED.

_Jennifer Rochon_
JENNIFER L. ROCHON
United States District Judge